## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| YOUR CBD STORES FRANCHISING, LLC and SUNFLORA, INC., <br><br> Plaintiffs, <br><br> v. <br><br> NATUROIL GEORGIA, LLC and JEFFREY YABUKI, <br><br> Defendants. | Civil Action File No. <br><br> 1:22-cv-00286-TWT |

## <u>COMPLAINT</u>

Plaintiffs Sunflora, Inc. and Your CBD Stores Franchising, LLC (collectively, "Plaintiffs") make and file this Complaint against Defendants NaturOil Georgia, LLC, Amber Knowles, and Jeffrey Yabuki (collectively, "Defendants"), alleging as follows:

### NATURE OF THE ACTION

1.     In this action, Plaintiffs seek injunctive relief, attorneys' fees, and costs for Defendants' acts of willful trademark infringement, false designation of origin, and false advertising under the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, unfair competition and unfair trade practice under the Georgia Uniform Deceptive Trade

Practices Act, O.C.G.A. § 10-1-370 *et. seq.*, trademark infringement and unfair competition under Georgia common law, and breaches of five separate Franchise Agreements.

## PARTIES

2.     Plaintiff Sunflora, Inc. ("Sunflora") is a Florida corporation with a principal office address at 600 8th Ave W., Suite 400, Palmetto, FL 34221.

3.     Plaintiff Your CBD Store Franchising, LLC ("YCBDS") is a Florida limited liability company with a principal office address at 600 8th Ave W., Suite 400, Palmetto, FL 34221.  No member of YCBDS is a citizen of the State of Georgia.

4.     Defendant NaturOil Georgia, LLC ("NaturOil") is a Georgia limited liability company with a principal office address at 1300 Indian Trail Lilburn Rd NW, Suite 105, Norcross, GA, 30093.  NaturOil may be served through its registered agent and address: Jeffrey Yabuki, 761 Autumn Meadow Drive, Loganville, GA, 30052.

5.     Defendant Jeffrey Yabuki ("Yabuki") is a citizen and resident of the State of Georgia who resides within the jurisdictional territory of this Court.

6.     Defendant Amber Knowles ("Knowles") is a citizen and resident of the State of Georgia who resides within the jurisdictional territory of this Court.

**JURISDICTION AND VENUE**

7.     Defendants are subject to personal jurisdiction in this Court.  Amber Knowles and Jeffrey Yabuki are subject to personal jurisdiction because they are residents of Georgia, and NaturOil is subject to personal jurisdiction because its principal office location is in Georgia.

8.     This matter involves trademark misuse and infringement violating §§ 32 and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114 and 1125.

9.     This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. §§ 1114, 1116(a), and 1125(a) and 28 U.S.C. §§ 1331, 1338, and 1367.

10.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c).

**FACTUAL BACKGROUND**

**The Your CBD Store Franchise System**

11.     Sunflora owns valid and enforceable federal trademark registrations, or has applied for registration, for the following trademarks (the "Marks"):

| Mark | Serial Number | Filing Date | Registration Number | Registration Date |
|---|---|---|---|---|
| SUNFLORA | 88498238 | July 2, 2019 | 6009664 | March 20, 2020 |
|  | 88498448 | July 2, 2019 | 6049535 | May 05, 2020 |

| YOUR CBD STORE | 88498257 | July 2,2019 | 6092793 | June 30, 2020 |
|---|---|---|---|---|
|  | 6559104 | October 29, 2020 | 90285727 | November 16, 2021 |
| SUNMED | 90285710 88498224 90825611 | October 28, 2020 July 2, 2019 July 13, 2021 | Pending | Pending |

12.    Sunflora licenses the use of the Marks to YCBDS.  Per the terms of the licensing agreement between Sunflora and YCBDS, YCBDS is authorized to sublicense the Marks to entities that enter into a franchising agreement with YCBDS.

13.    YCBDS grants franchises to qualified persons for the operation of Your CBD Store franchised businesses, which employ the YCBDS branded proprietary system for operating a retail cannabidiol business with exclusive rights to sell award-winning, hemp-derived SUNMED and SUNFLORA cannabidiol products (the "YCBDS Franchise System").

14.    The YCBDS Franchise System is characterized by, among other things: uniform standards and procedures for business operations; trade secrets and confidential information, procedures and strategies for sales, marketing, advertising, and promotions; business techniques; a confidential and proprietary Operations Manual; supplier relationships; training courses; and ongoing support and education.

15.     The products offered by YCBDS franchises are of top quality as they undergo rigorous testing protocols for potency and content by nationally recognized independent third-party labs that are widely available to the consumers and public officials.    Several of YCBDS's products are subject to clinical trials to assess efficiency and safety.    YCBDS products focus on the wellness of consumers and provide healthy natural alternatives to anxiety, sleep, pain, inflammation, skin care and beauty, and even weight loss. Many YCBDS products are USDA Certified Organic, vegan, natural, caffeine and sugar free, GMO and stimulant free.

16.     To maximize marketing, improve sales and margins, preserve quality control, safeguard consumers, and maintain brand integrity, YCBDS franchisees are required to only sell YCBDS products.

17.     YCBDS trains franchisees in the efficacies and functions of its products and in the use and operation of the YCBDS Franchise System, including imparting trade secrets and confidential information.    YCBDS requires its franchisees to operate their YCBDS franchised businesses in accordance with written franchise agreements.

18.     YCBDS has invested considerable time, effort, and resources to develop the business methods, specialized services, trade secrets, confidential information, Marks, advertising materials, marketing strategies, brand value,

supplier relationships, and training techniques for use in YCBDS franchised businesses.

19.    The Operations Manual, specifications, supplier relationships, pricing, sales techniques, customer relationship practices, uniform standards and procedures for business operations, procedures and strategies for sales, marketing, advertising and promotions, testing processes, supplier relationships, client relationships, customer lists, treatment protocols, and training curricula and methods, in addition to other non-public valuable YCBDS information, all of which are provided to and shared with YCBDS franchisees, are proprietary trade secrets and confidential information belonging to YCBDS. All proprietary, confidential, and trade secret information, including but not limited to that disclosed to or used by franchises in the operation of the YCBDS franchised business, is collectively referred to as "Confidential Information."

20.    Trade Secrets and YCBDS Franchise System components are licensed to YCBDS franchisees and authorized for use only pursuant to the franchise agreement between YCBDS and each franchisee.  Trade Secrets, the Operations Manual, and other components of the YCBDS Franchise System are protected from unauthorized use or disclosure pursuant to the terms of the franchise agreement and

collateral, but vitally important, agreements, including Personal Covenants and Guarantee Agreements.

21.     Typically, YCBDS franchisees, including Defendants, would not have any significant knowledge about how to operate an elite cannabidiol retail business without the Trade Secrets and other documentation and training provided by YCBDS.

**Defendants' Contractual Agreements with YCBDS**

22.     Between June 9, 2020 and August 6, 2020, NaturOil executed five (5) franchise agreements with YCBDS, one for each of the following locations: Conyers, GA, Loganville, GA, Macon, GA, Monroe, GA, and Warner Robbins, GA (the "Franchise Agreements").

23.     At all times pertinent to this action, NaturOil has been owned by Defendants Knowles and Yabuki.

24.     Knowles and Yabuki signed Personal Covenants for each of the Franchise Agreements.  Under each Personal Covenant, Knowles and Yabuki agreed to be personally bound by Sections 20.1 and 20.3 of the Franchise Agreements.

25.     In Section 9 of the Franchise Agreements, NaturOil acknowledged and agreed that all products sold by NaturOil must be purchased from Sunflora, YCBDS, or another supplier expressly approved by YCBDS in writing, and they also agreed

that this sourcing requirement was critical to the success of the YCBDS Franchise System because of the latter's reputation for quality products.

26.    Under Section 11.5 of the Franchise Agreements, NaturOil was obligated to seek approval from YCBDS prior to publishing, advertising or marketing materials, and it was prohibited from conducting any digital marketing, advertising, or promotion through the Internet without express prior written approval from YCBDS.  NaturOil was also prohibited from conducting any advertising or promotion that was factually inaccurate or that detrimentally affected the Marks or the YCBD Franchise System, as determined in YCBDS' sole discretion.

27.    In Section 15.1 of the Franchise Agreements, NaturOil acknowledged and agreed that the Marks were the sole and exclusive property of YCBDS, and in Section 15.2, NaturOil agreed to only use the Marks in the manner authorized and permitted by YCBDS.

28.    In Section 20.1 of the Franchise Agreements, NaturOil and its owners agreed to a covenant not to compete with YCBDS.  Accordingly, NaturOil and its owners are contractually prohibited from having a direct or indirect interest with a competitor of YCBDS or for providing service for a competitor or YCBDS within a five (5) mile radius of any YOUR CBD STORE location.  The covenant not to

compete applies for a period of two (2) years following any termination of the Franchise Agreements.

29.    Under Section 20.1(iii) of the Franchise Agreements, a competitive business of YCBDS is any business engaged in the retail or wholesale production or sale of herbal and nutritional supplements containing lawful cannabidiol/CBD from industrial hemp, and that derives more than fifty percent (50%) of its revenue from sales of CBD products.

30.    Section 20.1 of the Franchise Agreements provides that YCBDS may receive injunctive relief to enforce the covenant not to compete without the necessity of posting bond or other security.

31.    In Section 20.3 of the Franchise Agreements, NaturOil and its owners are contractually prohibited from disclosing, publishing, copying, or using any of YCBDS' proprietary or Confidential Information for a period of five (5) years following any termination of the Franchise Agreements.  Furthermore, Section 20.3 obligates NaturOil and its owners to immediately return any copies of documents containing YCBDS' Confidential Information upon YCBDS' request.

32.    In Section 20.6 of the Franchise Agreements, NaturOil and its owners acknowledged and agreed that (i) the covenants and restrictions in Sections 20.1 and 20.3 of the Agreements were reasonable, appropriate, and necessary to protect the

YCBDS Franchise System, other YCBDS franchisees, and the legitimate interest of YCBDS, and (ii) the same covenants and restrictions do not cause undue hardship on NaturOil or any of the other individuals required to comply with the covenants and restrictions.

33.    In Section 19.2 of the Franchise Agreements, NaturOil is prohibited from selling, assigning, transferring, merging, conveying, or encumbering any of its YCBDS franchised stores, the Franchise Agreements, or any of its rights or obligations thereunder without the prior express written consent of YCBDS.   In Section 23 of the Franchise Agreements, NaturOil agreed to grant YCBDS a right of first refusal to purchase any interest in a YCBDS franchise or store if NaturOil received a bona fide offer from a prospective purchaser.

34.    Knowles and Yabuki also signed Guaranty Agreements for each of the Franchise Agreements, by which they personally guaranteed the performance of NaturOil under the Franchise Agreements.

**Defendants' Breach of the Contractual Agreements with YCBD**

35.    On November 19, 2021, YCBDS gave NaturOil and Yabuki written notice of NaturOil's default of each of the five (5) Franchise Agreements.

36.    YCBDS notified NaturOil that it was in breach of each of the Franchise Agreements for the Conyers, Loganville, Macon, and Warner Robbins locations for

(i) having signage in and outside of the store making efficacy claims with respect to Plaintiffs' products, and (ii) selling substantial amounts of unauthorized products, specifically products from a competing cannabidiol retailer, Budzburn, which is endorsed by marijuana activist Tommy Chong and reputed to exceed maximum state and federal legal thresholds for the maximum amount of Delta-THC permitted in cannabidiol products.

37.    YCBDS also notified NaturOil that it was in breach of the Franchise Agreement for the Monroe, GA location by having transferred the interest and assets of the store to a third-party without first offering them to YCBDs as required under Section 23 of the Franchise Agreement.

38.    NaturOil failed to cure the defaults of the Franchise Agreements.

39.    On December 30, 2021, YCBDs terminated the five (5) Franchise Agreements.  In its termination notice, YCBDs demanded, among other things, that effective immediately, NaturOil:

– remove all signage and other items carrying Sunflora or YCBDs logos, trademarks, or trade dress;

– remove anything identifying any of its five (5) formerly franchised YCBDS locations as a YOUR CBD STORE franchise;

- honor all covenants not to compete contained within the NaturOil Franchise Agreements;

- return YCBD's Operations Manuals and immediately cease use of any and all Confidential Information contained therein or otherwise provided to NaturOil as a franchisee;

- cancel all assumed names NaturOil has filed for any of the Marks;  and

- fully comply with any other post-termination obligations of the Franchise Agreements and the Operations Manual.

40.     On or about January 14, 2022, YCBDS sent NaturOil and its counsel a Final Cease-and-Desist letter, demanding compliance with NaturOil's post-termination obligations under the Franchise Agreements.

41.     To date, NaturOil has not acknowledged receipt of the Final Cease and Desist letter and has not agreed to comply with its obligations under the Franchise Agreements.

42.     Notwithstanding an Arbitration provision in the Franchise Agreements, under Section 31.1 of the Agreements YCBDS is expressly entitled to obtain injunctive relief against threatened conduct that will cause irreparable harm to YCBDS.

## COUNT 1[1]
### Trademark Infringement of the YOUR CBD STORE Mark
### Under Section 32 of the Lanham Act
### (15 U.S.C. § 1114)

43.    Plaintiff Sunflora owns, and YCBDS has license to use, a valid and enforceable federal trademark registration for the standard character YOUR CBD STORE mark (Registration No. 6092793).

44.    Under Section 15.2(i) of the Franchise Agreements, any unauthorized use of the YOUR CBD STORE mark is an infringement of Plaintiffs' trademark rights.

45.    Following termination of the Franchise Agreements by YCBDS on December 30, 2021, NaturOil's continued use of the YOUR CBD STORE mark is unauthorized by Plaintiffs.

46.    Defendants' use of the YOUR CBD STORE mark on their storefronts and within their stores is likely to cause confusion, deception, and mistake by creating the false and misleading impression that Defendants have a contractual license to goods that are produced or distributed by Plaintiffs, are associated or connected with Plaintiffs, or have the sponsorship, endorsement, or approval of

---

[1] All Defendants are jointly and severally liable for each claim.

Plaintiffs, and as such constitutes infringement of the YOUR CBD STORE mark in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

47.     Unless enjoined, Defendants will continue to cause a likelihood of confusion and deception of members of the public and, additionally, injury to Plaintiffs' goodwill and reputation as embodied in the YOUR CBD STORE mark, for which Plaintiffs have no adequate remedy at law.

48.     Defendants' actions demonstrate an intentional, willful, and malicious intent to trade on the goodwill associated with Sunflora's federally registered YOUR CBD STORE mark to Plaintiffs' great and irreparable injury.

49.     Defendants have caused and are likely to continue causing substantial injury to Plaintiffs, and Plaintiffs are entitled to injunctive relief and to recover Defendants' profits, actual damages, enhanced profits and damages, costs, and reasonable attorneys' fees under 15 U.S.C. §§ 1114, 1116, and 1117.

**COUNT 2**
**Trademark Infringement of the SUNFLORA and SUNMED Marks**
**Under Section 32 of the Lanham Act**
**(15 U.S.C. § 1114)**

filed for registration of the standard character SUNMED mark (Serial No. 90285710), which is used in commerce (collectively, the "SUNFLORA Marks").

51.     Under Section 15.2(i) of the Franchise Agreements, any unauthorized use of the SUNFLORA Marks is an infringement of Plaintiffs' trademark rights.

52.     Following termination of the Franchise Agreements by YCBDS on December 30, 2021, NaturOil's continued use of the SUNFLORA Marks in advertising or promotional material is unauthorized by Plaintiffs.

53.     Defendants' use of the SUNFLORA Marks on their storefronts and within their stores is likely to cause confusion, deception, and mistake by creating the false and misleading impression that Defendants have a contractual license to goods that are produced or distributed by Plaintiffs, or are associated or connected with Plaintiffs, or have the sponsorship, endorsement, or approval of Plaintiffs, and as such constitutes infringement of the SUNFLORA Marks in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

54.     Unless enjoined, Defendants will continue to cause a likelihood of confusion and deception of members of the public and, additionally, injury to Plaintiffs' goodwill and reputation as embodied in the SUNFLORA Marks, for which Plaintiffs have no adequate remedy at law.

55.    The damage and injuries to the SUNFLORA Marks, to the YCBDS Franchise System, including other YCBDS franchisees, and to Plaintiffs is immediate and irreparable, and will continue so long as the Defendants continue to use the SUNFLORA Marks.

56.    Defendants' actions demonstrate an intentional, willful, and malicious intent to trade on the goodwill associated with Sunflora's federally registered SUNFLORA Marks to Plaintiffs' great and irreparable injury.

57.    Defendants have caused and are likely to continue causing substantial injury to the public and to Plaintiffs, and Plaintiffs are entitled to injunctive relief and to recover Defendants' profits, actual damages, enhanced profits and damages, costs, and reasonable attorneys' fees under 15 U.S.C. §§ 1114, 1116, and 1117.

## COUNT 3
### False Designation of Origin Concerning Plaintiffs' Marks
### Under Section 43 of the Lanham Act
### (15 U.S.C. § 1125)

58.    Defendants were licensed to use the Plaintiffs' Marks as set forth in the Franchise Agreements.    Defendants contractually acknowledged that any unauthorized use of any of Plaintiffs' Marks constituted infringement of YCBDS', and through it Sunflora's, trademark rights.

59.    YCBDS terminated the Franchise Agreements in part because NaturOil sold substantial amounts of unauthorized products in its YCBDS franchised location

in violation of the Franchise Agreements, specifically products from a competing cannabidiol retailer, Budzburn, which YCBDS considers inferior to YCBDS' products, below YCBDS quality standards, and possibly illegal in the State of Georgia.

60.    Defendants continued sale of Budzburn products (and other third-party products) alongside products bearing the SUNFLORA Marks in their stores bearing YOUR CBD STORE signs is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Plaintiffs' Marks with Budzburn, or as to the origin, sponsorship, or approval of Budzburn goods, services, or commercial activities by Plaintiffs, which constitutes a false designation of origin or false and misleading representation of fact in violation of 15 U.S.C. § 1125(a)(l).

61.    The customer confusion and deception caused by Defendants' unauthorized use of Plaintiffs' Marks have caused and continues to cause injury and damage to Plaintiffs and the Marks.   These injuries include loss of goodwill associated with the Plaintiffs' Marks mark and adverse effects to the integrity of the YCBDS Franchise System.

62.    The damage and injuries to the Marks, to the YCBDS Franchise System, including other YCBDFS franchisees, and to Plaintiffs is immediate and irreparable, and will continue so long as the Defendants continue to sell unauthorized

third-party products alongside Plaintiffs' products in stores bearing the YOUR CBD STORE mark.

63.    Defendants' actions demonstrate an intentional, willful, and malicious intent to trade on the goodwill associated with Plaintiffs' Marks to Plaintiffs' great and irreparable injury.

64.    Plaintiffs are entitled to injunctive relief and to recover Defendants' profits, actual damages, enhanced profits and damages, costs, and reasonable attorneys' fees under 15 U.S.C. §§ 1114, 1116, and 1117.

**COUNT 4**
**False Advertising of Plaintiffs' Marks**
**Under Section 43 of the Lanham Act**
**(15 U.S.C. § 1125)**

65.    Defendants were licensed to use the SUNFLORA Marks as set forth in the Franchise Agreements.  Defendants contractually acknowledged that any unauthorized use of any of Plaintiffs' Marks constituted infringement of YCBDS', and through it Sunflora's, trademark rights.

66.    YCBDS terminated the Franchise Agreements in part because NaturOil made claims about the therapeutic efficacy of SUNFLORA and SUNMED labeled products without authorization from YCBDS or Sunflora.

67.    Defendants continued sale of SUNFLORA and SUNMED products in their stores contemporaneous with unauthorized commercial advertisements or

promotions about the efficacy of those products misrepresents the nature, characteristics, and qualities of SUNFLORA and SUNMED marked products, which constitutes a false designation of origin or false and misleading representation of fact in violation of 15 U.S.C. § 1125(a)(l), **and which risks placing Plaintiffs in violation of several food and drug administration regulations prohibiting such efficacy claims.**

68.   The customer confusion and deception caused by Defendants' unauthorized representations about SUNFLORA and SUNMED marked products have caused and continues to cause injury and damage to Plaintiffs and the Marks. These injuries include loss of goodwill associated with the SUNFLORA Marks and adverse effects to the integrity of the YCBDS Franchise System.

69.   The damage and injuries to the Marks, to the YCBDS Franchise System, including other YCBDS franchisees, and to Plaintiffs is immediate and irreparable, and will continue unless Defendants are enjoined from making representations about SUNFLORA and SUNMED products sold in their stores.

70.   Plaintiffs are entitled to injunctive relief and to recover Defendants' profits, actual damages, enhanced profits and damages, costs, and reasonable attorneys' fees under 15 U.S.C. §§ 1114, 1116, and 1117.

**COUNT 5**
**Violation of the Georgia Deceptive Trade Practices Act**
**(O.C.G.A. §§ 10-1-370, *et seq.*)**

71.     In committing the aforesaid actions, Defendants have engaged in acts which have caused and will continue to cause a likelihood of confusion or misunderstanding as to the source, sponsorship, approval, affiliation, or connection of Plaintiffs' and their products and Defendants and third-party products sold by Defendants.

72.     Defendants' conduct constitutes unfair competition and unfair trade practice in violation of Georgia law, including the Georgia Uniform Deceptive Trade Practices Act, O.C.G.A. §§ 10-1-370 *et seq.*

73.     Defendants' actions have caused and, unless preliminarily and permanently enjoined by the Court, will continue to cause irreparable harm to Plaintiffs, their businesses, and their Marks for which there is no adequate remedy at law.

74.     Defendants' conduct has been willful and deliberate and in bad faith, thus entitling Plaintiffs to recover attorneys' fees and costs pursuant to O.C.G.A. §§ 10-1-373(b).

## COUNT 6
## Common Law Trademark Infringement

75.     Defendants' unauthorized use in commerce of the Marks and colorable imitations thereof as alleged herein is likely to deceive consumers as to the origin, source, sponsorship, or affiliation of Defendants' goods, and is likely to cause consumers to believe, contrary to fact, that Defendants' goods are authorized, endorsed, or sponsored by Plaintiffs, or that Defendants are in some way affiliated with or sponsored by Plaintiffs. Defendants' conduct therefore constitutes trademark infringement in violation of the common law of the State of Georgia.

76.     Defendants have committed the foregoing acts of infringement with full knowledge of Plaintiffs' prior rights in the Marks and with the willful intent to cause confusion and trade on Plaintiffs' goodwill.

77.     Defendants' conduct is causing immediate and irreparable harm and injury to Plaintiffs, and to their goodwill and reputation, and will continue to both damage Plaintiffs and confuse the public unless enjoined by this Court. Plaintiffs have no adequate remedy at law.

78.     Plaintiffs are entitled to, among other relief, injunctive relief to enjoin Defendants from infringing use of the Marks.

## COUNT 7
### Common Law Unfair Competition

79.    Defendants' unauthorized use in commerce of the Marks as alleged herein is likely to deceive consumers as to the origin, source, sponsorship, or affiliation of Defendants' goods, and is likely to cause consumers to believe, contrary to fact, that Defendants' goods are sold, authorized, endorsed, or sponsored by Plaintiffs, or that Defendants are in some way affiliated with or sponsored by Plaintiffs.

80.    Defendants' unauthorized use in commerce of the Marks as alleged herein constitutes use of a false designation of origin and misleading description and representation of fact.

81.    Defendants' conduct as alleged herein is willful and is intended to and is likely to cause confusion, mistake, or deception as to the affiliation, connection, or association of Defendants with Plaintiffs.

82.    Defendants' conduct as alleged herein constitutes unfair competition in violation of the common law of the State of Georgia.

83.    Defendants' conduct as alleged herein is causing immediate and irreparable harm and injury to Plaintiffs, and to their goodwill and reputation, and will continue to both damage Plaintiffs and confuse the public unless enjoined by this court. Plaintiffs do not adequate remedy at law.

84.     Plaintiffs are entitled to, among other relief, injunctive relief to enjoin Defendants from unfairly competing with Plaintiffs via unauthorized use of the Marks.

## COUNTS 8, 9, 10, 11, AND 12[2]
### Breach of the Franchise Agreements
### YCBD against all Defendants

85.     The duties and obligations set forth in the Franchise Agreements are binding upon Defendants.

86.     Section 31 of the Franchise Agreements provide that Florida law governs the interpretation and construction of the Franchise Agreement (without regard to its conflicts of laws provisions); however, Section 31 also provides that Georgia law applies to the construction and enforcement of the obligations set forth in Section 20.1.

87.     NaturOil breached Section 9 of the Franchise Agreements for the Conyers, Loganville, Macon, and Warner Robbins YCBDS franchised locations by selling substantial amounts of third-party products without authorization from YCBD.

---

[2] One claim for each of the five (5) Franchise Agreements between YCBD and NaturOil.

88.     NaturOil breached Sections 11.5 of each of the Franchise Agreements for the Conyers, Loganville, Macon, and Warner Robbins YCBDS franchised locations by having signage in and outside of the store making efficacy claims with respect to SUNFLORA and SUNMED products.

89.     NaturOil breached Sections 19.2 and 23 of the Franchise Agreement for the Monroe YCBDS franchised location by selling the store to a third-party without first giving YCBDS a right of first refusal.

90.     YCBDS gave NaturOil notice of NaturOil's default of the Franchise Agreements on or about November 19, 2021.  YCBDS terminated the Franchise Agreements over thirty (30) days later, when NaturOil had failed in that time to cure the defaults.

91.     YCBDS acted justifiably and within its rights under the Franchise Agreements in declaring them terminated.

92.     Following the effective date of termination, NaturOil breached Section 22.2 of each of the Franchise Agreements for the Conyers, Loganville, Macon, and Warner Robbins YCBDS franchised locations by failing to comply with its post-termination obligations.  NaturOil have failed to remove all signage and other items carrying Sunflora or YCBDS logos, trademarks, or trade dress; failed to remove any indicia that its five (5) former YCBDS franchised locations were affiliated with

YBCDS; have failed to honor all covenants not to compete contained within the NaturOil Franchise Agreements; and have failed to delete electronic copies of YCBDS' Operations Manuals, consumer lists, and immediately cease use of and delete any and all Confidential Information contained therein or otherwise provided to NaturOil as a franchisee.

93.    Defendants have also breached the post-termination obligations in Sections 20.1 of the Franchise Agreements by operating cannabidiol retail stores (the former YCBDS locations in Conyers, Loganville, Macon, and Warner Robbins) in competition with YCBDs.

94.    Defendants have also breached the post-termination obligations in Sections 20.3 of the Franchise Agreements by continuing to use YCBDs' proprietary and Confidential Information and by failing to immediately delete any electronic documents containing YCBDS' Confidential Information in response to YCBDS' requests.

95.    Defendants have no defense or justification for their many breaches of the Franchise Agreements.

96.    Defendants' breaches of the Franchise Agreements are material and ongoing. They have caused and continue to cause immediate and irreparable damage injury and damage to YCBDS, the Marks, and the YCBDS Franchise

System.    These  injuries  include  loss  of  income  from  Defendants'  sale  of unauthorized, off-brand products, loss of goodwill associated with the YOUR CBD STORE mark, adverse effects to the integrity of the YCBDS Franchise System, and compromise or loss of Plaintiffs' valuable Trade Secrets.

97.    YCBDS is entitled to temporary, preliminary, and permanent injunctive relief.

98.    The harm caused by Defendants' breaches of the Franchise Agreements will  continue  unless  YCBDS  is  granted  temporary,  preliminary,  and  permanent injunctive relief against Defendants.

99.    Under Section 32 of the Franchise Agreements, YCBD is entitled to reimbursement from Defendants of its costs and expenses incurred in enforcing the Franchise Agreements, including its reasonable attorney's fees.

## **PRAYER FOR RELIEF**

WHEREFORE, having fully pled, Plaintiffs pray for an Order of this Court awarding it equitable and legal relief against the Defendants as follows:

1.    Granting preliminary and injunctive relief against Defendants and all others associated with, under the direction of, or claiming rights through any of the Defendants, requiring each of the Defendants to:

(a)     Immediately cease using Plaintiffs' proprietary, confidential, and trade secret information, including but not limited to that disclosed to or used by Defendants in the operation of the former YCBDS franchised businesses;

(b)     Within five (5) business days, return to YCBDS all original and copies of YCBD's Operations Manuals and all other materials, media (including, but not limited to, electronic and archive storage media) and documents that contain, summarize, or reflect Plaintiffs' Confidential information;

(c)     Within five (5) business days to sell back to YCBDS at cost all YOUR CBD STORE, SUNFLORA, and SUNMED products in Defendants' stores;

(d)     Within five (5) business days to remove from their stores all signage and other items carrying Sunflora or YCBDS logos, trademarks, or trade dress, including Plaintiffs' Marks, and to remove any other material that would indicate an affiliation between Defendants' five (5) formerly franchised YCBD stores and Plaintiffs;

(e)     Within five (5) business days, remove all websites or social media pages any content with infringing use of Plaintiffs' Marks, and to remove any other material that would indicate an affiliation between Defendants' five (5) formerly franchised YCBDS stores and Plaintiffs;

(f)     Within five (5) business days, post a conspicuous notice of the following statement in each of Defendants' stores and on any websites or social media pages for Defendants' stores: "This business is not associated with, sponsored by, or endorsed by YOUR CBD STORE, SUNFLORA, or SUNMED," and requiring that the Defendants maintain such notice(s) for a period of three (3) months.

(g)     Within five (5) business days, cease operating each of their four (4) remaining competitive stores, or any other competitive business, from any former YCBDS franchise location, until such time as Defendants can show that less than fifty percent (50%) of each store's revenue derives from sales of cannabidiol or CBD products.

2.     Awarding Plaintiffs their costs and attorney's fees in bringing this action, pursuant to Section 32 of each Franchise Agreement, 15 U.S.C. § 1117(a), and 10-1-373(b).

3.     Acknowledging Plaintiffs' rights to pursue legal damages for the abovementioned claims through Arbitration, pursuant to Section 31.2 of each of the Franchise Agreements.

4.     For such other relief as is just and proper.

02231593-5

Respectfully submitted this 24th day of January, 2022.

TAYLOR ENGLISH DUMA LLP

*/s/ Michael S. Rosenthal*
Michael S. Rosenthal
GA Bar No. 614750
A. Binford Minter
GA Bar No. 117844
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339
770.434.6868
mrosenthal@taylorenglish.com
bminter@taylorenglish.com

*Attorneys for Plaintiff*

EXHIBIT A
TO
COMPLAINT

DocuSign Envelope ID: A00B65BA-5C73-4345-B658-503992A4FB2E

# DO NOT SIGN THE FRANCHISE AGREEMENT UNTIL 7 DAYS AFTER FIRST VIEWING



# YOUR CBD STORES
# FRANCHISING, LLC

# FRANCHISE AGREEMENT

2020 FA v.2
2020 FDD and FA v.3a
01701353-1

# TABLE OF CONTENTS
## YOUR CBD STORES FRANCHISING, LLC
## FRANCHISE AGREEMENT

SECTION 1  GRANT OF FRANCHISE ................................................................ 2
SECTION 2  TERM AND RENEWAL ................................................................. 2
    2.1  Initial Term ............................................................................ 2
    2.2  Renewal ................................................................................ 2
SECTION 3  FRANCHISED SITE AND TERRITORY .................................... 3
    3.1  Franchised Site ...................................................................... 3
    3.2  Territorial Protection ............................................................ 4
    3.3  Reservation of Rights ........................................................... 4
SECTION 4  INITIAL FRANCHISE FEE; INITIAL INVENTORY PURCHASE AND
    MONTHLY MINIMUM PURCHASE REQUIREMENTS ............... 5
    4.1  Initial Franchise Fee ............................................................. 5
    4.2  Initial Inventory Purchase .................................................... 5
    4.3  Minimum Product Purchases ................................................ 5
SECTION 5  ROYALTY FEE; METHOD OF PAYMENT; LATE PAYMENT ........ 6
    5.1  Royalty Fee ........................................................................... 6
    5.2  Definition of Gross Sales ..................................................... 6
    5.3  Automated Bank Draft .......................................................... 6
    5.4  Late Payments and Insufficient Funds ................................. 6
    5.5  Application of Payments ....................................................... 6
SECTION 6  RECORDS, REPORTS, AND AUDITS ......................................... 7
    6.1  Bookkeeping and Recordkeeping .......................................... 7
    6.2  Reporting .............................................................................. 7
    6.3  Audit .................................................................................... 8
SECTION 7  OPERATIONS MANUAL ............................................................. 8
SECTION 8  MODIFICATION AND IMPROVEMENTS TO YOUR CBD STORE™ SYSTEM 9
    8.1  Modification by Franchisor ................................................... 9
    8.2  Modification by Franchisee ................................................... 9
SECTION 9  OBLIGATIONS OF FRANCHISEE .............................................. 9
SECTION 10  TECHNOLOGY SYSTEMS AND WEBSITE ........................... 13
    10.1  Point of Sale System .......................................................... 13
    10.2  Website .............................................................................. 13
SECTION 11  ADVERTISING ......................................................................... 14
    11.1  Grand Opening ................................................................... 14
    11.2  Advertising Fund ............................................................... 14
    11.3  Local Advertising ............................................................... 15
    11.4  Advertising Cooperatives ................................................... 16
    11.5  Approval of Advertising .................................................... 16
SECTION 12  COUNSELING AND ADVISORY SERVICES AND ONSITE ASSISTANCE ....... 17
SECTION 13  OPENING ASSISTANCE .......................................................... 17
SECTION 14  TRAINING ................................................................................ 17
    14.1  Initial Training ................................................................... 17
    14.2  Training of Employees ....................................................... 18
    14.3  Additional Training ............................................................ 18
    14.4  Conferences ....................................................................... 18
    14.5  Requirements to Attend Training ....................................... 18

2020 FA v.2
2020 FDD and FA v.3a
01701353-1

| | | |
|---|---|---|
| SECTION 15. | MARKS | 18 |
| | 15.1 Ownership of the Marks | 18 |
| | 15.2 Use of the Marks | 19 |
| | 15.3 Infringement | 19 |
| | 15.4 Substitute Marks | 20 |
| SECTION 16 | RELATIONSHIP OF THE PARTIES | 20 |
| SECTION 17 | MAINTENANCE OF CREDIT STANDING | 20 |
| SECTION 18 | INDEMNIFICATION, INSURANCE AND TAXES | 20 |
| | 18.1 Indemnification | 20 |
| | 18.2 Insurance | 21 |
| | 18.3 Taxes | 22 |
| SECTION 19 | ASSIGNMENT | 22 |
| | 19.1 Assignment by Franchisor | 22 |
| | 19.2 Assignment by Franchisee | 22 |
| | 19.3 Death or Disability of Franchisee | 23 |
| | 19.4 Approval of Assignment | 23 |
| | 19.5 Removal of General partner | 24 |
| 20. | RESTRICTIVE COVENANTS | 24 |
| | 20.1 Covenants not to Compete | 24 |
| | 20.2 Non-Solicitation of Employees | 25 |
| | 20.3 Trade Secrets and Confidential Information | 25 |
| | 20.4 Personal Covenants of Certain Bound Parties | 26 |
| | 20.5 Agreements by Other Third parties | 26 |
| | 20.6 Reasonable restrictive Covenants | 26 |
| 21. | TERMINATION | 26 |
| | 21.1 Termination by Franchisee | 26 |
| | 21.2 Termination by Franchisor without a Cure Period | 26 |
| | 21.3 Termination by Franchisor with a Cure Period | 28 |
| | 21.4 Management of Store by Franchisor | 28 |
| 22. | EFFECT OF AND OBLIGATIONS UPON TERMINATION | 29 |
| | 22.1 Liquidated Damages | 29 |
| | 22.2 Obligations upon Termination or Expiration | 29 |
| | 22.3 Sale Upon Expiration or Termination | 30 |
| | 22.4 Effect of Expiration or Termination | 31 |
| 23. | RIGHT OF FIRST REFUSAL | 31 |
| 24. | STORE CLASSIFICATION | 32 |
| 25. | OTHER BUSINESS | 32 |
| 26. | OWNERSHIP OF FRANCHISEE | 32 |
| 27. | SUCCESSORS AND THIRD PARTY BENEFICIARIES | 32 |
| 28. | CONSTRUCTION | 32 |
| 29. | INTERPRETATION AND HEADINGS | 33 |
| 30. | NOTICES | 33 |
| 31. | GOVERNING LAW AND ENFORCEMENT | 33 |
| | 31.1 Governing Law | 33 |
| | 31.2 Arbitration | 34 |
| | 31.3 Damages and Timing of Claims | 35 |
| 32. | COSTS AND ATTORNEYS' FEES | 35 |
| 33. | WAIVER | 35 |
| 34. | SEVERABILITY | 35 |
| 35. | FORCE MAJEURE | 35 |
| 36. | DELEGATION BY FRANCHISOR | 36 |
| 37. | REVIEW OF AGREEMENT | 36 |
| 38. | NO RIGHT TO SET OFF | 36 |
| 39. | CUMULATIVE RIGHTS | 36 |

40.  ENTIRE AGREEMENT                                                    36
41.  COUNTERPARTS                                                        36
42.  FRANCHISEE'S ACKNOWLEDGMENTS                                        37
      42.1  Success Depends on Franchisee and No Warranties              37
      42.2  Anti-Terrorism Laws                                          37

## EXHIBITS

EXHIBIT A        Franchised Site, Franchised Territory and Franchise Fee
EXHIBIT B        Personal Covenants
EXHIBIT C        Internet Web Sites and Listings Agreement
EXHIBIT D        Telephone Listing Agreement
EXHIBIT E        Franchisee Information
EXHIBIT F        Guarantee Agreement
EXHIBIT G        State Specific Addenda
EXHIBIT H        Collateral Assignment of Lease

2020 FA v.2
2020 FDD and FA v.3a
01701353-1

# YOUR CBD STORES FRANCHISING, LLC
## FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT (this "Agreement") is made and entered into this 6/9/2020 (the "Effective Date"), by and between YOUR CBD STORES FRANCHISING, LLC, a Florida limited liability company ("Franchisor") with its principal office at 411 19th Street South, St. Petersburg, FL 33712, and NaturOil Georgia, a Limited Liability Company, with (its principal office) (his/her residence) at 1300 Indian Trail Lilburn Trail Rd. NW #105,  Norcross, GA  30093 ("Franchisee").

W I T N E S S E T H :

WHEREAS, Franchisor at a substantial expenditure of time, effort and money has established a system of developing, opening, operating and promoting stores specializing in offering herbal and nutritional supplements containing lawful CBD "cannabidiol" from industrial hemp to the public and other products and related CBD store services under the name "YOUR CBD STORE™" ("CBD Stores" or "Stores") (the "YOUR CBD STORE™ System"); and

WHEREAS, Franchisor has established a business model in which Franchisor strives to provide each franchisee with certain services without imposing separate additional charges for those services, with Franchisor's costs being built into the price at which Franchisor sells its products to its franchisees, and this means that Franchisee understands that product prices charged by Franchisor at wholesale to Franchisee may increase as needed to cover Franchisor's cost of providing services.

WHEREAS, the distinguishing features of the YOUR CBD STORE™ System, include, but are not limited to, the name "YOUR CBD STORE™" and all such other trade names, trademarks, service marks, logos, emblems, insignia and signs developed for use with the YOUR CBD STORE™ System from time to time (collectively, the "Marks"); specially designed fixtures, equipment, facilities, containers, and other items used in serving and dispensing CBD products; products, methods, procedures, recipes, distinctive CBD products and the formula and quality standards therefor; and instructional materials and training courses; all of which may be changed, improved and further developed by Franchisor from time to time; and

WHEREAS, Franchisor has acquired knowledge and experience in the composition, distribution, advertising and sale of CBD products by Stores using the YOUR CBD STORE™ System and with respect to the style of the facilities and signs used by said Stores and has successfully established a reputation, demand and goodwill for the products sold by such Stores; and

WHEREAS, YOUR CBD STORES™ and the products sold therein have a reputation for quality that has been acquired and is being maintained by requiring all franchisees of the YOUR CBD STORE™ System to maintain high standards of quality and service; and

WHEREAS, Franchisee recognizes the value and benefits to be derived from utilizing the YOUR CBD STORE™ System and being associated with Franchisor, the Marks and other distinctive features of the YOUR CBD STORE™ System, and now desires to obtain a franchise from Franchisor to use the YOUR CBD STORE™ System and to operate a YOUR CBD STORE™ at an approved location, and Franchisor

C-1

is willing to grant Franchisee the right to operate a YOUR CBD STORE™ all subject to the terms and conditions hereinafter set forth.

NOW, THEREFORE, for and in consideration of the covenants and agreements hereinafter set forth, it is mutually understood, agreed and covenanted as follows:

1.      **GRANT OF FRANCHISE**

During the term of this Agreement, Franchisor hereby grants to Franchisee the non-exclusive right and license, and Franchisee undertakes the obligation, to develop and operate a YOUR CBD STORE™ and to use solely in connection therewith, the Marks and the YOUR CBD STORE™ System in accordance with the terms and conditions of this Agreement only at the Franchised Site, as such term is hereinafter defined.  Franchisee agrees to use the Marks and YOUR CBD STORE™ System, as they are changed, improved and further developed by Franchisor from time to time.  Unless otherwise agreed to by Franchisor, Franchisee has 4 months from the Effective Date to complete the initial training as required by Section 14.1 and to commence operation of the Store.  Franchisee must obtain Franchisor's written approval before commencing operation of the Store.

2.      **TERM AND RENEWAL**

2.1     Initial Term.  Unless terminated earlier in accordance with the terms and conditions set forth herein, this Agreement and the franchise granted hereunder shall have an initial term of 5 years commencing as of the Effective Date (the "Initial Term").

2.2     Renewal.  Upon the expiration of the Initial Term, Franchisee shall have the right to renew the franchise granted hereunder for up to three additional 5 year periods provided that all of the following conditions are met:

(i)      Franchisee gives Franchisor written notice of its election to renew the franchise not less than six months before the expiration of the Initial Term;

(ii)     Franchisee is not, when notice is given, and does not become before the expiration of the Initial Term, in default of any provision of this Agreement or any other agreement between Franchisee and Franchisor or its subsidiaries or affiliates or with any other creditor or supplier of the Store or lessor or sublessor of the Franchised Site, and Franchisee shall have fully and faithfully performed all of its obligations under this Agreement and all such other agreements throughout their terms;

(iii)    Franchisee shall execute, at Franchisor's option, Franchisor's then-current form of Franchise Agreement, which Franchise Agreement shall supersede in all respects the terms and conditions of this Agreement and may contain terms and conditions substantially different from those set forth herein, including, without limitation, an increase in Advertising Fees (as such terms are hereinafter defined); provided, however, the renewal Franchise Agreement shall not provide for any additional renewal rights;

(iv)    Franchisee shall pay a renewal fee equal to one-half of the then-current Franchise Fee (as such term is hereinafter defined) charged by Franchisor;

C-2

(v)     Franchisee shall complete, at its own expense and to Franchisor's satisfaction, all maintenance, refurnishing, renovation, modernizing and remodeling of the Store as Franchisor shall reasonably require so as to reflect the current image and standards of YOUR CBD STORES™;

(vi)     Franchisee shall be current in the payment of all obligations to Franchisor and to any of its affiliates and subsidiaries as well as lessors, vendors and suppliers of the Store;

(vii)     Before renewal, Franchisee and/or Franchisee's supervisory and operational manager(s) shall at Franchisee's expense, attend and successfully complete to Franchisor's reasonable satisfaction any retraining program Franchisor may require;

(viii)     Franchisee and its owners execute a general release, in a form satisfactory to Franchisor, of any and all claims it may have against Franchisor, including any affiliates or subsidiaries, and its and their officers, directors, shareholders, managers, members, partners, employees and agents; and

(ix)     Franchisee provides Franchisor with evidence that Franchisee has the right to remain in possession of the Franchised Site or to secure and develop a suitable alternative site acceptable to Franchisee for the renewal term.

3.     **FRANCHISED SITE AND TERRITORY**

3.1     <u>Franchised Site</u>.  The rights granted to Franchisee hereunder shall be non-exclusive and shall be restricted to the operation of a single YOUR CBD STORE™ to be located at the address and location set forth on Exhibit A attached hereto (the "Franchised Site").  During the term of this Agreement, the Franchised Site shall be used exclusively to operate a Store.  In connection with the execution of any lease or sublease for the Franchised Site, Franchisee must execute, and cause the lessor and/or sublessor of the Franchised Site to execute, the Collateral Assignment of Lease attached hereto in addition to complying with any other obligations and conditions contained herein relating to the lease or sublease of the Franchised Site and the development and construction of the Store.  The rights granted to Franchisee are for the specific Franchised Site and cannot be transferred to any other location, except with Franchisor's prior written approval.  If you do not commence operation of your Store within four months of the execution of this Agreement, we may terminate the Agreement.

(i)     Franchisee is responsible for locating proposed sites for you're YOUR CBD STORE™ to be established hereunder.  Franchisor, in its sole discretion, may counsel and offer advice to Franchisee, or suggest a third party real estate advisor to assist Franchisee with respect to site selection; however, in no event shall Franchisor be liable to Franchisee in connection with providing advice or any such assistance.   Upon selection of a proposed site for a Store, Franchisee shall promptly submit to Franchisor such site, demographic and other data and information about the proposed site as reasonably requested by Franchisor, utilizing such forms as may be required by
Franchisor, and a copy of any lease, sublease or purchase agreement to be entered into in connection with the acquisition of such site.  Franchisor shall either accept or reject the proposed site utilizing its then-current site selection policies and procedures.  As a condition for accepting a proposed site to be leased or subleased, Franchisee must sign, and cause the lessor or sublessor of the proposed site, to sign the Collateral Assignment of Lease attached hereto as Exhibit H.  In addition, Franchisee acknowledges that Franchisor's acceptance of a proposed site may be conditioned upon Franchisee meeting certain other requirements (including, without limitation, the negotiation of additional terms and conditions

C-3

satisfactory to Franchisor to any lease, sublease or purchase agreement for the proposed site), and if Franchisee does not, or is unable to meet such requirements within a reasonable time, the site will be deemed rejected.  To be accepted, any acceptance of a proposed site by Franchisor must be in writing.  Franchisor may reject any proposed site for any reason in its sole discretion, in which event Franchisee may not develop a store at the proposed site, but must locate another proposed site for the Store and submit it in accordance with this Section 3.1.

(ii)    Upon Franchisor's written acceptance of a proposed site, Franchisee shall promptly enter into the approved lease, sublease or purchase agreement for the site and obtain all necessary zoning, building and other governmental or regulatory approvals or permits required for the establishment of the Store.  Franchisor may provide Franchisee with a set of standard architectural plans and specifications for a prototype YOUR CBD STORE™.  You must employ a qualified general contractor, who is reputable and experienced building units of similar retail concepts, to supervise, delegate and/or perform (i) the construction and development of the Store, (ii) the completion of all improvements, (iii) the outfitting of the Store with furnishings, fixtures and equipment, and (iv) all other services that are designated by Franchisor to be performed by such general contractor in connection with constructing the Store ("the General Contractor").  Franchisor shall have the right, but not the obligation, to designate one or a list of approved General Contractors for Franchisee to employ in the construction of the Store.   Franchisor shall also have the right to designate one or more suppliers of design services or architecture services (an "Architectural Firm") to supply such services to the System.   Franchisee shall employ the Architectural Firm to furnish to Franchisor, for Franchisor's written acceptance, a proposed preliminary site and construction plans (adopted from any prototype plans provided by Franchisor) for the Store which, if accepted, shall not be modified, altered or changed without Franchisor's written consent.

(iii)    Franchisee shall furnish Franchisor with such information relating to the construction of the Store and development of the site as Franchisor may from time to time request, which may include copies of all commitments and plans for construction and financing, the contact name, address and telephone number for any lenders and contractors, and a copy of any construction or financing arrangements.   Franchisee shall promptly commence construction of the YOUR CBD STORE™ in accordance with the accepted site and construction plans and specifications.  Franchisor and its agents have the right to inspection the construction site at any reasonable time without prior notice.  Franchisee shall correct, upon Franchisor's request, and at Franchisee's expense, any deviation from any accepted site or construction plans or specifications.

3.2    Territorial Protection.  Franchisor will not establish for itself or grant a franchise to any other party to establish a Store within the territory specified on Exhibit A attached hereto (the "Franchise Territory").  Notwithstanding anything herein to the contrary, if any disagreement arises regarding the area comprising the Franchise Territory, then Franchisor's decision as to the definition of the Franchise Territory shall be final and binding.  Except as expressly provided in the first sentence of this Section 3.2, Franchisee acknowledges that the franchise granted under this Agreement is non-exclusive and Franchisee has no territorial protection and Franchisee has no right to exclude, control or impose conditions on the location or development of other or future franchises under the Marks, or on any sales or distribution of products under the Marks or other business activities of Franchisor or any other party licensed to use the Marks.

2020 FA v.2
2020 FDD and FA v.3a
01701353-1

3.3    Reservation of Rights.  Franchisor retains the right, in its sole discretion, to:

(i)    Establish and operate, and grant to other franchisees or licensees the right to establish and operate, a YOUR CBD STORE™ or any other business using the Marks, the YOUR CBD STORE™ System or any variation of the Marks and the YOUR CBD STORE™ System, in any location outside the Franchise Territory, on any terms and conditions that Franchisor deems appropriate;

(ii)    Develop, use and franchise anywhere (including within the Franchise Territory) the rights to any trade names, trademarks, service marks, commercial symbols, emblems, signs, slogans, insignia, patents or copyrights not designated by Franchisor as Marks, for use with similar or different franchise systems for the sale of similar or different products or services than those constituting a part of the YOUR CBD STORE™ System, without granting Franchisee any rights therein;

(iii)    Offer, ship, sell and provide products or services identified by the Marks or other trademarks, service marks, commercial symbols or emblems to customers located in the Franchise Territory through any distribution channel or method, including grocery stores, convenience stores, Internet (or any other existing or future form of electronic commerce), and delivery services, irrespective of the proximity to the Store without compensation to Franchisee; provided, however, that any such sales will not be made from a YOUR CBD STORE™ located in the Franchise Territory;

(iv)    Own, acquire, establish and/or operate and license to others to establish and operate YOUR CBD STORE™ Franchises at destination locations which may be within the Territory, including but not limited to airports, stadiums, schools, and universities, hospitals, malls, or kiosks at any such facility;

(v)    Own, operate, franchise or license anywhere, even in close proximity to the Store licensed hereunder, stores of any other type whatsoever operating under marks other than the Marks;

(vi)    Offer to convert from an "Affiliated Licensee" to a franchised unit any Licensee store operating as of the date hereof as a Licensee and not as a franchised unit; and

(vii)    Engage in any other activity, action or undertaking that Franchisor is not expressly prohibited from taking under this Agreement.

4.    **INITIAL FRANCHISE FEE/INITIAL INVENTORY PURCHASE/REQUIRED MINIMUM MONTHLY PRODUCT PURCHASES**

4.1    Initial Franchise Fee.  Upon the execution of this Agreement, Franchisee shall pay to Franchisor an Initial Franchise Fee in an amount set forth on Exhibit A (the "Franchise Fee").  In the event that the parties enter into a Multi-Unit Development Agreement ("Development Agreement") and the Development Agreement requires the payment of a development fee by Franchisee to Franchisor, there shall be credited toward the payment of the Franchise Fee all or a portion of those development fees in the manner and to the extent provided for in the Development Agreement.  Franchisee acknowledges and agrees that the Franchise Fee is paid as consideration for Franchisor granting Franchisee the right to develop, open and operate the Store using the Marks and the YOUR CBD STORE™ System, having made available and providing resources for Franchisee's training and that the Franchise Fee is fully

2020 FA v.2
2020 FDD and FA v.3a
01701353-1

DocuSign Envelope ID: A00B65BA-5C33-4345-B653-503992A1FB2E

earned by Franchisor at the time this Agreement is executed, and the Franchise Fee shall not be refundable for any reason.

If Franchisee pays a Franchise Fee, Franchisee shall be eligible to receive a credit for the purchase of $5,000 of Products at wholesale price from Franchisor or its affiliate, Sunflora.  In order to receive this credit, Franchisee must operate the Store for no less than one full year, and must otherwise be in full compliance with this Agreement and the Operations Manual.

If Franchisee is an existing Affiliated Licensee, Franchisee will not pay any Franchise Fee.

     4.2    <u>Initial Inventory Purchase</u>.  Franchisees who are not existing Affiliated Licensees (conversion franchisees) must purchase an Initial Inventory of no less than $20,000, at wholesale price, of Sunflora products.  Franchisees are encouraged to purchase Initial Inventory equal to $25,000 to better service customers and reduce the risk of running out of key Products during the initial opening or launch of their Store.

     4.3    <u>Minimum Product Purchases</u>.  Franchisee must make certain Minimum Product Purchases from Sunflora or whatever other vendor Franchisor may designate.  Minimum Product Purchase requirements begin in the fourth full month following opening of your Store, and are $15,000 at wholesale price, of Products during that calendar quarter.  Beginning in the seventh month following opening of your Store, Minimum Product Purchase requirements increase to $30,000 at wholesale price, of Products each calendar quarter, and remain at that level for the rest of the Agreement term.  Failure to meet Minimum Product Purchase Requirements are a material breach of this Agreement and ground for termination of this Agreement.

5.    **ROYALTY FEE; METHOD OF PAYMENT; LATE PAYMENT**

     5.1    <u>Royalty Fee</u>.  Franchisor does not charge any royalty fee to its franchisees.  Franchisor may nonetheless require Franchisee to report Franchisee's Gross Sales periodically to Franchisor for system management purposes.

     5.2    <u>Definition of Gross Sales</u>.  Gross Sales shall mean the amount of sales of all products and services sold in, on, about or from the Store, together with any other revenues derived from the operation of the Store, whether by Franchisee or by any other person, whether or not in accordance with the terms hereof, and whether for cash or on a charge, credit, barter or time basis, including, but not limited to, all such sales and services (i) where orders originate and/or are accepted by Franchisee in the Store but delivery or performance thereof is made from or at any place other than the Store or (ii) pursuant to telephone or other similar orders received or filled at or in the Store.  There shall be deducted from Gross Sales: (a) the amount of refunds, allowances or discounts to customers (including coupon sales) up to 10% of the Gross Sales, provided the related sales have previously been included in Gross Sales; and (b) the amount of any excise or sales tax levied upon retail sales and paid over to the appropriate governmental authority.

     5.3    <u>Automated Bank Draft</u>.  Franchisee understands and agrees that Franchisor reserves the right and may require, in its sole discretion, that all Advertising Fees and Advertising Cooperative (as defined below) contributions and other fees or contributions required to be paid to Franchisor or any Advertising Cooperative hereunder must be paid by automated bank draft or other reasonable means

DocuSign Envelope ID: A00B65BA-5C73-4345-B659-503992A1FB2E

necessary to ensure payment of such fees are received by Franchisor or the appropriate Advertising Cooperative.  Franchisee agrees to comply with Franchisor's payment instructions.

5.4     Late Payments and Insufficient Funds.  All overdue payments for all Advertising Fees and other fees required to be paid hereunder shall bear interest from the date due at the rate specified by Franchisor from time to time, up to the highest rate permitted by the law, but in no event shall such rate exceed 18% per annum.  Interest shall accrue on all late payments regardless of whether Franchisor exercises its right to terminate this Agreement as provided for herein.  In addition to its right to charge interest as provided herein, Franchisor may charge Franchisee a $100.00 late payment fee for all such overdue payments and a $100.00 insufficient funds fee for each check, automated bank draft payment, or other payment method that is not honored by Franchisee's financial institution.    Franchisee acknowledges that Franchisor has the right to set-off amounts Franchisee owes Franchisor against any amounts Franchisor may owe Franchisee.

5.5     Application of Payments.  Notwithstanding designation by Franchisee to the contrary, all payments made by Franchisee hereunder will be applied by Franchisor at its discretion to any of Franchisee's past due indebtedness.

6.      **RECORDS, REPORTS AND AUDITS**

6.1     Bookkeeping and Recordkeeping.  Franchisee agrees to establish a bookkeeping and recordkeeping system conforming to the requirements prescribed from time to time by Franchisor, relating, without limitation, to the use and retention of daily sales slips, coupons, purchase orders, purchase invoices, payroll records, check stubs, bank statements, sales tax records and returns, cash receipts and disbursements, payroll records, journals, and general ledgers.  In establishing and maintaining Franchisee's bookkeeping and recordkeeping system, Franchisee shall use all form documents established by Franchisor in the Operations Manual (as defined below) or otherwise.  Franchisee acknowledges and agrees that if Franchisor is required or permitted by statute, rule, regulation or any other legal requirement to disclose any information regarding Franchisee or the operation of the Store, including, without limitation, earnings or other financial information, Franchisor shall be entitled to disclose such information.  In addition, Franchisee hereby expressly permits Franchisor to disclose any such information to potential purchasers (and their employees, agents, and representatives) of Franchisor in connection with the sale or transfer of any equity interests or assets of Franchisor or any merger, reorganization or similar restructuring of Franchisor.

6.2     Reporting.  Franchisee must provide Franchisor with those financial reports required by Franchisor from time to time.  All such reports shall be prepared (i) using any form documents established by Franchisor as set forth in the Operations Manual or otherwise and (ii) in accordance with the generally accepted accounting principles of the United States, to the extent applicable.  Franchisee's current reporting obligations include the following:

(i)     A statement of relevant Gross Sales in the form required by Franchisor to be delivered monthly by the 5th day of the following month;

(ii)     Each payment of the Advertising Fee no later than 5:00 p.m. on each Tuesday;

(iii)     A monthly unaudited balance sheet and profit and loss statement in a form satisfactory to Franchisor covering Franchisee's business for the prior month and fiscal year to date, all

DocuSign Envelope ID: A00B65BA-5C73-4345-B658-503992A1FB2E

of which shall be certified by Franchisee as true and correct and delivered to Franchisor no later than the 21st day of each month;

          (iv)    Annual financial statements compiled or reviewed by an independent certified public accountant in a form satisfactory to Franchisor, which shall include a statement of income and retained earnings, a statement of cash flows, and a balance sheet of Franchisee, all for the fiscal year then ended.  If Franchisee does not, in the ordinary course, obtain financial statements compiled or reviewed by an independent certified public accountant, then Franchisee may provide internally prepared financial statements which shall be certified as true and correct by Franchisee or Franchisee's principal executive officer or chief financial officer if Franchisee is a partnership, corporation or limited liability company. Franchisor shall have the right at any time to require audited annual statements to be provided to it, at Franchisee's expense;

          (v)    An annual copy of Franchisee' signed 1120 or 1120S tax form (including all supporting schedules) as filed with the Internal Revenue Service (or any forms which take the place of those forms), and all other federal, state and local sales and use and income tax reports Franchisee is required to file, all to be delivered within 30 days after filing;

          (vi)    A statement of local advertising expenditures made pursuant to Section 11.3 below for each calendar quarter and fiscal year to date, in a form satisfactory to Franchisor, along with invoices documenting such expenditures (if required by Franchisor), to be delivered within 15 days after the end of each calendar quarter;

          (vii)    Insurance certificates upon the annual renewal of the policies and all health and safety inspection reports; and

          (viii)    Any other data, information and supporting records reasonably requested by Franchisor, including account login and password information for any delivery service applications, social media sites or other electronic media.

All reports or other information required to be submitted under this Section 6.2 shall be submitted to the attention of Franchisor's franchise department.  If any of the reports or other information required to be given to Franchisor in accordance with this Section are not received by Franchisor by the required deadline, Franchisor may charge Franchisee a late submission fee equal to $100.00.

       6.3    <u>Audit</u>.  Franchisee shall allow representatives of Franchisor to inspect Franchisee's books and records at all reasonable times in order to verify Gross Sales, that Franchisee reports as well as to verify Franchisee's advertising expenditures required by Section 11.3 below and any other matters relating to this Agreement and the operation of the Store.  Franchisor may require Franchisee to submit to Franchisor, or Franchisor's representatives, copies of Franchisee's books and records for any offsite inspection that Franchisor or Franchisor's representatives conduct to audit the Store.  All inspections shall be at the expense of Franchisor; provided, however, if the inspection results in a discovery of a discrepancy in the Gross Sales reported by Franchisee of 5% or more, then Franchisee shall pay or reimburse Franchisor for any and all reasonable expenses incurred by Franchisor in connection with the inspection, including, but not limited to, attorneys' and accounting fees and travel expenses, room and board and compensation of Franchisor's employees.

C-8

7.    **OPERATIONS MANUAL**

During the term of this Agreement, Franchisor will loan to Franchisee one copy of, or provide Franchisee with electronic access to, Franchisor's confidential Operations Manual (the "Operations Manual"), which may consist of printed manuals, computerized documents or software, information provided on the internet or an extranet, audiotapes, videotapes, or any other medium Franchisor adopts periodically for use with the YOUR CBD STORE™ System and designates as part of the Operations Manual.  The Operations Manual will contain information and specifications concerning the standards and specifications of the YOUR CBD STORE™ System, the development and operation of the Store and any other information and advice Franchisor may periodically provide to its franchisees.  Franchisor may update and change the Operations Manual periodically to reflect changes in the YOUR CBD STORE™ System and the operating requirements applicable to YOUR CBD STORES™, and Franchisee expressly agrees to comply with each requirement within such reasonable time as Franchisor may require, or if no time is specified, within 30 days after receiving notification of the requirement.  Franchisee shall at all times ensure that its copy of the Operations Manual and any other confidential materials supplied by Franchisor to Franchisee are kept current and up to date.  Franchisee must keep any printed Operations Manual in a secure location at the Store, and must restrict employee access to the Operations Manual on a need to know basis, and take reasonable steps to prevent unauthorized disclosure or copying of any information in any printed or computerized Operations Manual.  If Franchisor and Franchisee have any disagreement about the most current contents of the Operations Manual, Franchisor's master copy of the Operations Manual will control.  Upon the expiration or termination of this Agreement for any reason, Franchisee must return all copies of the Operations Manual to Franchisor, and upon Franchisor's request, certify to Franchisor that Franchisee has not kept any copies in any medium.  The Operations Manual is confidential, copyrighted and Franchisor's exclusive property.

8.    **MODIFICATION AND IMPROVEMENTS TO THE YOUR CBD STORE™ SYSTEM**

8.1    <u>Modification by Franchisor</u>.  Franchisee recognizes and agrees that from time to time hereafter, Franchisor may change, modify or improve the YOUR CBD STORE™ System, including, without limitation, modifications to the Operations Manual, the menu and format, the processes and systems to support the business, the products offered for sale, the required equipment, the signage, the presentation and usage of the Marks, and the adoption and use of new, modified or substituted Marks or other proprietary materials.  Franchisee agrees to accept, use and/or display for the purposes of this Agreement any such changes, modifications or improvements to the YOUR CBD STORE™ System, including, without limitation the adoption of new, modified or substituted Marks, as if they were part of the YOUR CBD STORE™ System as of the Effective Date, and Franchisee agrees to make such expenditures as such changes, modifications or improvements to the YOUR CBD STORE™ System may require.  For purposes of this Agreement, all references to the YOUR CBD STORE™ System shall include such future changes, modifications and improvements.

8.2    <u>Modification by Franchisee</u>.  If Franchisee develops any new modification, concept, process, improvement or slogan in the operation or promotion of the Store or to the YOUR CBD STORE™ System, the same shall be deemed a work made for hire, and Franchisee shall promptly notify Franchisor of, and provide Franchisor with all necessary information, regarding such modification, concept, process, improvement or slogan, without compensation to Franchisee.   Franchisee acknowledges that any such modification, concept, process, improvement or slogan shall become Franchisor's sole and exclusive property and that Franchisor may use or allow other franchisees to use

C-9

DocuSign Envelope ID: A00B65BA-5C73-4345-B658-503992A1FB2E

the same in connection with the YOUR CBD STORE™ System or the operation of YOUR CBD STORES™, without compensation to Franchisee.

9.     **OBLIGATIONS OF FRANCHISEE**

Franchisee recognizes the mutual benefit to Franchisee, Franchisor and other franchisees of the YOUR CBD STORE™ System of the uniformity of the appearance, services, products and advertising of the YOUR CBD STORE™ System and acknowledges and agrees that such uniformities are necessary for the successful operation of YOUR CBD STORES™.  Franchisee also acknowledges and agrees that products and services sold under the Marks and at YOUR CBD STORES™ have a reputation for excellence.  This reputation has been developed and maintained by Franchisor, and Franchisee acknowledges and agrees that it is of the utmost importance to Franchisor, Franchisee, and all other franchisees of the YOUR CBD STORE™ System that such reputation be maintained.  To this end, Franchisee covenants and warrants with respect to the operation of the Store that Franchisee and its employees and agents will comply with all of the requirements of the YOUR CBD STORE™ System and the Operations Manual and will throughout the term of this Agreement:

(i)     Operate the Store and prepare and sell all products and services sold therein in accordance with the specifications, standards, business practices and policies of Franchisor now in effect or hereafter promulgated, and comply with all requirements of Franchisor, the YOUR CBD STORE™ System and the Operations Manual as they are now or hereafter established, including, without limitation, any health, sanitation and cleanliness standards and specifications.  Franchisor and its duly authorized representatives shall have the right, if they so elect, at all reasonable times, to enter and inspect the Store to ensure that Franchisee is complying with such specifications, standards, business practices, policies and requirements and to test any and all equipment, systems, products and  ingredients used in connection with the operation of the Store.  If Franchisee in any way shall fail to maintain the standards of quality for the products and services as established by Franchisor from time to time, Franchisor shall notify Franchisee in writing of the failure and give Franchisee 10 days in which to cure such failure.  If Franchisee fails to cure such failure within such 10 day period, Franchisor shall, in addition to any other remedy available to it, have the right to assign to the Store such persons as it deems necessary for the training of Franchisee's employees to ensure that the standards of quality for the products and services are maintained.  Franchisee shall reimburse Franchisor for all costs associated with providing such personnel, including costs of transportation, meals, lodging, salaries, wages and other compensation (including fringe benefits).

(ii)     Maintain at all times, at its expense, the Store and its machinery, equipment, fixtures, furnishings, furniture, décor, premises, parking areas, landscape areas, if any, and interior and exterior signs in an excellent, clean, attractive and safe condition in conformity with the Operations Manual and Franchisor's high standards and public image.  Franchisee shall promptly make all repairs and replacements thereto as may be required to keep the Store in the highest degree of sanitation, repair and condition and to maintain maximum efficiency and productivity.  However, Franchisee shall not undertake any alterations or additions (but may perform maintenance and make repairs) to the buildings, equipment, premises or parking areas associated with the Store without the prior written approval of Franchisor.  If Franchisor changes its image or standards of operation with respect to the Store, Franchisee expressly agrees to comply with each change within such reasonable time as Franchisor may require, or if no time is specified, within 30 days after receiving notification of the change.  Franchisee shall  also  maintain  maintenance  contracts  and/or  service  contracts  on  all  equipment  and  machinery

C-10

designated by Franchisor and Franchisor shall have the right to designate the vendor(s) for such contracts and the requirements for the contracts.

(iii)    Comply with all applicable laws, rules, ordinances and regulations that affect or otherwise concern the Store or the Franchised Site, including, without limitation, zoning, disability access, signage, fire and safety, fictitious name registrations, sales tax registration, and health and sanitation.  Franchisee will be solely responsible for obtaining any and all licenses and permits required to operate the Store.  Franchisee must keep copies of all health, fire, building occupancy and similar inspection reports on file and available for Franchisor to review.  Franchisee must immediately forward to Franchisor any inspection reports or correspondence stating that Franchisee is not in compliance with any such laws, rules, ordinances and regulations.

(iv)    Maintain sufficient inventories and employ sufficient employees to operate the Store at its maximum capacity and efficiency at such hours or days as Franchisor shall designate or approve in the Operations Manual or otherwise, and operate the Store for such hours or days so designated or approved by Franchisor.

(v)    Require all employees of the Store to wear uniforms and abide by the dress guidelines conforming to the specifications and standards Franchisor may from time to time designate in the Operations Manual or otherwise.

(vi)    Require all employees of the Store to conduct themselves at all times in a competent and courteous manner and use best efforts to ensure that its employees maintain a neat and clean appearance and render competent, sober and courteous service to patrons of the Store.  Franchisor shall have no control over Franchisee's employees, including, without limitation, work hours, wages, hiring or firing.

(vii)    Use only those ingredients, products, supplies, furnishings and equipment that (a) conform to the standards and specifications designated by Franchisor in the Operations Manual or otherwise, and (b) are purchased from suppliers designated or approved in writing by Franchisor.  Franchisor may designate at any time and for any reason, a single or multiple suppliers for ingredients, products, supplies, furnishings and equipment and require Franchisee to purchase exclusively from such designated supplier or suppliers, which exclusive designated supplier(s) may be Franchisor or an affiliate of Franchisor.  If Franchisor designates itself or any affiliate, such as SunMed, Inc. as a supplier, Franchisor has the right to earn a profit on any items it supplies.  Franchisor and its affiliates may receive payments, discounts or other consideration from suppliers in consideration of such suppliers' dealings with Franchisee and/or the system of YOUR CBD STORE™ franchisees, and may use all amounts received by it without restriction.  Franchisor is not required to give Franchisee an accounting of supplier payments or to share the benefit of supplier payments with Franchisee or other YOUR CBD STORE™ franchisees.

(viii)    If Franchisee desires to purchase any ingredients, products, supplies, furnishings and equipment from suppliers other than those previously approved by Franchisor and such items have not been designated by Franchisor to be exclusively supplied by a designated supplier(s), Franchisee shall first submit to Franchisor a written request for authorization to purchase such items, together with such information and samples as Franchisor may require.  Franchisor shall have the right to require periodically that its representatives be permitted to inspect such items and/or supplies' facilities, and that samples from the proposed suppliers, or of the proposed items, be delivered for evaluation and testing

C-11

either to Franchisor or to an independent testing facility designated by Franchisor. Permission for such inspections shall be a condition of the initial and continuing approval of such supplier, manufacturer or distributor. A charge not to exceed the reasonable cost of the evaluation and testing shall be paid by Franchisee. Franchisor shall, within 90 days after its receipt of such request and completion of such evaluation and testing (if required by Franchisor), notify Franchisee in writing of its approval or disapproval. Franchisor may deny such approval for any reason, including its determination to limit the number of approved suppliers. The provisions above shall only apply if Franchisor has not designated a supplier or suppliers.

(ix)     Prominently display at the Store and the Franchised Site signs using the name "YOUR CBD STORE™" and/or other signs, of such nature, form, color, number, location and size, and containing such material as Franchisor may from time to time reasonably direct or approve in writing; and not display in the Store or on the Franchised Site or elsewhere any sign or advertising media of any kind to which Franchisor reasonably objects. Franchisor or its authorized representatives may at any time during normal business hours enter the Store or the Franchised Site and remove any objectionable signs or advertising media.

(x)     Use Franchisee's best and continuing efforts to fully promote and develop the Store and use the Franchised Site only for the purposes designated in this Agreement and avoid any activities that would conflict or interfere with or be detrimental to such purposes.

(xi)     Sell only those products and services from the Store specified by Franchisor from time to time in the Operations Manual or otherwise, and refrain from maintaining or using vending machines or entertainment devices not included in the YOUR CBD STORE™ System, unless approved in writing by Franchisor.

(xii)     Refrain from deviating from the formulas, specifications of materials and ingredients of products as specified by Franchisor, without the prior written consent of Franchisor, and adhere to the product list and all changes, alterations, additions and subtractions thereof, thereto or therefrom as specified by Franchisor from time to time and follow all specifications of Franchisor as to the uniformity of products and weight, quality and quantity of unit products served and sold, and serve and sell only such products as are designated by Franchisor. Franchisee shall not sell any additional products or any other merchandise of any kind without the prior written approval of Franchisor.

(xiii)     Make no physical changes from blueprint specifications or approved remodeling plans in connection with the premises constituting the Store on the Franchised Site, or the design thereof, or any of the materials used therein, or their colors, without the express written approval of Franchisor, except that Franchisee will, upon request of the Franchisor, make such reasonable alterations to the Store or premises as may be necessary to conform to the then-current marketing and operating standards and specifications of YOUR CBD STORE™. Franchisee will paint the Store (interior or exterior) at such intervals as Franchisor may reasonably determine to be advisable, which determination shall in no event be more than once in any calendar year, using paints which will be in accordance with specifications given by Franchisor.

(xiv)     Ensure that an individual who has completed the initial training program described in Section 14.1 below is at the Store at all times during normal business hours as established by Franchisor from time to time.

C-12

(xv)    Participate in all national, regional or local advertising and promotional activities Franchisor requires.  Franchisee understands that Franchisor implements promotions such as discount coupons, certificates, frequent customer cards, special promotions, gift cards and other activities intended to enhance customer awareness and build traffic at YOUR CBD STORES™ on a national, regional or local level.  Franchisor may establish procedures and regulations related to these promotions in the Operations Manual and Franchisee agrees to honor and participate in these programs in accordance with such procedures and regulations specified by Franchisor in the Operations Manual or otherwise in writing.  Franchisee understands that its participation in these programs is essential to its success and that its participation may entail some cost to Franchisee.  Franchisee agrees that Franchisor has no obligation to reimburse Franchisee for any costs it incurs due to its mandatory participation in these special promotional programs.

(xvi)   Without limiting any of Franchisee's other obligations under this Agreement, at the request of Franchisor, but not more often than once every 5 years, unless sooner required by Franchisee's lease, Franchisee shall refurbish the premises of the Store at its expense, to conform to the Store, trade dress, color schemes and presentation of the Marks in a manner consistent with the then-current image for new Stores ("Refurbishments").  Refurbishments may include structural changes, installation of new equipment and signs, remodeling, redecoration and modifications to existing improvements.  Refurbishments are intended to be large-scale re-equipping, refurbishing and remodeling of the Store, and nothing contained in this Subsection (xvi) of this Agreement will limit Franchisee's other obligations under this Agreement or the Operations Manual.

(xvii)  Become a member of any purchasing and/or distribution cooperative(s)/association(s)/program(s) designated by Franchisor and/or established by Franchisor for the YOUR CBD STORE™ System, remain a member in good standing thereof throughout the term of this Agreement and pay all membership fees or fees on purchases that are assessed by such purchasing and/or distribution cooperative(s)/association(s)/program(s).

(xviii) As required by Franchisor, maintain a contract(s) with, or participate in any Franchisor contract(s), with any third-party(ies) offering customer service, shopper experience, product safety or other service programs designed to audit, survey, evaluate or inspect business operations.  Franchisee understands that Franchisor has the right to specify the third party(ies) and the required level of participation in such programs and Franchisee will bear the cost.

10.    **TECHNOLOGY SYSTEMS AND WEBSITE**

10.1    Point of Sale System.  Franchisee, at its expense, must purchase and use a computerized cash collection and data processing system (the "POS System") that meets the standards and specifications provided by Franchisor from time to time in the Operations Manual or otherwise.  Franchisee must enter all sales and other information Franchisor requires in the POS System.  Franchisor may periodically require Franchisee, at its expense, to upgrade or update the POS System to remain in compliance with the standards and specifications required by Franchisor.  Franchisee, at its expense, must maintain the POS System in good working order and connected to any telephone system or computer network that Franchisor requires.  Franchisor may require Franchisee, at its expense, to configure and connect the POS System to Franchisor's systems to provide Franchisor with continuous real-time access to all information and data stored on the POS System.  Franchisor may require Franchisee to pay Franchisor or its designated third parties reasonable fees to support and upgrade the POS System and a

2020 FA v.2
2020 FDD and FA v.3a
01701353-1

reasonable fee to Franchisor or its designated third party for polling or collecting data from the POS System.  In addition to the POS System, Franchisee, at its expense, must equip the Store with the computer hardware and software that Franchisor specifies periodically and maintain access to the Internet or other computer network(s) that Franchisor specifies.  In addition, Franchisee, at its expense, must also apply for and maintain other credit card, debit card or other non-cash payment systems that Franchisor periodically requires.  Franchisor may require Franchisee to maintain support service contracts and/or maintenance service contracts and implement and periodically make upgrades and changes to the POS System, computer hardware and software, and credit card, debit card or other non-cash payment systems.  Franchisor shall have the right to designate the vendor(s) for such support service contracts and maintenance service contracts.

10.2    Website.  Franchisor currently operates a website related to the YOUR CBD STORE™ System at *www.cbdrx4u.com* (the "Website").  Franchisor shall have the right to designate a successor Website.  Subject to the terms of this Agreement, during the term hereof, Franchisor will endeavor to make available to Franchisee a sub-page on the Website that will be located at a sub-domain of the Website to be specified by Franchisor (the "Subpage").  Franchisee will be permitted to upload content onto the Subpage solely to promote, and provide customers information related to, the Store operated by Franchisee.  Franchisee shall only upload content onto the Subpage in accordance with terms of this Agreement as well as any guidelines, directives or specifications (collectively, "Subpage Standards") in the Operations Manual.  Franchisee understands and agrees that the Subpage may not contain content which references any other Store other than the Store operated by Franchisee.  Franchisee will not upload, publish, display, or otherwise include or use any content on the Subpage without receiving the prior written approval of Franchisor.  Accordingly, once the initial content of the Subpage is approved by Franchisor, Franchisee must submit any changes to such content to Franchisor for its prior written approval.

Franchisor's review and approval of the Subpage content shall not be construed as Franchisor's approval, recommendation or endorsement of Franchisee or a representation or warranty by Franchisor that such content is accurate, complete, truthful or correct.  Franchisee acknowledges and understands that the registration for the Website domain name is and shall be maintained exclusively in the name of Franchisor or its designee. Franchisee acknowledges Franchisor's or its designee's exclusive right, title and interest in and to the domain name for the Website and further acknowledges that nothing herein shall give it any right, title or interest in such domain name.  Franchisee will not, at any time, challenge Franchisor's or its designee's ownership of the Website domain name, challenge the validity of the Website domain name, or impair any right, title or interest of Franchisor or its designee in the Website domain name.  Franchisee will assist Franchisor in preserving and protecting Franchisor's or its designee's rights in and to the Website domain name.

Franchisee further acknowledges and agrees that Franchisor may, at any time in its sole discretion, cease to make the Subpage available to Franchisee or the public.  Franchisee agrees that Franchisor shall have no liability for failing to make the Subpage available to Franchisee or the public.  ADDITIONALLY, TO THE MAXIMUM EXTENT PERMITTED BY LAW, FRANCHISOR HEREBY EXPRESSLY DISCLAIMS ALL WARRANTIES (WHETHER EXPRESS, IMPLIED OR STATUTORY) RELATED TO THE AVAILABILITY AND PERFORMANCE OF THE WEBSITE AND THE SUBPAGE, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF NONINFRINGEMENT, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.  TO THE MAXIMUM EXTENT PERMITTED BY LAW, FRANCHISOR SHALL NOT BE LIABLE FOR ANY DIRECT OR

INDIRECT DAMAGES (INCLUDING, WITHOUT LIMITATION, ANY CONSEQUENTIAL, PUNITIVE OR INCIDENTAL DAMAGES OR DAMAGES FOR LOST PROFIT OR LOSS OF BUSINESS) RELATED TO THE USE, OPERATION, AVAILABILITY OR FAILURE OF THE WEBSITE OR SUBPAGE.  Upon the termination or expiration of this Agreement for any reason or Franchisee's default under this Agreement for any reason, all right of Franchisee to upload content onto, or otherwise use, the Subpage shall immediately cease and Franchisor may cease to make the Subpage available to Franchisee.

Any and all use of social media by Franchisee, along with all digital marketing is subject to Franchisor's prior approval, which approval may be denied in Franchisor's sole discretion.

11.    **ADVERTISING**

11.1    <u>Grand Opening</u>.  Franchisee, at its sole expense, must develop and implement a grand opening promotion approved by Franchisor to introduce or (if Franchisee is purchasing an existing Store) to re-introduce the Store to the public during the period that is 14 days prior and 7 days after the opening of the Store or 30 days after the transfer of the Store (if Franchisee is purchasing an existing Store). Franchisee is required to spend a minimum of $1,000 for the grand opening promotion.  To the extent Franchisor has developed or approved marketing or advertising programs and materials for the Store's grand opening, Franchisee must use such programs and materials.  Part of Franchisee's grand opening promotion may include obtaining pre and/or post opening coaching by a vendor designated by Franchisor and the cost of such coaching will count toward Franchisee's required grand opening promotion expenditures required under this Section.  FRANCHISEE UNDERSTANDS AND AGREES THAT THE MANDATORY GRAND OPENING PROCESS IS AN INTEGRAL PART OF STARTING THE FRANCHISED UNIT AND THAT FRANCHISEE MUST THEREFORE FAITHFULLY FOLLOW FRANCHISOR'S INSTRUCTIONS IN THIS REGARD.

11.2    <u>Advertising Fund</u>.  In addition to all other amounts required to be paid hereunder, during the term hereof, Franchisee must pay to Franchisor, or such other entity designated by Franchisor, an amount based upon wholesale Product purchases to be designated by Franchisor from time to time, in its sole discretion, provided such amount shall not exceed 2% of wholesale Product purchases (the "Advertising Fee"), which amount shall be used by the Advertising Fund (as such term is hereinafter defined).  The Advertising Fee shall be the same for all YOUR CBD STORE™ franchisees.  Payment of the Advertising Fee shall be made on or before Tuesday of each week and be based upon wholesale Product purchases of the Store for the preceding week.  Wholesale Product purchases includes all Product purchased by franchisee from Sunflora or approved Product Supplier.

The Advertising Fee will be expended for the benefit of Franchisor, Franchisee and all other franchisees or users of the YOUR CBD STORE™ for the production or purchase of such radio, television, internet, print and/or other advertising materials or services as Franchisor deems necessary or appropriate, in its sole discretion, on a national, regional or local basis (the "Advertising Fund").  The expenditure of such funds for advertising is to be under the control of, and in the discretion of, Franchisor at all times, or such other entities designated by Franchisor.  Franchisee understands and acknowledges that the Advertising Fund is intended to maximize and support general public recognition, brand identity, sales and patronage of YOUR CBD STORES™ for the benefit of all YOUR CBD STORES™ and that Franchisor undertakes no obligation to ensure that the Advertising Fund benefits each YOUR CBD STORE™ in proportion to its respective contributions.  Franchisee agrees that all

2020 FA v.2
2020 FDD and FA v.3a
01701353-1

funds contributed to the Advertising Fund may be used to meet any and all costs (including, without limitation, reasonable salaries and overhead incurred by Franchisor) of maintaining, administering, directing and preparing national, regional or local advertising materials, programs and public relations activities including, without limitation, the costs of preparing and conducting television, radio, magazine, billboard, newspaper, direct response literature, direct mailings, brochures, collateral advertising material, implementing websites for Franchisor and/or its franchises, surveys of advertising effectiveness and other media programs and activities, employing advertising agencies to assist therewith and providing promotional brochures, decals and other marketing materials.

The Advertising Fund shall be established as a separate banking account and monies received shall be accounted for separately from Franchisor's other funds and shall not be used to defray any of Franchisor's general operating expenses, except for such reasonable salaries, administrative costs and overhead as Franchisor may incur in activities reasonably related to the administration or direction of the Advertising Fund and its advertising programs (including, without limitation, conducting market research, preparing advertising and promotional materials, collecting and accounting for contributions to the Advertising Fund, paying for the preparation and distribution of financial statements, legal and accounting fees and expenses, taxes, and other reasonable direct and indirect expenses incurred by Franchisor or its authorized representatives in connection with programs funded by the Advertising Fund). The Advertising Fund will not be Franchisor's asset. A financial statement of the operations of the Advertising Fund shall be prepared annually, and shall be made available to Franchisee upon request. Franchisor may spend in any fiscal year more or less than the aggregate contribution of all YOUR CBD STORES™ to the Advertising Fund in that year, and the Advertising Fund may borrow from Franchisor or others to cover deficits or invest any surplus for future use. Any lender loaning money to the Advertising Fund shall receive interest at a reasonable rate. All interest earned on monies contributed to the Advertising Fund will be used to pay advertising costs before other assets of the Advertising Fund are expended. Franchisor may cause the Advertising Fund to be incorporated or operated through a separate entity at such time as Franchisor may deem appropriate, and such successor entity, if established, will have all rights and duties specified in this Section. Franchisor will not be liable for any act or omission with respect to the Advertising Fund that is consistent with this Agreement and done in good faith. Except as expressly provided in this Section 11.2, Franchisor assumes no direct or indirect liability or obligation to Franchisee with respect to the maintenance, direction or administration of the Advertising Fund. Franchisee acknowledges and agrees that Franchisor is not operating or acting as a trustee or fiduciary with respect to the Advertising Fees collected. Franchisee agrees to participate in any promotion, marketing or advertising campaigns created by the Advertising Fund. Franchisor may reduce contributions of franchises to the Advertising Fund and upon notice to Franchisee, reduce the Advertising Fund's operation or terminate the Advertising Fund and distribute unspent monies to those contributing franchisees in proportion to their contributions in the past.

11.3   <u>Local Advertising</u>. Franchisee agrees that, in addition to the payment of the Advertising Fee and any amounts required under Section 11.1 hereof, it will spend a reasonable amount each calendar quarter for local market advertising but in no event less than 3% of Gross Sales per calendar quarter. The amount of advertising funds expended by Franchisee for individual local market advertising shall be determined by Franchisee, subject to the foregoing minimum requirement. Local advertising expenditures shall not include incentive programs, including, without limitation, costs of honoring coupons, product costs incurred in honoring sales promotions, salaries, contributions, donations, press parties, in-store fixtures or equipment, yellow page advertising and exterior or interior signage. If Franchisee fails to make advertising expenditures in accordance with this Section, Franchisor shall have the right to spend an amount not to exceed 3% of the Gross Sales of the Store on local

2020 FA v.2
2020 FDD and FA v.3a
01701353-1

advertising on behalf of Franchisee, and Franchisee must reimburse Franchisor for such expenses. Failure to comply with this Section shall be deemed a material breach of this Agreement.

11.4   Advertising Cooperatives.  In connection with the Store and any and all other YOUR CBD STORES™ owned or operated by Franchisee, Franchisee shall participate, if required by Franchisor, in any local, regional or national cooperative advertising group, consisting of other franchisees of YOUR CBD STORES™ when and if any such groups are created (each, an "Advertising Cooperative").   The particular Advertising Cooperative(s) in which Franchisee may be required to participate shall be designated by Franchisor in its sole discretion (which designations may be based upon, without limitation, the particular Designated Market Area or the Area of Dominant Influence, as those terms are used in the advertising industry, where the YOUR CBD STORES™ operated by Franchisee are located).  Franchisee's payments to any Advertising Cooperative shall be determined by Franchisee and those other franchisees of the YOUR CBD STORE™ System and/or Franchisor, as the case may be, who are participants in such Advertising Cooperative, as set forth in the by-laws of that Advertising Cooperative or membership, dues, participation or other payment agreements of such Advertising Cooperative.  Franchisee, however, may not be required to spend more than 3% of Gross Sales per annum in connection with any Advertising Cooperative.  Amounts paid to an Advertising Cooperative shall be credited against payments Franchisee is otherwise required to make for local advertising as required by Section 11.3 above.  Any payments to an Advertising Cooperative shall be in addition to the amounts required to be paid or spent under Sections 11.1 and 11.2 hereof.  Franchisee shall enter into such formal agreements with such other franchisees of the YOUR CBD STORE™ System and/or Franchisor, as the case may be, as shall be necessary or appropriate to accomplish the foregoing and Franchisee shall abide by such formal agreements and decisions that the Advertising Cooperative is authorized by Franchisor to make related to advertising and marketing in the area covered by the Advertising Cooperative.  If Franchisee becomes delinquent in its dues or other payments to the Advertising Cooperative or fails to abide by any formal agreements or authorized decisions of the Advertising Cooperative, such delinquency or failure shall be deemed a failure to participate in the Advertising Cooperative and a material breach of this Agreement.  Franchisor may upon 30 days' written notice to Franchisee suspend or terminate an Advertising Cooperative's program or operations.  As a member, officer or director of an Advertising Cooperative, at the request of Franchisor, Franchisee shall provide to Franchisor all information requested by Franchisor related to such Advertising Cooperative and Franchisee shall have the obligation to provide such information within 10 days after Franchisor's request to Franchisee.

11.5   Approval of Advertising. Any and all advertising and marketing materials (whether developed in connection with an Advertising Cooperative or otherwise) not prepared or previously approved by Franchisor shall be submitted to Franchisor at least two weeks before any publication or run date for approval, which may be arbitrarily withheld.  Franchisor may grant or withhold its approval, in its sole discretion.  Franchisor will provide Franchisee with written notification of its approval or disapproval within a reasonable time.  In the event Franchisor does not notify Franchisee of its approval or disapproval within 10 days of Franchisor's receipt of the materials, the materials shall be deemed approved.   Franchisee must discontinue the use of any approved advertising within five days of Franchisee's receipt of Franchisor's request to do so.  No digital marketing, advertising or promotion by Franchisee shall be conducted on or through the Internet/world wide web or other electronic transmission via computer without express prior written approval by Franchisor, including all social media sites.  Franchisee shall monitor and control its employees so they make no social media postings using the Marks without obtaining Franchisor's prior written approval.  Franchisee understands and agrees that

C-17

franchisee's compliance with Franchisor's social media policies and controls is essential to maintenance of the YOUR CBD STORE™ brand. Without limiting the generality of the foregoing, Franchisee, without the express prior written approval of Franchisor, shall not operate, or permit to be operated on its behalf, any internet or world wide web site or page which incorporates any of the Marks or otherwise promotes the Store. All advertising and promotion by Franchisee must be factually accurate and shall not detrimentally affect the Marks or the YOUR CBD STORE™ System, as determined in Franchisor's sole discretion.

12.     **COUNSELING AND ADVISORY SERVICES AND ONSITE ASSISTANCE**

During the term of this Agreement, Franchisor may, in its sole discretion, upon the request of Franchisee, furnish counseling and advisory services to Franchisee with respect to the opening and operation of the Store, including consultation and advice regarding the following: (i) equipment selection and layout; (ii) employee selection and training; (iii) advertising and promotion; (iv) product formulas and specifications; (v) bookkeeping and accounting; (vi) purchasing and inventory control; (vii) operational problems and procedures; (viii) periodic inspections; and (ix) new developments and improvements to the YOUR CBD STORE™ System. These counseling and advisory services shall occur at Franchisor's offices or via telephone or e-mail. Franchisor shall provide such assistance at no expense to Franchisee; provided, however, Franchisor reserves the right, in its sole discretion, to charge Franchisee a reasonable fee for unusual, extensive or extraordinary assistance requested by Franchisee and/or require Franchisee to reimburse Franchisor for expenses incurred by it in connection with providing such counseling and advisory services. In addition, if requested by Franchisee and Franchisor's personnel are available, Franchisor may provide onsite assistance and training at the Store, however, Franchisor reserves the right to charge a reasonable fee for this onsite assistance plus expenses and costs incurred by Franchisor in rendering such assistance. In no event shall Franchisor be liable to Franchisee in connection with providing or failing to provide such services.

13.     **OPENING ASSISTANCE**

Before opening the Store, Franchisee shall comply with (i) all of Franchisor's pre-opening, development, construction and training requirements and checklists, and (ii) all other opening requirements set forth in this Agreement, the Operations Manual and/or elsewhere in writing by Franchisor ("Opening Requirements"). Upon satisfactory completion of the Opening Requirements, Franchisor shall provide Franchisee with an opening person(s) to assist in the opening of the Store and the training of Franchisee's management employees, which may be performed at the Store or remotely via internet or telephone. Franchisor shall provide any opening person(s) at no charge to Franchisee; provided, however, Franchisor reserves the right, in its sole discretion, to charge Franchisee for extraordinary travel and living expenses incurred by any opening person(s) in connection with providing opening assistance. In the event Franchisee needs and requests additional opening assistance from Franchisor's personnel, and Franchisor approves that request, Franchisee will pay all costs and expenses of such personnel, for as long as any such additional personnel assist at the Store. The costs and expenses associated with this assistance include, but are not limited to, wages, salary, transportation, meals, lodging and fringe benefits. All personnel provided under this Section shall be selected by Franchisor and is subject to change or removal by Franchisor in its sole discretion. Franchisee must obtain written approval by Franchisor before opening the Store. Franchisor shall have no obligation to approve the opening of the Store if (a) Franchisee has not satisfied, as determined by Franchisor, all the Opening Requirements and other

C-18

requirements under this Agreement, or (b) Franchisee or any of its affiliates are in default under any agreement with Franchisor.

14.     **TRAINING**

14.1     <u>Initial Training</u>.  The Store must have at least 1 person that (i) is designated by Franchisee to assume primary responsibility for managing the Store and (ii) will devote full time and best efforts to the management and operation of the Store (the "Managers").  Franchisee will inform Franchisor in writing as to the identity of the Managers, including all additions to and successors.  As and when required by Franchisor, the Managers must attend and successfully complete to the satisfaction of Franchisor an initial management training program specified by Franchisor or a comparable training program approved in advance by Franchisor in its sole discretion.  Each Manager required to complete the initial training program must successfully complete it before the Store may open for business.  No fee will be charged by Franchisor for the participation of up to 3 Managers in the training program, however, the Franchisee shall be responsible for the costs and expenses (such as transportation, lodging, meals and compensation) of each person who attends the training.  During operations hours, a Manager who has successfully completed the initial training program must at all times be at the Store.  In the event that a Manager ceases active employment at the Store, Franchisee must notify Franchisor within 5 days of cessation of the Manager's employment at the Store and enroll a qualified replacement in the initial management training program within 30 days of cessation of such Manager's employment.  Franchisor, in its sole discretion, reserves the right to waive all or a portion of the training program required under this Section.

14.2     <u>Training of Employees</u>.  Franchisee shall implement a training program approved by Franchisor for employees of the Store and shall be responsible for the proper training of its employees.  Franchisee agrees not to employ any person who fails or refuses to complete Franchisee's training program or is unqualified to perform his or her duties at the Store in accordance with the requirements established for the operation of a YOUR CBD STORE™.

14.3     <u>Additional Training</u>.  Franchisee and its Managers and employees shall attend and conduct such additional training programs as Franchisor may from time to time reasonably require relating to the operation of the Store and the products.  Franchisee also may be required to purchase training films or other instructional materials as specified by Franchisor from time to time in the Operations Manual or otherwise.

14.4     <u>Conferences</u>.  Franchisor may require Franchisee and/or one or more of the operating managers of the Store to attend conferences which may be offered by Franchisor from time to time.  Franchisee will be responsible for the travel and living expenses of such persons, and Franchisor may charge a reasonable fee sufficient to cover the costs and expenses of such conferences.

14.5     <u>Requirements to Attend Training</u>.  All individuals participating in training programs offered by Franchisor must (i) behave in a professional, non-disruptive, non-harassing and non-discriminatory manner during training, (ii) not be under the influence of any stimulant during training, and (iii) satisfy any other training pre-requisites set forth in the Operations Manual or otherwise.  Franchisor has a right to terminate training for any individual that, in Franchisor's judgment, does not satisfy the requirements in this Section and Franchisee must immediately designate a replacement.

15.    **MARKS**

15.1    <u>Ownership of the Marks</u>.  Franchisee acknowledges and agrees that nothing herein contained shall give Franchisee any right, title or interest in and to the Marks, except the non-exclusive right to use the Marks in connection with the operation of the Store under the YOUR CBD STORE™ System in accordance with the terms of this Agreement.  Franchisee also acknowledges and agrees that the Marks and all goodwill now or in the future pertaining to the Marks are the sole and exclusive property of Franchisor and that it shall not raise or cause to be raised any questions concerning, or objections to, the validity or ownership of the Marks on any grounds whatsoever.  Franchisee will not seek to register, re-register or assert claim to or ownership of, or otherwise appropriate to itself, any of the Marks or any marks or names confusingly similar to the Marks, or the goodwill symbolized by the Marks except insofar as such action inures to the benefit of and has the prior written approval of Franchisor.  Upon the expiration, termination or cancellation of this Agreement, whether by lapse of time, default or otherwise, Franchisee agrees immediately to discontinue all use of the Marks and to remove all copies, replicas, reproductions or simulations thereof from the Store and to take all necessary steps to assign, transfer or surrender to Franchisor or otherwise place in Franchisor or its designee title to all such names or marks (other than the Marks) which Franchisee may have used during the term of this Agreement or any renewal or extension thereof in connection with the operation of the Store.  Franchisee hereby acknowledges that Franchisor owns and controls the YOUR CBD STORE™ System and all of its components.

15.2    <u>Use of the Marks</u>.  In order to protect the Marks, the YOUR CBD STORE™ System, and the goodwill associated therewith, Franchisee shall, unless Franchisor otherwise consents in writing:

(i)    Only use the Marks designated by Franchisor, and only in the manner authorized and permitted by Franchisor.  Franchisee's right to use the Marks is limited to such uses as are authorized under this Agreement, and any unauthorized use thereof shall constitute an infringement of Franchisor's rights.

(ii)    Only use the Marks for the operation of the Store and only at the Franchised Site, or in advertising for the business conducted at or from the Franchised Site.  Franchisee may not use any of the Marks in any part of any domain name or electronic address or any similar proprietary or common carrier electronic delivery system.  Franchisee will not seek to register, or assert any claim of ownership or usage rights to, any domain name or electronic address incorporating any of the Marks or any names confusingly similar to the Marks.  Franchisee agrees, at the request of Franchisor, to take all necessary steps to assign to Franchisor all rights in or to such domain names and electronic addresses (and any registrations for the foregoing) that Franchisee may acquire.

(iii)    Operate and advertise the Store only under the name "YOUR CBD STORE™" or such other Marks as Franchisor may designate from time to time, without prefix or suffix, except to describe the location of the Store.

(iv)    If Franchisee is a corporation, limited liability company, partnership or other type of entity, not use any of the Marks, including, without limitation, the name "YOUR CBD STORE™" in its corporate or other legal name without the prior express written consent of Franchisor.

C-20

(v)     Not permit the use of any trade names, trademarks or service marks at the Store or the Franchised Site other than the Marks.

(vi)     If state or local laws or ordinances require that Franchisee file an affidavit of doing business under an assumed name or otherwise file a report or other certificate indicating that YOUR CBD STORE™ or any similar name is being used as a fictitious or assumed name, include in such filing or application therefor an indication that the filing is made as a franchisee of Your CBD Stores Franchising, LLC, a Florida limited liability company.

(vii)     Have the symbol TM, SM or R enclosed in a circle or such other symbols or words as Franchisor may designate to protect the Marks on all surfaces where the Marks appear.

15.3     <u>Infringement</u>.   Promptly notify Franchisor of any suspected unauthorized use of the Marks, any challenge to the validity of the Marks, or any challenge to Franchisor's ownership of the right of Franchisor to use and to license others to use, or Franchisee's right to use, the Marks. Franchisee acknowledges that Franchisor has the sole right to direct and control any administrative proceeding or litigation involving the Marks, including any settlement of the proceeding. Franchisor has the right, but not the obligation, to take action against uses by others that may constitute infringement of the Marks. Franchisor will defend Franchisee against any third-party claim, suit, or demand arising out of Franchisee's use of the Marks. If Franchisor, in its sole discretion, determines that Franchisee has used the Marks in accordance with this Agreement, the cost of such defense, including the cost of any judgment or settlement, will be borne by Franchisor. If Franchisor, in its sole discretion, determines that Franchisee has not used the Marks in accordance with this Agreement, the cost of such defense, including the cost of any judgment or settlement, will be borne by Franchisee. In the event of any litigation relating to Franchisee's use of the Marks, Franchisee will execute any and all documents and do such acts as may, in the opinion of Franchisor, be necessary to carry out such defense or prosecution, including, but not limited to, becoming a nominal party to any legal action. Except to the extent that such litigation is the result of Franchisee's use of the Marks in a manner inconsistent with the terms of this Agreement, Franchisor agrees to reimburse Franchisee for its out-of-pocket costs in doing such acts.

15.4     <u>Substitute Marks</u>.   If Franchisor decides to change, add or discontinue use of any Mark, or to introduce additional or substitute Marks, Franchisee, upon a reasonable period of time after receipt of written notice, shall take such action, at its sole expense, as is necessary to comply with such changes, alteration, discontinuation, addition or substitution.   Franchisor shall have no liability for any loss of revenue or goodwill due to any new Mark or discontinued Mark.

16.     **RELATIONSHIP OF THE PARTIES**

It is the express intention of the parties hereto that Franchisee is and shall be an independent contractor under this Agreement, and no partnership, joint venture, fiduciary relationship or other special relationship shall exist between Franchisee and Franchisor.   This Agreement does not constitute Franchisee as the agent, legal representative or employee of Franchisor for any purpose whatsoever, and Franchisee is not granted any right or authority to assume or create any obligation for or on behalf of, or in the name of, Franchisor or in any way to bind Franchisor.   Franchisee agrees not to incur or contract for any debt or obligation on behalf of the Franchisor, or commit any act, make any representation or advertise in any manner which may adversely affect any right of Franchisor, or be detrimental to the good name and reputation of Franchisor or any other franchisees of Franchisor.

C-21

DocuSign Envelope ID: A00B65BA-5C73-4345-B658-503992A1FB2E

17.    **MAINTENANCE OF CREDIT STANDING**

The failure or repeated delay in making prompt payments in accordance with the terms of invoices and statements rendered to Franchisee for purchases of supplies, equipment and other items, whether purchased from Franchisor or others, or defaults in making payments due hereunder or under any other agreement entered into in connection with the operation of the Store, will result in a loss of credit rating and standing which will be detrimental to Franchisor and other franchisees of the YOUR CBD STORE™ System.  Franchisee agrees to pay when due all amounts which it owes to anyone for supplies, equipment and other items used in connection with the Store and all payments owed hereunder or under any other agreement entered into in connection with the operation of the Store.  Franchisee must notify Franchisor immediately when and if Franchisee becomes more than 90 days delinquent in the payment of any of the obligations mentioned above.

18.    **INDEMNIFICATION, INSURANCE AND TAXES**

   18.1    <u>Indemnification</u>.  Franchisee agrees to indemnify, defend and hold harmless Franchisor and its affiliates, shareholders, directors, officers, employees, agents, successors and assignees (the "Indemnified Parties") against and to reimburse any one or more of the Indemnified Parties for all claims, obligations and damages described in this Section, any taxes described in Section 18.3 below and any claims and liabilities directly or indirectly arising out of the Store's operation or Franchisee's breach of this Agreement, except to the extent they arise as a result of Franchisor's own gross negligence or willful misconduct.  For purposes of this indemnification, "claims" includes all obligations, damages (actual, consequential or otherwise) and costs reasonably incurred in the defense of any claim against any of the Indemnified Parties, including reasonable accountants', arbitrators', attorneys' and expert witness fees, costs of investigations and proof of facts, court costs, other expenses of litigation, arbitration or alternative dispute resolution and travel and living expenses.  Franchisor has the exclusive right to defend any such claim.  This indemnity will continue in effect after the expiration or termination of this Agreement.  Under no circumstances will Franchisor or any other Indemnified Party be required to seek recovery from any insurer or other third party, or otherwise to mitigate its or their losses and expenses, in order to maintain and recover fully a claim against Franchisee.

   18.2    <u>Insurance</u>.  Franchisee agrees to secure and maintain during the term of this Agreement, at its own cost, the following insurance policies by carriers approved by Franchisor:

         (i)    Such insurance as may be required by the terms of any lease for the Franchised Site or, if there is no such lease, Franchisee agrees to carry fire and extended coverage insurance covering the building and all equipment, supplies, products, inventory, furniture, fixtures and other tangible property located in the Store or on the Franchised Site in the amount of the full insurable value of such property.

         (ii)    Commercial General Liability Insurance, including coverage for products-completed operations, contractual liability, personal and advertising injury, fire damage, medical expenses, and dram shop/liquor liability, having a combined single limit for bodily injury and property damage of $1,000,000 per occurrence and $2,000,000 in the aggregate (except for fire damage and medical expense coverages, which may have different limits of not less than $300,000 for one fire and $5,000 for one person, respectively); plus (ii) non-owned automobile liability insurance and, if Franchisee owns, rents or identifies any vehicles with any Mark or vehicles are used in connection with the operation of the Store, automobile liability coverage for owned, non-owned, scheduled and hired

C-22

vehicles having a combined single limit of $1,000,000 per occurrence; plus (iii) excess liability umbrella coverage for the general liability and automobile liability coverages in an amount of not less than $2,000,000 per occurrence and aggregate.  All such coverages shall be on an occurrence basis and shall provide for waivers of subrogation.

(iii)     Workers' compensation insurance, or a similar policy if the Store is located in a non-subscriber state, covering all of its employees as is required by law.

(iv)     Adequate limits for comprehensive crime and blanket employee dishonesty insurance.

(v)     Business interruption and extra expense insurance for a minimum of six months to cover net profits and continuing expenses (including Royalty Fees).

Franchisee agrees that Franchisor shall be named as an additional insured under each of the foregoing insurance policies.  Before the opening of the Store and, thereafter, at least 30 days before the expiration of any such policy or policies, Franchisee shall deliver to Franchisor  certificates of insurance evidencing the proper coverage with limits not less than those required hereunder, and all such certificates shall expressly contain endorsements requiring the insurance company to give Franchisor at least 30 days written notice in the event of material alteration to termination, non-renewal, or cancellation of, the coverages evidenced by such certificates and notice of any claim filed under such policy within 30 days after the filing of such claim.  Franchisor may, from time to time, during the term of this Agreement, at its sole option, require that the minimum limits and types of insurance coverage, as specified above, be increased or changed as determined solely by Franchisor.  If Franchisee at any time fails or refuses to maintain any insurance coverage required by Franchisor or to furnish satisfactory evidence thereof, Franchisor, at its option and in addition to its other rights and remedies hereunder, may, but need not, obtain such insurance coverage on behalf of Franchisee, and Franchisee shall pay to Franchisor on demand any premiums incurred by Franchisor in connection therewith.  Franchisee's obligation to obtain and maintain, or cause to be obtained and maintained, the foregoing policy or policies in the amounts specified shall not be limited in any way by reason of any insurance which may be maintained by Franchisor, nor shall Franchisee's performance of that obligation relieve it of liability under the indemnity provisions set forth in Section 18.1 hereof.  Notwithstanding the existence of such insurance, Franchisee, as agreed above, is and shall be responsible for all loss or damage and contractual liability to third persons originating from or in connection with the operation of the franchised business and for all claims or demands for damages to property or for injury, illness or death of persons directly or indirectly resulting therefrom.

Notwithstanding the above, Franchisor will provide product liability insurance coverage to Franchisee, which insurance shall flow through from Franchisor's liability insurance policy.  This coverage will apply to all Sunflora products sold to Franchisee by Sunflora or Franchisor.

18.3    Taxes.  Franchisee shall promptly pay when due all taxes levied or assessed by reason of its operation and performance under this Agreement including, but not limited to, if applicable, state employment tax, state sales tax (including any sales or use tax on equipment purchased or leased) and all other taxes and expenses of operating the Store.  In no event shall Franchisee permit a tax sale or seizure by levy or execution or similar writ or warrant to occur against the Store, the Franchised Site or any tangible personal property used in connection with the operation of the Store.

C-23

19.    **ASSIGNMENT**

19.1    <u>Assignment by Franchisor</u>.   This Agreement may be unilaterally assigned by the Franchisor and shall inure to the benefit of its successors and assigns.  Franchisee agrees and affirms that Franchisor may sell itself, its assets, the Marks and/or the YOUR CBD STORE™ System to a third-party; may go public, may engage in private placement of some or all of its securities; may merge, acquire other corporations, or be acquired by another corporation; and/or may undertake a refinancing, recapitalization, leveraged buyout or other economic or financial restructuring.  Franchisee further agrees and affirms that Franchisor has the right, now or in the future, to purchase, merge, acquire or affiliate with an existing competitive or noncompetitive franchise network, chain or any other business regardless of the location of that chain's or business' facilities, and to operate, franchise or license those businesses and/or facilities as YOUR CBD STORES™ operating under the Marks or any other marks following Franchisor's purchase, merger, acquisition or affiliation, regardless of the location of these facilities, which Franchisee acknowledges may be proximate to any of its Stores.  With regard to any of the above sales, assignments and dispositions, Franchisee expressly and specifically waives any claims, demands or damages arising from or related to the loss of Franchisor's name, the Marks (or any variation thereof) and the YOUR CBD STORE™ System and/or the loss of association with or identification of YOUR CBD STORE™ under this Agreement.  If Franchisor assigns its rights in this Agreement, nothing in this Agreement shall be deemed to require Franchisor to remain in the YOUR CBD STORE™ business or to offer or sell any products or services to Franchisee.

19.2    <u>Assignment by Franchisee</u>.   Franchisee shall not subfranchise, sell, assign, transfer, merge, convey or encumber (each, a "Transfer"), the Store, the Franchised Site, this Agreement or any of its rights or obligations hereunder, or suffer or permit any such Transfer of the Store, the Franchised Site, this Agreement or its rights or obligations hereunder to occur by operation of law or otherwise without the prior express written consent of Franchisor.  In addition, if Franchisee is a corporation, limited liability company, partnership, business trust, or similar association or entity, the shareholders, members, partners, beneficiaries, investors or other equity holders, as the case may be, may not Transfer their equity interests in such corporation, limited liability company, partnership, business trust, or similar association or entity, without the prior written consent of Franchisor.  Furthermore, in the event that any shareholder, member, partner, investor or other equity holder of Franchisee (the "Equity Holder") is a corporation, limited liability company, partnership, business trust, or similar association or entity, the interests of the shareholders, members, partners, beneficiaries, investors or other equity holders, as the case may be, in such Equity Holder, may not be Transferred, without the prior written consent of Franchisor.  Franchisor will not unreasonably withhold consent to a Transfer provided the requirements of Section 19.4 have been satisfied.  Any Transfer in violation of this Section shall be void and of no force and effect.  In the event Franchisee or an Equity Holder is a corporation, limited liability company, partnership, business trust, or similar association or entity with certificated equity interests, all stock or equity certificates of Franchisee or Equity Holder, as the case may be, shall have conspicuously endorsed upon them a legend in substantially the following form:

"A transfer of this stock is subject to the terms and conditions of YOUR CBD STORE™
                FRANCHISE        AGREEMENT        dated        the____        day        of
                _____, 20__."

19.3    <u>Death or Disability of Franchisee</u>.  Upon Franchisee's death or Disability (as such term is hereinafter defined), this Agreement or the ownership interest of any deceased or disabled shareholder,

C-24

partner, member or other equity holder of the Franchisee or an Equity Holder must be transferred to a party approved by Franchisor.   Any Transfer, including, without limitation, transfers by devise or inheritance or trust provisions, shall be subject to the same conditions for Transfers set forth in Section 19.4.   Franchisor shall not unreasonably withhold its consent to the Transfer of this Agreement or any ownership interest to the deceased or disabled Franchisee's or Equity Holder's spouse, heirs or members of his or her immediate family, provided all requirements of Section 19.4 have been complied with (except payment of the transfer fee, which shall not apply to such Transfers).  A "Disability" shall have occurred with respect to Franchisee if Franchisee, or, if Franchisee is a corporation, partnership or limited liability company, its controlling shareholder, partner, member or other equity holder, is unable to actively participate in its activities as Franchisee hereunder for any reason for a continuous period of six months.  As used in this Section 19.3, "Franchisee" may include a disabled or deceased controlling shareholder, partner or member where the context so requires.

19.4    <u>Approval of Assignment</u>.   Franchisor's approval of any Transfer is, in all cases, contingent upon the following:

(i)     the purchaser and/or the controlling persons of the purchaser having a satisfactory credit rating, being of good moral character, having business qualifications satisfactory to Franchisor, being willing to comply with Franchisor's training requirements and being willing to enter into an agreement in writing to assume and perform all of Franchisee's duties and obligations hereunder and/or enter into a new Franchise Agreement, if so requested by Franchisor, and agreeing to enter into any and all agreements with Franchisor that are being required of all new franchisees, including a guaranty agreement, or any other agreement which may require payment of different or increased fees from those paid under this Agreement; provided, however, the amount of the Royalty Fees paid hereunder shall not be increased upon an assignment;

(ii)     the terms and conditions of the proposed transfer (including, without limitation, the purchase price) being satisfactory to Franchisor;

(iii)     all monetary obligations (whether hereunder or not) of Franchisee to Franchisor or Franchisor's affiliates or subsidiaries being paid in full;

(iv)     Franchisee not being in default hereunder or any other agreement between Franchisee and Franchisor, including the Development Agreement;

(v)     Franchisee and its owners executing a general release of any and all claims against Franchisor and its affiliates, subsidiaries, members, managers, officers, directors, employees and agents, in a form satisfactory to Franchisor;

(vi)     Franchisee paying to Franchisor a transfer fee equal to one-half of the then current Franchise Fee plus reimbursement for all legal, training and other expenses incurred by Franchisor in connection with the Transfer;

(vii)     Franchisee first offering to sell such interest to Franchisor pursuant to Section 22.3 of this Agreement and the same having been declined in the manner therein set forth;

2020 FA v.2
2020 FDD and FA v.3a
01701353-1

(viii)   the Marks not being used in any advertising for any Transfer prohibited by Sections 19.2 and 19.3 hereof; and

(ix)   at Franchisor's request, the proposed transferee or assignee refurbishes the Store in the manner and subject to the provisions described in Section 2.2(v) hereof.

19.5   <u>Removal of General Partner</u>.  If Franchisee is a limited partnership, Franchisee may not remove or appoint, or permit the limited partners to remove or appoint, a new or successor general partner without the prior written consent of Franchisor (even if such appointment is due to the resignation, death or disability of the General Partner).

20.   **RESTRICTIVE COVENANTS**

20.1   <u>Covenants Not to Compete</u>.

(i)   <u>Non-Competition during Term</u>.  In addition to and not in limitation of any other restrictions on Franchisee contained herein, Franchisee and Franchisee's spouse, and, if Franchisee is not an individual, its shareholders, members, partners and managers, as applicable, and their spouses (each, a "Bound Party"), agree that they will not, during the term of this Agreement, directly or indirectly, for and on behalf of itself, himself, herself or any other person or entity, during the term of this Agreement (a) have any direct or indirect interest as a disclosed or beneficial owner in a Competitive Business (as defined below), regardless of location or (b) perform services as a director, officer, manager, employee, consultant, representative, agent, or otherwise for a Competitive Business, regardless of location.

(ii)   <u>Post-Term Non-Competition</u>.  In addition to and not in limitation of any other restrictions on Franchisee contained herein, Franchisee and the Bound Parties agree that they will not, for two years following the effective date of termination or expiration of this Agreement for any reason, or following the date of a Transfer by Franchisee, directly or indirectly, for and on behalf of itself, himself, herself or any other person or entity, (a) have any direct or indirect interest as a disclosed or beneficial owner in a Competitive Business or (b) perform services as a director, officer, manager, employee in a sales-related capacity, consultant, representative, agent, or otherwise for a Competitive Business which, in either case, is located or operating within a five mile radius of any YOUR CBD STORE™ .

(iii)   <u>General</u>.   For purposes of this Agreement, the term "Competitive Business" means any business operating, or granting franchises or licenses to others to operate, a YOUR CBD STORE™ or other service business (a) engaged in the retail or wholesale production or sale herbal and nutritional supplements containing lawful CBD "cannabidiol" from industrial hemp and (b) that derives more than 50% of its revenue from sales of CBD products (other than another YOUR CBD STORE™ operated by Franchisee under license from Franchisor).  Neither Franchisee nor the other Bound Parties will be prohibited from owning securities in a Competitive Business if they are listed on a stock exchange or traded on the over-the-counter market and represent 5% or less of the number of shares of that class of securities which are issued and outstanding.  The parties acknowledge that the covenants contained in Section 20.1 are based on the reason and understanding that Franchisee and the Bound Parties will possess knowledge of Franchisor's business and operating methods and confidential information, disclosure and use of which would prejudice the interest of Franchisor and its Franchisees. Franchisee further understands and acknowledges the difficulty of ascertaining monetary damages and the irreparable harm that would result from breach of these covenants.  If any part of this restriction is

C-26

found to be unreasonable in time or distance, such time or distance may be reduced by appropriate order of the court to that deemed reasonable. Franchisor shall, as a matter of course, receive injunctive relief to enforce such covenants in addition to any other relief to which it may be entitled at law or in equity. Franchisor shall receive such injunctive relief without the necessity of posting bond or other security, such bond or other security being hereby waived. Franchisee understands and agrees that the waiver of bond is a critical element in this Agreement without which, Franchisor would not have entered into this contract.

20.2   <u>Non-Solicitation of Employees</u>.   Franchisee and the Bound Parties agree that while this Agreement is in effect and for one year after expiration or termination of this Agreement for any reason, or following the date of a Transfer by Franchisee, they will not, directly or indirectly, solicit or attempt to solicit, or otherwise interfere with or disrupt the employment relationship between Franchisor and any of its employees.

20.3   <u>Trade Secrets and Confidential Information</u>.

(i)   Franchisee acknowledges and agrees that in connection with the operation of YOUR CBD STORE™ and the YOUR CBD STORE™ System, Franchisor has developed at a great expense competitively sensitive proprietary and confidential information which are not commonly known by or available to the public. This proprietary and confidential information does not include any information that (a) is commonly known by or available to the public; (b) has been voluntarily disclosed to the public by Franchisor; (c) been independently developed or lawfully obtained by Franchisee; or (d) has otherwise entered the public domain through lawful means. All information which comprises the YOUR CBD STORE™ System including the information and data in the Operations Manual will be presumed to be confidential information of Franchisor.

(ii)   Franchisee and each Bound Party agree that while this Agreement remains in effect such party will not, directly or indirectly, disclose or publish to any party, or copy or use for such party's own benefit, or for the benefit of any other party, any of Franchisor's proprietary or confidential information, except as required to carry out Franchisee's obligations under this Agreement or as Franchisor has otherwise expressly approved in writing. All proprietary and confidential information of Franchisor is the sole and exclusive property of Franchisor. Franchisee and each Bound Party agree that the restriction contained in the preceding sentence will remain in effect with respect to the confidential information for five years following termination or expiration of this Agreement for any reason; provided, however, if the confidential information rises to the level of a trade secret, then such restriction shall remain in effect until such time as the information does not constitute a trade secret. Franchisee also agrees that it and all of its employees and agents will take appropriate steps to protect Franchisor's confidential information from any unauthorized disclosure, copying or use. At any time upon Franchisor's request, and in any event upon termination or expiration of this Agreement, Franchisee will immediately return any copies of documents where there are materials containing confidential information and will take appropriate steps to permanently delete and render unusable any confidential information stored electronically.

20.4   <u>Personal Covenants of Certain Bound Parties</u>.   As a condition to the effectiveness of this Agreement, and at the time Franchisee delivers this signed Agreement to Franchisor, each Bound Party of Franchisee must sign and deliver to Franchisor the Personal Covenants attached hereto as Exhibit B (the "Personal Covenants"), agreeing to be bound personally by all the provisions of Sections 20.1, 20.2

and 20.3 hereof.  If there are any changes in the identity of any such Bound Party while this Agreement is in effect, Franchisee must notify Franchisor promptly and make sure the new Bound Party signs and delivers to Franchisor the Personal Covenants.

20.5    <u>Agreements by Other Third Parties</u>.  As a condition to Franchisor's execution of this Agreement, Franchisee, if requested by Franchisor, shall cause each of its management and supervisory employees and other employees to whom disclosures of confidential information are made to execute a noncompetition, nonsolicitation and/or nondisclosure agreement in the form(s) prescribed by Franchisor from time to time.

20.6    <u>Reasonable Restrictive Covenants</u>.  Franchisee acknowledges and agrees that (i) the covenants and restrictions in this Section 20 are reasonable, appropriate and necessary to protect the YOUR CBD STORE™ System, other YOUR CBD STORE™ franchisees and the legitimate interest of the Franchisor, and (ii) do not cause undue hardship on Franchisee or any of the other individuals required by this Section 20 to comply with the covenants and restrictions.

21.    **TERMINATION**

21.1    <u>Termination by Franchisee</u>.  Franchisee may terminate this Agreement if Franchisee is in substantial compliance with this Agreement and Franchisor materially breaches this Agreement and fails to cure such material breach within 90 days after written notice thereof is delivered to Franchisor. Notwithstanding the foregoing, if the breach is curable but is of a nature which cannot reasonably be cured with such 90 day period and Franchisor has commenced and is continuing to make good faith efforts to cure such breach, Franchisor shall be given an additional 60 day period to cure the same, and this Agreement shall not terminate.  In the event of termination by Franchisee, all post-termination obligations of Franchisee described herein shall not be waived but shall be strictly adhered to by Franchisee.

21.2    <u>Termination by Franchisor without a Cure Period</u>.    Franchisor may immediately terminate this Agreement upon written notice to Franchisee, without opportunity to cure, if:

(i)    Franchisee files a petition under any bankruptcy or reorganization law, becomes insolvent, or has a trustee or receiver appointed by a court of competent jurisdiction for all or any part of its property;

(ii)    Following commencement of the operation of the Store, Franchisee ceases to operate the Store at the Franchised Site;

(iii)    Franchisee seeks to effect a plan of liquidation, reorganization, composition or arrangement of its affairs, whether or not the same shall be subsequently approved by a court of competent jurisdiction; it being understood that in no event shall this Agreement or any right or interest hereunder be deemed an asset in any insolvency, receivership, bankruptcy, composition, liquidation, arrangement or reorganization proceeding;

(iv)    Franchisee has an involuntary proceeding filed against it under any bankruptcy, reorganization, or similar law and such proceeding is not dismissed within 60 days thereafter;

(v)     Franchisee makes a general assignment for the benefit of its creditors;

(vi)     Franchisee fails to pay when due any amount owed to Franchisor or its affiliates or subsidiaries, whether under this Agreement or not, and Franchisee does not correct such failure within 10 calendar days after written notice thereof is delivered to Franchisee;

(vii)     Franchisee fails to pay when due any amount owed to any creditor, supplier or lessor of the Store or the Franchised Site or any taxing authority for federal, state or local taxes (other than amounts being bona fide disputed through appropriate proceedings) and Franchisee does not correct such failure within 10 calendar days after written notice is delivered thereof to Franchisee;

(viii)     Franchisee fails to commence operation of the Store at the Franchised Site within 4 months after execution of this Agreement, except for any delay that is agreed to in writing by the Franchisor, in its sole discretion;

(ix)     Franchisee or any of Franchisee's owners are convicted of or plead no contest to a felony, a crime involving moral turpitude or any other crime or offense that is likely to adversely affect the reputation of the YOUR CBD STORE™ System and the goodwill associated with the Marks;

(x)     Franchisee operates the Store or any phase of the franchised business in a manner that presents a health or safety hazard to Franchisee's customers, employees or the public;

(xi)     Franchisee makes a material misrepresentation to Franchisor before or after being granted the franchise;

(xii)     Franchisee makes an unauthorized Transfer of this Agreement, the franchise, the Store, or an ownership interest in Franchisee;

(xiii)     Franchisee or any Bound Party or any other employee of Franchisee breaches or fails to comply fully with Section 20 above;

(xiv)     Franchisee (a) misuses or makes an unauthorized use of or misappropriates any Mark, (b) commits any act which can be reasonably expected to materially impair the goodwill associated with any Mark, (c) challenges Franchisor's ownership of the Marks, (d) files a lawsuit involving the Marks without Franchisor's consent, or (e) fails to cooperate with Franchisor in the defense of any Mark;

(xv)     Franchisee makes or permits a third party to make any unauthorized use or disclosure of any confidential information or trade secret of Franchisor;

(xvi)     Franchisee fails to comply with any federal, state or local law or regulation applicable to the operation of the franchise (including any failure to comply with the Anti-Terrorism Laws (as defined below) as set forth in Section 42.2 below);

(xvii)     The franchised business or the Franchised Site is seized, taken over or foreclosed by a government official in the exercise of his or her duties, or seized, taken over or foreclosed by a creditor, lienholder or lessor, provided that a final judgment against Franchisor remains unsatisfied for 30 days (unless a supersedeas or other appeal bond has been filed), or a levy of execution has been made

C-29

upon the license granted by this Agreement or any property used in the franchised business, and it is not discharged within five days of such levy;

(xviii) Franchisee loses for any cause whatsoever right of possession as owner or lessee of the real property on which the Store is located. (However, if all or a substantial part of the real property on which the Store is located is taken by eminent domain proceedings so as to make the Store not in compliance with Franchisor's construction specifications or so as to make the Store inoperable for the purpose of carrying out the requirements of this Agreement, then Franchisor and Franchisee will agree upon a new location for the Store and Franchisee will construct and equip the new Store in accordance with the then current construction specifications of Franchisor within 180 days after the designation of such location. All of the terms of this Agreement not specifically modified herein shall apply to the construction, maintenance and operation of such new Store);

(xix) Franchisee knowingly maintains false books or records or denies Franchisor's authorized representatives immediate access to Franchisee's books and records during an audit or inspection;

(xx) Franchisee submits to Franchisor a financial report or other data, information or supporting records which understate by more than 5% the Advertising Fees due for any reporting period and is unable to demonstrate that such understatements resulted from an inadvertent error;

(xxi) Franchisee has received at least three default notices from Franchisor within a 12 month period, even if such default is subject to a right to cure or is cured after notice is delivered to Franchisee; or

(xxii) Franchisee is dissolved either voluntarily or involuntarily.

21.3    Termination by Franchisor with a Cure Period.    Franchisor shall have the right to terminate this Agreement upon 30 days written notice if defaults remain uncured in Franchisor's sole discretion for the following reasons. Notwithstanding the foregoing, if the breach is curable but is of a nature which cannot reasonably be cured within such 30 day period and Franchisee has commenced and is continuing to make good faith efforts to cure such breach, Franchisee shall be given an additional 30 day period to cure the same, and this Agreement shall not terminate.

(i)    Franchisee fails or refuses to submit financial statements, reports or other operating data, information or supporting records when due;

(ii)    Franchisee fails to relocate or commits a default (other than a monetary default which shall be subject to Section 21.2(vii) above) under the lease, sublease, purchase contract or other contract for the Franchised Site, the Store or any equipment or supplies utilized in the operation thereof;

(iii)    Franchisee fails to provide or maintain required insurance coverage;

(iv)    Franchisee fails to restore the Store to full operation within a reasonable period of time (not to exceed 90 days) after the Store is rendered inoperable by any casualty; or

(v)     Franchisee fails to comply with any other provision of this Agreement or any mandatory specification, standard or operating procedure prescribed by Franchisor.

21.4    <u>Management of Store by Franchisor</u>.  In addition to Franchisor's right to terminate this Agreement, and not in lieu thereof, Franchisor may enter into the Store and exercise complete authority with respect to the management thereof until such time as Franchisor shall determine that the default of Franchisee has been cured and that Franchisee is complying with the requirements of this Agreement. Franchisee specifically agrees that a designated representative of Franchisor may take control and manage the Store in the event of any such default.  If Franchisor assumes the management of the Store, Franchisee must pay Franchisor a Management Fee equal to ten percent (10%) of the Store's Gross Sales (the "Management Fee") plus reimburse Franchisor for the full compensation paid to such representative, including the cost of all fringe benefits plus any and all expenses reasonably incurred by such representative so long as such representative shall be necessary and in any event until the default has been cured and Franchisee is complying with the terms of this Agreement.  Franchisee acknowledges that the Management Fee shall be in addition to the Advertising Fee and any other fees required under this Agreement and shall be paid in accordance with the methods of payment set forth in Section 5.  If Franchisor assumes the Store's management, Franchisee acknowledges that Franchisor will have a duty to utilize only reasonable efforts and will not be liable to Franchisee or its owners for any debts, losses, or obligations the Store incurs, or to any of Franchisee's creditors for any supplies or services the Store purchases, while Franchisor manages it.

22.     **EFFECT OF AND OBLIGATIONS UPON TERMINATION**

22.1    <u>Liquidated Damages</u>.  Franchisee acknowledges and confirms that by granting Franchisee the license to operate the Store in the Franchise Territory, Franchisor lost the opportunity to grant a franchise for the Franchise Territory to another person or entity or to itself to own and operate a Store within the Franchise Territory.  Additionally, Franchisee confirms that Franchisor will suffer substantial damages by virtue of the termination of this Agreement, including, without limitation, lost product revenues, lost market penetration and goodwill in the Franchise Territory, lost opportunity costs and the expense Franchisor will incur in developing another franchise for the Franchise Territory, which damages are impractical and extremely difficult to ascertain and/or calculate accurately, and the proof of which would be burdensome and costly, although such damages are real and meaningful to Franchisor and the YOUR CBD STORE™ System.  Accordingly, in the event that Franchisor terminates this Agreement for Franchisee's default hereunder, Franchisee agrees to pay to Franchisor in a lump sum on the effective date of termination, liquidated damages in the amount of $20,000 within 2 weeks of termination of the Franchise Agreement by us.

Franchisee acknowledges that its obligation to pay Franchisor liquidated damages is in addition to, not in lieu of, Franchisee's obligations to pay other amounts due to Franchisor under this Agreement up to the date of termination and to strictly comply with any other post-termination obligations required hereunder.  Should any valid, applicable law or regulation of a competent governmental authority having jurisdiction over this Agreement limit Franchisee's ability to pay, and Franchisor's ability to receive, such liquidated damages, Franchisee shall be liable to Franchisor for any and all damages which it incurs, now or in the future, as a result of Franchisee's default under this Agreement.

C-31

22.2    Obligations upon Termination or Expiration.  Upon the termination or expiration of this Agreement, whether by reason of lapse of time, default in performance, abandonment of the Store or other cause or contingency, Franchisee shall:

(i)    forthwith return to Franchisor all material furnished by Franchisor containing confidential information, operating instructions, business practices, or methods or procedures, including, without limitation, the Operations Manual;

(ii)    discontinue at the Franchised Site all use of the Marks, and the use of any and all signs, products, paper goods and other items bearing the Marks.  Any signs containing the Marks which Franchisee is unable to remove within one day of the termination or expiration of this Agreement shall be completely covered by Franchisee until the time of their removal which shall be within 10 days of termination or expiration of this Agreement;

(iii)    if Franchisee retains possession of the Franchised Site, at Franchisee's expense, make such reasonable modifications to the exterior and interior décor of the Store and the Franchised Site as Franchisor requires to eliminate its identification as a YOUR CBD STORE™ and to avoid violation of the non-compete provision;

(iv)    refrain from operating or doing business under any name or in any manner that may give the general public the impression that this Agreement is still in force or that Franchisee is connected in any way with Franchisor or that Franchisee has the right to use the YOUR CBD STORE™ System or the Marks;

(v)    refrain from making use of or availing itself to any of the confidential information, Operations Manual or other information received from Franchisor or disclosing or revealing any of the same in violation of Section 20.3 hereof;

(vi)    take such action as may be required to cancel all assumed names or equivalent registrations relating to the use of any Mark;

(vii)    assign to Franchisor or its designee all of Franchisee's rights, title, and interest in the telephone numbers, telephone directory listings and advertisements, website URLs (whether acquired by Franchisee in accordance with or in violation of Section 15.2 hereof), e-mail addresses, store leases and governmental licenses or permits used for the operation of the Store.  Simultaneously with Franchisee's execution of this Agreement, Franchisee will execute the Internet Web Sites and Listings Agreement attached hereto as Exhibit C and the Telephone Listing Agreement attached hereto as Exhibit D; and

(viii)   strictly comply with the terms and conditions of Section 20 above and any other procedures in the Operations Manual that are established by Franchisor related to discontinuing operations of the Store.

If Franchisee fails to modify the exterior and interior décor of the Store and the Franchised Site as Franchisor requires to eliminate its identification as a YOUR CBD STORE™ (including the removal of all signs bearing the Marks), Franchisor may take such action to modify the exterior and interior décor of the Store and the Franchised Site and charge Franchisee for the cost of such action.  Franchisee shall

C-32

immediately pay Franchisor for the cost of any action taken by Franchisor to modify the exterior and interior décor of the Store and the Franchised Site.

      22.3   <u>Sale upon Expiration or Termination</u>.

          (i)     Except in the case of a renewal under Section 2, if this Agreement expires or is terminated or canceled for any reason, Franchisor shall have the option to purchase the Store, or a portion of the assets of the Store (including fixtures, furniture, equipment and improvements), and which may include at Franchisor's option, all of Franchisee's leasehold interest in and to the real estate upon which the Store is located, but not including real property (collectively, the "Assets"), to Franchisor. If Franchisor desires to purchase the Assets but the parties are unable to agree as to a purchase price and terms of such sale, the fair market value of the Assets (to be determined without goodwill or going concern value) shall be determined by three appraisers. Franchisee and Franchisor shall each select one appraiser, and the two appraisers so chosen shall select the third appraiser. The three appraisals shall be averaged to determine the purchase price. Franchisor shall have the right, at any time within 15 days after being advised in writing of the decision of the appraisers as aforesaid, to purchase the Assets at the purchase price as determined above. Each party shall be responsible for the costs and expenses of the appraiser it selected and the cost of the third appraiser shall be shared equally by the parties. Nothing contained in this Section shall be deemed to be a waiver by Franchisor of any default by Franchisee under this Agreement nor shall the exercise of the option to purchase the Assets contained in this Section affect any other rights or remedies granted to Franchisor hereunder or otherwise available to it.

          (ii)    Notwithstanding the provisions set forth in Section 22.3(i) above, if, within 45 days following the expiration of this Agreement, Franchisee shall receive a bona fide offer for the purchase of the Assets, Franchisee shall offer the same in writing to Franchisor at the same price and on the same terms or the monetary equivalent; which offer Franchisor may accept at any time within 15 days after receipt thereof. If Franchisor declines, or does not within such 15 day period accept, such offer, then Franchisee may sell the Assets to such purchaser, but not at a lower price nor on more favorable terms than have been offered to Franchisor.

          (iii)   Any sale of the Assets hereunder shall close no later than 60 days after delivery of written notice of Franchisor's exercise of its option is given to Franchisee. Franchisor has the right to assign its option hereunder and Franchisee must sign all documents of transfer reasonably necessary for the purchase of the Assets. All Assets transferred shall be free and clear of all liens and encumbrances, with all sales and transfer taxes paid by the Franchisee. At the closing, Franchisee and its owners shall execute general releases, in a form satisfactory to Franchisor, of any and all claims against Franchisor and its owner, officers, employees, directors, agents, successors, and assigns.

      22.4   <u>Effect of Expiration or Termination</u>. Upon the expiration or termination of this Agreement for any reason, any and all rights granted to Franchisee hereunder shall be extinguished immediately, and Franchisee shall not be relieved of any of its obligations, debts or liabilities hereunder. The expiration or termination of this Agreement for any reason will be without prejudice to the rights of Franchisor against Franchisee and will not destroy or diminish the binding force and effect of any of the provisions of this Agreement that expressly, or by reasonable implication, come into or continue in effect on or after the expiration or termination hereof.

C-33

23.     **RIGHT OF FIRST REFUSAL**

If during the term of this Agreement, Franchisee shall receive a bona fide offer from a prospective purchaser for any interest in Franchisee or the Store (whether by sale of assets, sale of equity interest, merger, consolidation or otherwise), it shall offer the same to Franchisor in writing at the same price and on the same terms or the monetary equivalent; which offer Franchisor may accept at any time within 30 days after receipt thereof.  If the parties cannot agree on a reasonable monetary equivalent, an independent appraiser designated by Franchisor shall determine the monetary equivalent and the appraiser's determination will be final.  If Franchisor declines, or does not within such 30 day period accept, such offer, then Franchisee may make such Transfer to such purchaser (provided Franchisor approves of such purchaser in accordance with Section 19.2 and subject to compliance with Section 19.4), but not at a lower price nor on more favorable terms than have been offered to Franchisor.  If Franchisee fails to complete such Transfer within 90 days following the refusal or failure to act by Franchisor, then Franchisee may not complete such Transfer without first offering the same to Franchisor again as provided above.  The parties recognize that the terms of this Section 23 do not apply to a sale and subsequent leaseback of the Franchised Site or any furnishings or equipment used thereon, or any other Transfer of the Franchised Site or the furnishings or equipment thereon in connection with any bona fide financing plan.  In no event shall Franchisee offer any interest in this Agreement, or such premises or any interest therein, or any interest in the business conducted thereon, or in the equipment or furnishings located thereon, or in any interest of Franchisee or an Equity Holder for Transfer at public auction, nor at any time shall an offer be made to the public to Transfer the same, through the medium of advertisement, either in the newspapers or otherwise, without having first obtained the written consent of Franchisor to such advertisement or publication.

24.     **STORE CLASSIFICATION**

Franchisee shall operate and maintain the YOUR CBD STORE™ in a manner which will ensure that the Store will obtain the highest classification possible for CBD Stores of like kind from the governmental authorities that inspect CBD Stores in the area where the Store is operated.  If Franchisee is not able to obtain such classification, or if Franchisee fails to operate in accordance with the general standards of quality, maintenance, repairs and sanitation required by Franchisor, then Franchisor may, at its option, place such trained personnel in the Store as Franchisor deems necessary to train the managerial and operating personnel of the Store until the Store can obtain the highest classification or meet such general standards.  Franchisor's personnel shall remain at the Store until the required classification is obtained or until Franchisor, in its sole discretion, decides to remove them.  Franchisee shall pay all costs associated with providing such personnel, including costs of transportation, meals, lodging, wages or other compensation, including fringe benefits.

25.     **OTHER BUSINESS**

Franchisee agrees not to carry on or conduct or permit others to carry on or conduct any other business, activity or operation at the Store (other than the operation of the Store in conformity with this Agreement and the Operations Manual) without first obtaining the written consent of Franchisor.

26.     **OWNERSHIP OF FRANCHISEE**

Attached hereto as Exhibit E is a description of the legal organization of Franchisee (whether a corporation, limited, liability company, partnership or otherwise), the names and addresses of each person

C-34

or entity owning a 10% or greater interest in Franchisee (the "Principal Owners") and the percentage of such interest owned by such person or entity.  Franchisee agrees to notify Franchisor in writing whenever there is any change in the organizational structure or ownership interest of Franchisee as set forth on Exhibit E.   At Franchisor's request, Franchisee shall provide to Franchisor a copy of all Franchisee's governing and/or organizational documents and any amendments thereto.  Franchisor may require each Principal Owner to execute the Guaranty Agreement attached hereto as Exhibit F.

27.     **SUCCESSORS AND THIRD PARTY BENEFICIARIES**

This Agreement and the covenants, restrictions and limitations contained herein shall be binding upon and shall inure to the benefit of Franchisor and its successors and assigns and shall be binding upon and shall inure to the benefit of Franchisee and its permitted heirs, successors and assigns.  Except as contemplated by Section 18.1, nothing in this Agreement is intended, nor is deemed, to confer any rights or remedies upon any person or legal entity not a party hereto.  This Agreement is, however, intended to bind the Bound Parties to the extent set forth in this Agreement.

28.     **CONSTRUCTION**

All terms and words used in this Agreement, regardless of the number and gender in which they are used, shall be deemed and construed to include any other number, and any other gender, as the context or sense of this Agreement or any provision hereof may require, as if such words had been fully and properly written in the appropriate number and gender.  All covenants, agreements and obligations assumed herein by Franchisee shall be deemed to be joint and several covenants, agreements and obligations of each of the persons named as Franchisee, if more than one person is so named.  Except where this Agreement expressly obligates Franchisor not to unreasonably withhold its approval of any of Franchisee's actions or requests, Franchisor has the absolute right, in its sole and arbitrary discretion, to refuse any request Franchisee makes or to withhold its approval of any of Franchisee's proposed or effected actions that require Franchisor's approval.

29.     **INTERPRETATION AND HEADINGS**

The parties agree that this Agreement should be interpreted according to its fair meaning.  Franchisee waives to the fullest extent possible the application of any rule which would construe ambiguous language against Franchisor as the drafter of this Agreement.  The words "include," "includes" and "including" when used in this Agreement will be interpreted as if they were followed by the words "without limitation".  References to section numbers and headings will refer to sections of this Agreement unless the context indicates otherwise.  Captions and section headings are used herein for convenience only.  They are not part of this Agreement and shall not be used in construing it.

30.     **NOTICES**

Whenever notice is required or permitted to be given under the terms of this Agreement, it shall be given in writing, and be delivered personally, by certified, express or registered mail, or by an overnight delivery service (e.g., Federal Express), postage prepaid, addressed to the party to be notified at the respective address first above written, or at such other address or addresses as the parties may from time to time designate in writing.  Notices shall be deemed delivered on the date shown on the return receipt or

C-35

in the delivery service's records as the date of delivery or on the date of first attempted delivery, if actual delivery cannot for any reason be made.

31.    **GOVERNING LAW AND ENFORCEMENT**

31.1    <u>Governing Law</u>.    ALL MATTERS RELATING TO ARBITRATION WILL BE GOVERNED BY THE FEDERAL ARBITRATION ACT (9 U.S.C. §§ ET SEQ.)  EXCEPT TO THE EXTENT PROVIDED BY THE FEDERAL ARBITRATION ACT AS REQUIRED HEREBY, THE UNITED STATES TRADEMARK ACT OF 1946 (LANHAM ACT, 15 U.S.C. §1051 ET SEQ.) OR OTHER APPLICABLE FEDERAL LAW, THE TERMS OF THIS AGREEMENT SHALL BE INTERPRETED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF FLORIDA WITHOUT REGARD TO ITS CONFLICTS OF LAWS PROVISIONS; PROVIDED, HOWEVER, THAT THE LAW OF THE STATE IN WHICH THE STORE IS LOCATED SHALL APPLY TO THE CONSTRUCTION AND ENFORCEMENT OF THE OBLIGATIONS SET FORTH IN SECTIONS 20.1 AND 20.2 HEREOF, WITHOUT REGARD TO ITS CONFLICTS OF LAWS. FOR ACTIONS THAT ARE NOT SUBJECT TO MANDATORY ARBITRATION UNDER SECTION 31.2, FRANCHISEE HEREBY SUBMITS AND IRREVOCABLY CONSENTS TO THE EXCLUSIVE JURISDICTION OF THE STATE COURTS WHERE FRANCHISOR'S PRINCIPAL EXECUTIVE OFFICE IS LOCATED ON THE DATE OF THE FILING OF THE ACTION, AND AGREES NOT TO RAISE AND HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION BASED UPON *FORUM NON CONVENIENS* OR ANY OTHER OBJECTION IT MAY NOW HAVE OR HEREAFTER HAVE TO SUCH JURISDICTION OR VENUE.  FURTHER, NOTHING HEREIN CONTAINED SHALL BAR FRANCHISOR'S RIGHT TO OBTAIN INJUNCTIVE RELIEF AGAINST THREATENED CONDUCT THAT WILL CAUSE IRREPARABLE HARM, UNDER THE USUAL EQUITY RULES INCLUDING THE APPLICABLE RULES FOR OBTAINING SPECIFIC PERFORMANCE, RESTRAINING ORDERS AND PRELIMINARY INJUNCTIONS.

31.2    <u>Arbitration</u>.    EXCEPT TO THE EXTENT FRANCHISOR SEEKS INJUNCTIVE OR OTHER EQUITABLE RELIEF TO ENFORCE PROVISIONS OF THIS AGREEMENT, AND EXCEPT FOR CONTROVERSIES, CLAIMS OR DISPUTES BASED ON FRANCHISEE'S FAILURE TO PAY ANY FEES DUE HEREUNDER WHEN DUE; FRANCHISEE'S VIOLATION OF ANY HEALTH OR SAFETY LAW; OR FRANCHISEE'S USE OF THE MARKS, ALL CONTROVERSIES, CLAIMS OR DISPUTES BETWEEN FRANCHISOR AND FRANCHISEE ARISING OUT OF OR RELATING TO (I) THIS AGREEMENT OR ANY OTHER AGREEMENT BETWEEN FRANCHISOR AND FRANCHISEE, (II) THE RELATIONSHIP BETWEEN FRANCHISEE AND FRANCHISOR, OR (III) THE SCOPE AND VALIDITY OF THIS AGREEMENT OR ANY OTHER AGREEMENT BETWEEN FRANCHISOR AND FRANCHISEE (INCLUDING THE SCOPE AND VALIDITY OF THE ARBITRATION OBLIGATIONS UNDER THIS SECTION, WHICH FRANCHISOR AND FRANCHISEE ACKNOWLEDGE IS TO BE DETERMINED BY AN ARBITRATOR AND NOT A COURT) SHALL BE DETERMINED BY ARBITRATION WITH THE AMERICAN ARBITRATION ASSOCIATION ("AAA") AT THE OFFICE OF THE AAA CLOSEST TO FRANCHISOR'S PRINCIPAL EXECUTIVE OFFICE ON THE DATE OF SUBMISSION OF THE MATTER TO THE AAA.  SUCH ARBITRATION SHALL BE CONDUCTED BEFORE ONE ARBITRATOR CHOSEN IN ACCORDANCE WITH AAA COMMERCIAL ARBITRATION RULES.  THE DECISION OF THE ARBITRATOR SHALL BE FINAL AND BINDING UPON ALL PARTIES CONCERNED.  SUCH DECISION SHALL BE

C-36

RENDERED WITHIN 30 DAYS OF THE CLOSE OF THE ARBITRATION HEARING RECORD. THE ARBITRATION PROCEEDING SHALL BE CONDUCTED AT THE OFFICE OF THE AAA CLOSEST TO FRANCHISOR'S PRINCIPAL EXECUTIVE OFFICE ON THE DATE OF SUBMISSION OF THE MATTER TO THE AAA.  IN ANY ARBITRATION PROCEEDING, FRANCHISOR AND FRANCHISEE AGREE THAT EACH MUST SUBMIT OR FILE ANY CLAIM WHICH WOULD CONSTITUTE A COMPULSORY COUNTERCLAIM (AS DEFINED BY THE THEN CURRENT RULE 13 OF THE FEDERAL RULES OF CIVIL PROCEDURE) WITHIN THE SAME PROCEEDING AS THE CLAIM TO WHICH IT RELATES.  ANY CLAIM NOT SUBMITTED OR FILED AS REQUIRED IS FOREVER BARRED.  THE ARBITRATOR MAY NOT CONSIDER ANY SETTLEMENT DISCUSSIONS OR OFFERS THAT MIGHT HAVE BEEN MADE BY EITHER PARTY.  FRANCHISOR RESERVES THE RIGHT, BUT HAS NO OBLIGATION, TO ADVANCE FRANCHISEE'S SHARE OF THE COSTS OF ANY ARBITRATION PROCEEDING IN ORDER FOR SUCH ARBITRATION PROCEEDINGS TO TAKE PLACE AND BY DOING SO WILL NOT BE DEEMED TO HAVE WAIVED OR RELINQUISHED FRANCHISOR'S RIGHT TO SEEK THE RECOVERY OF THOSE COSTS IN ACCORDANCE WITH SECTION 32.  THE ARBITRATION WILL BE CONDUCTED ON AN INDIVIDUAL, NOT A CLASS-WIDE BASIS, AND THE ARBITRATION PROCEEDING MAY NOT BE CONSOLIDATED WITH ANY OTHER ARBITRATION PROCEEDING BETWEEN FRANCHISOR AND ANY OTHER PERSON. NOTWITHSTANDING THE FOREGOING OR ANYTHING TO THE CONTRARY IN THIS SECTION OR SECTION 34, IF ANY COURT OR ARBITRATOR DETERMINES THAT ALL OR ANY PART OF THE PRECEDING SENTENCE IS UNENFORCEABLE WITH RESPECT TO A DISPUTE THAT OTHERWISE WOULD BE SUBJECT TO ARBITRATION UNDER THIS SECTION 31.2, THEN ALL PARTIES AGREE THAT THIS ARBITRATION CLAUSE SHALL NOT APPLY TO THAT DISPUTE AND THAT SUCH DISPUTE SHALL BE RESOLVED IN A JUDICIAL PROCEEDING IN ACCORDANCE WITH THIS SECTION 31 (EXCLUDING THIS SECTION 31.2). IN ALL OTHER RESPECTS, THE RULES OF THE AAA AND THE UNITED STATES ARBITRATION ACT SHALL CONTROL.  JUDGMENT UPON THE AWARD RENDERED BY THE ARBITRATION MAY BE ENTERED IN ANY COURT HAVING COMPETENT JURISDICTION THEREOF.

    31.3   **Damages And Timing Of Claims**.  **THE PARTIES AGREE THAT NEITHER PARTY SHALL HAVE THE RIGHT TO RECEIVE OR COLLECT PUNITIVE OR EXEMPLARY DAMAGES FROM THE OTHER PARTY.  ANY AND ALL CLAIMS AND ACTIONS ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE RELATIONSHIP BETWEEN FRANCHISEE AND FRANCHISOR, OR THE OPERATION OF THE FRANCHISE AND THE STORE BROUGHT BY ANY PARTY TO THIS AGREEMENT AGAINST ANOTHER PARTY TO THIS AGREEMENT, SHALL BE COMMENCED WITHIN ONE YEAR FROM THE DISCOVERY OF THE FACTS GIVING RISE TO ANY SUCH CLAIM OR ACTION, OR SUCH CLAIM OR ACTION SHALL BE BARRED; PROVIDED, HOWEVER, THAT THIS TIME LIMITATION SHALL NOT APPLY TO ANY UNPERFORMED FINANCIAL OBLIGATION OF FRANCHISEE TO FRANCHISOR.  THE PARTIES UNDERSTAND THAT SUCH TIME LIMIT MAY BE SHORTER THAN OTHERWISE ALLOWED BY LAW.  FRANCHISEE AND THE BOUND PARTIES AGREE THAT THEIR SOLE RECOURSE FOR CLAIMS ARISING BETWEEN THE PARTIES SHALL BE AGAINST FRANCHISOR AND ITS SUCCESSORS AND ASSIGNS.  FRANCHISEE AND THE BOUND PARTIES AGREE THAT THE OWNERS, DIRECTORS, OFFICERS, EMPLOYEES AND AGENTS OF FRANCHISOR AND ITS AFFILIATES SHALL NOT BE PERSONALLY LIABLE**

DocuSign Envelope ID: A00B65BA-5C73-4345-B658-503992A1FB2E

**NOR NAMED AS A PARTY IN ANY ACTION BETWEEN FRANCHISOR AND FRANCHISEE AND ANY BOUND PARTY.**

32. **COSTS AND ATTORNEYS' FEES**

If Franchisor incurs any expenses in connection with Franchisee's failure to pay any amounts it owes when due, submit any required reports when due or otherwise comply with this Agreement, Franchisee agrees to reimburse Franchisor for any of the costs and expenses which Franchisor incurs, including, without limitation, reasonable accounting, attorneys', arbitrators' and related fees.

33. **WAIVER**

No waiver, delay, omission or forbearance on the part of Franchisor to exercise any right, option, duty or power arising from any default or breach by Franchisee shall affect or impair the rights of Franchisor with respect to any subsequent default of the same or a different kind; nor shall any delay or omission of Franchisor to exercise any right arising from any such default affect or impair Franchisor's rights as to such default or any future default.

34. **SEVERABILITY**

If any term, restriction or covenant of this Agreement is deemed invalid or unenforceable, all other terms, restrictions and covenants and the application thereof to all persons and circumstances subject hereto shall remain unaffected to the extent permitted by law; and if any application of any term, restriction or covenant to any person or circumstance is deemed invalid or unenforceable, the application of such terms, restriction or covenant to other persons and circumstances shall remain unaffected to the extent permitted by law.

35. **FORCE MAJEURE**

Neither Franchisor nor Franchisee will be liable for loss or damage or deemed to be in breach of this Agreement if Franchisor's or Franchisee's failure to perform any obligation results from: (i) transportation shortages, inadequate supply of equipment, products, supplies, labor, material or energy or the voluntary foregoing of the right to acquire or use any of the foregoing in order to accommodate or comply with the orders, requests, regulations, recommendations or instructions of any federal, state or municipal government or any department or agency thereof; (ii) acts of God; (iii) fires, strikes, embargoes, wars or riots; or (iv) any other similar event or cause beyond the control of the affected party. Any delay resulting from any of said causes will extend performance accordingly or excuse performance, in whole or in part, as may be reasonable, except that said causes will not excuse payments of amounts owed by Franchisee to Franchisor hereunder.

36. **DELEGATION BY FRANCHISOR**

Franchisor shall have the right to delegate performance of any or all of its obligations and duties hereunder. Franchisee hereby agrees to such delegation.

DocuSign Envelope ID: A00B65BA-5C73-4345-B658-503992A1FB2E

37.    **REVIEW OF AGREEMENT**

Franchisee acknowledges that it has had a copy of the Franchisor's franchise disclosure document for at least 14 calendar days before signing any franchise or related agreement; or at least 14 calendar days before the payment of any consideration to Franchisor.  Franchisee has had the opportunity to have this Agreement and the business offered hereunder reviewed by professionals of Franchisee's choosing before executing this Agreement.

38.    **NO RIGHT TO SET OFF**

Franchisee agrees that it will not set off or withhold payment of any amounts it owes Franchisor on the grounds of Franchisor's alleged nonperformance of any of Franchisor's obligations under this Agreement or for any other reason.  Franchisee agrees that all such claims will, if not otherwise resolved, be submitted to arbitration as provided in Section 31.2.

39.    **CUMULATIVE RIGHTS**

The rights granted hereunder are cumulative, and no exercise or enforcement by either party of any right or remedy hereunder will preclude the exercise or enforcement of any other right or remedy to which either Franchisor or Franchisee are entitled.

40.    **ENTIRE AGREEMENT**

This Agreement and any addendum, schedule or exhibit attached hereto contains the entire agreement between the parties hereto relating to the operation of the Store and the franchised business and no representations, inducements, promises, agreements, arrangements or undertakings, oral or written, have been made or relied upon by the parties other than those set forth herein.  No agreement altering, changing, waiving or modifying any of the terms and conditions of this Agreement shall be binding upon either party unless and until the same is made in writing and executed by all interested parties. Notwithstanding the foregoing, nothing in this Agreement shall disclaim or require Franchisee to waive reliance on any representation that Franchisor made in its most recent disclosure document (including its exhibits and amendments) that Franchisor delivered to Franchisee or Franchisee's representative.

41.    **COUNTERPARTS**

This Agreement may be signed in multiple counterpart copies, each of which will be deemed an original.

42.    **FRANCHISEE'S ACKNOWLEDGMENTS**

42.1    <u>Success Depends on Franchisee and No Warranties</u>.    Franchisee assumes sole responsibility for the operation of the business franchised hereunder and acknowledges that, while Franchisor may furnish advice and assistance to Franchisee from time to time during the term of this Agreement, Franchisor has no legal or other obligation to do so except as specifically set forth herein.  In addition, Franchisee acknowledges that Franchisor does not guarantee the success or profitability of the business franchised hereunder in any manner whatsoever and shall not be liable therefor; in particular, Franchisee understands and acknowledges that the success and profitability of the business franchised hereunder depend on many factors outside the control of either Franchisor or Franchisee (such as interest rates, unemployment rates, demographic trends and the general economic climate) and there are

significant risks in any business venture, but principally depend on Franchisee's efforts in the operation of the business and the primary factor in Franchisee's success or failure in the business franchised hereunder will be Franchisee's own efforts. IN ADDITION, FRANCHISEE ACKNOWLEDGES AND AGREES THAT FRANCHISOR AND ITS REPRESENTATIVES HAVE MADE NO REPRESENTATIONS OR WARRANTIES TO FRANCHISEE OTHER THAN OR INCONSISTENT WITH THE MATTERS SET FORTH IN THIS AGREEMENT, AND THAT FRANCHISEE HAS UNDERTAKEN THIS VENTURE SOLELY IN RELIANCE UPON THE MATTERS SET FORTH HEREIN AND FRANCHISEE'S OWN INDEPENDENT INVESTIGATION OF THE MERITS OF THIS VENTURE.

42.2    Anti-Terrorism Laws.

(i)     Franchisee and its owners agree to comply with and/or to assist Franchisor to the fullest extent possible in Franchisor's efforts to comply with Anti-Terrorism Laws. In connection with such compliance, Franchisee and its owners certify, represent, and warrant that none of their property or interests is subject to being "blocked" under any of the Anti-Terrorism Laws and that Franchisee and its owners are not otherwise in violation of any of the Anti-Terrorism Laws.

(ii)    "Anti-Terrorism Laws" means Executive Order 13224 issued by the President of the United States ("Executive Order 13224"), the Terrorism Sanctions Regulation (Title 31, Part 595 of the U.S. Code of Federal Regulations), the Foreign Terrorist Organizations Sanctions Regulations (Title 31, Part 597 of the U.S. Code of Federal Regulations), the Cuban Assets Control Regulations (Title 31, Part 515 of the U.S. Code of Federal Regulations), the USA PATRIOT Act, and all other present and future federal, state and local laws, ordinances regulations, policies, lists and any other requirements of any governmental authority (including, without limitation, the United States Department of Treasury Office of Foreign Assets Control, and any other government agency with jurisdiction over the parties to this Agreement and/or their actions) addressing or in any way relating to terrorist acts and/or acts of war.

(iii)   Franchisee and its owners certify that none of them, their respective employees, agents, bankers, affiliates or anyone associated with them is listed in the Annex to Executive Order 13224. Franchisee agrees not to hire (or, if already employed, retain the employment of) any individual who is listed in the Annex. (A copy of the Annex can be accessed on the internet at the following address: http://www.treasury.gov/offices/enforcement/ofac/sanctions/terrorism.html.)

(iv)    Franchisee certifies that it has no knowledge or information that, if generally known, would result in (a) Franchisee, (b) Franchisee's owners, employees, agents, bankers or affiliates or (c) anyone associated with Franchisee to be listed in the Annex to Executive Order 13224.

(v)     Franchisee is solely responsible for ascertaining what actions it must take to comply with the Anti-Terrorism Laws, and Franchisee specifically acknowledges and agrees that Franchisee's indemnification responsibilities set forth in Section 18 above of this Agreement pertain to Franchisee's obligations under this Section 42.2.

(vi)    Any misrepresentation under this Section or any violation of the Anti-Terrorism Laws by Franchisee or Franchisee's owners, agents, bankers, employees and affiliates shall constitute grounds for immediate termination of this Agreement and any other agreement Franchisee has entered with Franchisor or an affiliate of Franchisor, in accordance with Section 21.2(xvi) above.

IN WITNESS WHEREOF, the undersigned have executed or caused their duly authorized representatives to execute this Agreement as of the Effective Date.

FRANCHISOR:

YOUR CBD STORES FRANCHISING, LLC

By: _Adam Campbell_____
DocuSigned by:
E4CE5FE33EAF442...

Name: Adam Campbell_____

Title: Director of Sales_____

FRANCHISEE:

If an Individual:

Signature:_____

Printed Name:_____

If other than an Individual:

NaturOil Georgia, LLC
(Name of corporation or LLC)

By _Amber Knowles_____
DocuSigned by:
D6A6CC7757F8414...

Name:Amber Knowles

Title: Owner

C-41

DocuSign Envelope ID: A00B65BA-6C73-4345-B653-503992A1FB2E

Exhibit A

Franchised Site, Franchise Territory and Franchise Fee


Franchised Site: 1360 Dogwood Dr. SE #105,  Conyers, GA  30013

Franchise Territory: Loganville, Monroe, Covington, Conyers, Norcross, Macon, Warner Robbins and surrounding areas

Franchise Fee (Section 4): Zero upfront fee

DocuSign Envelope ID: A00B65BA-6C73-4345-B659-503992A1FB2E

Exhibit B

Personal Covenants

(See Attached)

## PERSONAL COVENANTS

Each of the undersigned ("you") agree that:

1.      All capitalized terms used but not defined in this Personal Covenants shall have the meaning set forth in that certain YOUR CBD STORE™ FRANCHISE AGREEMENT, dated as of __6/9/2020__ (the "Franchise Agreement"), by and between YOUR CBD STORES FRANCHISING, LLC ("Franchisor"), and _Amber Knowles, Jeff Yabuki_ ("Franchisee").

2.      You are a Bound Party.

3.      As an inducement to Franchisor to enter into the Franchise Agreement, and in consideration of the direct and personal benefits you will derive from the Franchise Agreement, you agree that: (i) you have read and understand all the provisions of Sections 20.1, 20.2, 20.3 and 31.3 of the Franchise Agreement; (ii) you will be personally bound by all of the obligations and covenants of Franchisee contained in Sections 20.1, 20.2, 20.3 and 31.3 as if such obligations and covenants were made and given personally by you directly to Franchisor; and (iii) such obligations and covenants are fair and reasonable and will not deprive you of your livelihood.

4.      If any sentence, clause, paragraph, or combination of any of them in Sections 20.1, 20.2, 20.3 or 31.3 of the Franchise Agreement is held by a court of competent jurisdiction to be unenforceable as applied to you, then such unenforceable sentence, clause, paragraph, or combination may be modified by such court to the extent necessary to render it enforceable, and if it cannot be so modified, it shall be severed and the remainder of Sections 20.1, 20.2, 20.3 and 31.3 shall remain in full force and effect.

5.      These personal covenants shall be governed by the internal laws of the State of Florida, unless the law of your jurisdiction applies as provided for in Section 31.1 of the Franchise Agreement.

        The undersigned hereby execute and deliver this instrument effective as of the Effective Date of the Franchise Agreement.

Signature _Amber Knowles_                    Signature _Jeff Yabuki_

Print Name: Amber Knowles                    Print Name: Jeff Yabuki

Date: 6/9/2020                               Date: 6/9/2020

B-1

Signature_____          Signature_____

Print Name_____          Print Name_____

Date:_____          Date:_____


Signature_____          Signature_____

Print Name_____          Print Name_____

Date:_____          Date:_____


Signature_____          Signature_____

Print Name_____          Print Name_____

Date:_____          Date:_____


Signature_____          Signature_____

Print Name_____          Print Name_____

Date:_____          Date:_____


Signature_____          Signature_____

Print Name_____          Print Name_____

Date:_____          Date:_____


Exhibit B-2

Exhibit B-3

Exhibit C

Internet Web Sites and Listings Agreement

(See Attached)

## INTERNET WEB SITES AND LISTINGS AGREEMENT

THIS INTERNET WEB SITES AND LISTINGS AGREEMENT (the "Internet Listing Agreement") is made and entered into as of _____6/9/2020_____ (the "Effective Date"), by and between YOUR CBD STORES FRANCHISING, LLC, a Florida limited liability company (the "Franchisor"), and NaturOil Georgia, LLC, 1300 Indian Trail Lilburn Rd NW #105, Norcross, GA 30093 (the "Franchisee").

W I T N E S S E T H :

WHEREAS, Franchisee desires to enter into a YOUR CBD STORE™ Franchise Agreement (the "Franchise Agreement"); and

WHEREAS, Franchisor would not enter into the Franchise Agreement without Franchisee's agreement to enter into, comply with, and be bound by all the terms and provisions of this Internet Listing Agreement;

NOW, THEREFORE, for and in consideration of the foregoing and the mutual promises and covenants contained herein, and in further consideration of the Franchise Agreement and the mutual promises and covenants contained therein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      **DEFINITIONS**

All terms used but not otherwise defined in this Internet Listing Agreement shall have the meanings set forth in the Franchise Agreement.  "Termination" of the Franchise Agreement shall include, but shall not be limited to, the voluntary termination, involuntary termination, or natural expiration thereof.

2.      **TRANSFER; APPOINTMENT**

        2.1     <u>Interest in Internet Web Sites and Listings</u>.  Franchisee may acquire (whether in accordance with or in violation of Section 15.2 of the Franchise Agreement) during the term of the Franchise Agreement, certain right, title, and interest in and to certain domain names, hypertext markup language, uniform resource locator addresses, and access to corresponding Internet web sites, and the right to hyperlink to certain web sites and listings on various Internet search engines (collectively, the "Internet Web Sites and Listings") related to the Store or the Marks (all of which right, title, and interest is referred to herein as "Franchisee's Interest").

        2.2     <u>Transfer</u>.  On Termination of the Franchise Agreement, or on periodic request of Franchisor, Franchisee will immediately direct all Internet Service Providers, domain name registries, Internet search engines, and other listing agencies (collectively, the "Internet Companies") with which Franchisee has Internet Web Sites and Listings: (i) to transfer all of Franchisee's Interest in such Internet Web Sites and Listings to Franchisor; and (ii) to execute such documents and take such actions as may be necessary to effectuate such transfer.  In the event Franchisor does not desire to accept any or all such Internet Web Sites and Listings, Franchisee will immediately direct the Internet Companies to terminate such Internet Web Sites and Listings or will take such other actions with respect to the Internet Web Sites and Listings as Franchisor directs.

        2.3     <u>Appointment; Power of Attorney</u>.  Franchisee hereby constitutes and appoints Franchisor and any officer or agent of Franchisor, for Franchisor's benefit under the Franchise Agreement and this

C-1

DocuSign Envelope ID: A00B65BA-5C73-4345-B658-503992A1FB2E

Internet Listing Agreement or otherwise, with full power of substitution, as Franchisee's true and lawful attorney-in-fact with full power and authority in Franchisee's place and stead, and in Franchisee's name or the name of any affiliated person or affiliated company of Franchisee, to take any and all appropriate action and to execute and deliver any and all documents that may be necessary or desirable to accomplish the purposes of this Internet Listing Agreement.  Franchisee further agrees that this appointment constitutes a power coupled with an interest and is irrevocable until Franchisee has satisfied all of its obligations under the Franchise Agreement and any and all other agreements to which Franchisee and any of its affiliates on the one hand, and Franchisor and any of its affiliates on the other, are parties, including without limitation this Internet Listing Agreement.  Without limiting the generality of the foregoing, Franchisee hereby grants to Franchisor the power and right to do the following:

      (i)     Direct the Internet Companies to transfer all Franchisee's Interest in and to the Internet Web Sites and Listings to Franchisor;

      (ii)     Direct the Internet Companies to terminate any or all of the Internet Web Sites and Listings; and

      (iii)     Execute the Internet Companies' standard assignment forms or other documents in order to affect such transfer or termination of Franchisee's Interest.

2.4    <u>Certification of Termination</u>.  Franchisee hereby directs the Internet Companies to accept, as conclusive proof of Termination of the Franchise Agreement, Franchisor's written statement, signed by an officer or agent of Franchisor, that the Franchise Agreement has terminated.

2.5    <u>Cessation of Obligations</u>.  After the Internet Companies have duly transferred all Franchisee's Interest in such Internet Web Sites and Listings to Franchisor, as between Franchisee and Franchisor, Franchise will have no further interest in, or obligations under, such Internet Web Sites and Listings.  Notwithstanding the foregoing, Franchisee will remain liable to each and all of the Internet Companies for the sums Franchisee is obligated to pay such Internet Companies for obligations Franchisee incurred before the date Franchisor duly accepted the transfer of such Interest, or for any other obligations not subject to the Franchise Agreement or this Internet Listing Agreement.

3.    **MISCELLANEOUS**

3.1    <u>Release</u>.  Franchisee hereby releases, remises, acquits, and forever discharges each and all of the Internet Companies and each and all of their parent corporations, subsidiaries, affiliates, directors, officers, stockholders, employees, and agents, and the successors and assigns of any of them, from any and all rights, demands, claims, damage, losses, costs, expenses, actions, and causes of action whatsoever, whether in tort or in contract, at law or in equity, known or unknown, contingent or fixed, suspected or unsuspected, arising out of, asserted in, assertable in, or in any way related to this Internet Listing Agreement.

3.2    <u>Indemnification</u>.  Franchisee is solely responsible for all costs and expenses related to its performance, its nonperformance, and Franchisor's enforcement of this Agreement, which costs and expenses Franchisee will pay Franchisor in full, without defense or setoff, on demand.  Franchisee agrees that it will indemnify, defend, and hold harmless Franchisor and its affiliates, and its and their directors, officers, shareholders, partners, members, employees, agents, and attorneys, and the successors and assigns of any and all of them, from and against, and will reimburse Franchisor and any and all of them

Exhibit C-2

for, any and all loss, losses, damage, damages, claims, debts, claims, demands, or obligations that are related to or are based on this Internet Listing Agreement.

      3.3   <u>No Duty</u>.  The powers conferred on Franchisor hereunder are solely to protect Franchisor's interests and shall not impose any duty on Franchisor to exercise any such powers. Franchisee expressly agrees that in no event shall Franchisor be obligated to accept the transfer of any or all of Franchisee's Interest in any or all such Internet Web Sites and Listings.

      3.4   <u>Further Assurances</u>.  Franchisee agrees that at any time after the date of this Internet Listing Agreement, Franchisee will perform such acts and execute and deliver such documents as may be necessary to assist in or accomplish the purposes of this Internet Listing Agreement.

      3.5   <u>Successors, Assigns, and Affiliates</u>.  All Franchisor's rights and powers, and all Franchisee's obligations, under this Internet Listing Agreement shall be binding on Franchisee's successors, assigns, and affiliated persons or entities as if they had duly executed this Internet Listing Agreement.

      3.6   <u>Effect on Other Agreements</u>.  Except as otherwise provided in this Internet Listing Agreement, all provisions of the Franchise Agreement and exhibits and schedules thereto shall remain in effect as set forth therein.

      3.7   <u>Survival</u>.  This Internet Listing Agreement shall survive the Termination of the Franchise Agreement.

      3.8   <u>Joint and Several Obligations</u>.  All Franchisee's obligations under this Internet Listing Agreement shall be joint and several

      IN WITNESS WHEREOF, the undersigned have executed or caused their duly authorized representatives to execute this Agreement as of the Effective Date.

YOUR CBD STORES FRANCHISING, LLC

By: *Adam Campbell*

Name: Adam Campbell

Title: Director of Sales

FRANCHISEE:

If an Individual:

Signature:_____

Printed Name:_____

Exhibit C-3

If other than an Individual:

<u>NaturOil Georgia, LLC</u>

By _____

Name: Amber Knowles

Title: Owner

Exhibit C-4

Exhibit D

Telephone Listing Agreement

(See Attached)

DocuSign Envelope ID: A00B65BA-5C73-4345-B653-503992A1FB2E

## TELEPHONE LISTING AGREEMENT

THIS TELEPHONE LISTING AGREEMENT (the "Telephone Listing Agreement") is made and entered into as of _____6/9/2020_____ (the "Effective Date"), by and between YOUR CBD STORES FRANCHISING, LLC, a Florida limited liability company (hereinafter the "Franchisor"), and NaturOil Georgia, LLC,  1300 Indian Trail Lilburn Rd NW #105,  Norcross, GA  30093  (the "Franchisee").

W I T N E S S E T H :

WHEREAS, Franchisee desires to enter into a YOUR CBD STORE™ Franchise Agreement (the "Franchise Agreement"); and

WHEREAS, Franchisor would not enter into the Franchise Agreement without Franchisee's agreement to enter into, comply with, and be bound by all the terms and provisions of this Telephone Listing Agreement;

NOW, THEREFORE, for and in consideration of the foregoing and the mutual promises and covenants contained herein, and in further consideration of the Franchise Agreement and the mutual promises and covenants contained therein, and for other good and valuable consideration, the receipt and sufficiency of all of which are hereby acknowledged, the parties hereto agree as follows:

1.      **DEFINITIONS**

All terms used but not otherwise defined in this Telephone Listing Agreement shall have the meanings set forth in the Franchise Agreement.  "Termination" of the Franchise Agreement shall include, but shall not be limited to, the voluntary termination, involuntary termination, or natural expiration thereof.

2.      **TRANSFER; APPOINTMENT**

2.1     Interest in Telephone Numbers and Listings.  Franchisee has, or will acquire during the term of the Franchise Agreement, certain right, title, and interest in and to those certain telephone numbers and regular, classified, yellow-page, and other telephone directory listings (collectively, the "Telephone Numbers and Listings") related to the Store or the Marks (all of which right, title, and interest is referred to herein as Franchisee's "Interest").

2.2     Transfer.  On Termination of the Franchise Agreement, if Franchisor directs Franchisee to do so, Franchisee will immediately direct all telephone companies, telephone directory publishers, and telephone directory listing agencies (collectively, the "Telephone Companies") with which Franchisee has Telephone Numbers and Listings: (i) to transfer all Franchisee's Interest in such Telephone Numbers and Listings to Franchisor; and (ii) to execute such documents and take such actions as may be necessary to effectuate such transfer.  In the event Franchisor does not desire to accept any or all such Telephone Numbers and Listings, Franchisee will immediately direct the Telephone Companies to terminate such Telephone Numbers and Listings or will take such other actions with respect to the Telephone Numbers and Listings as Franchisor directs.

2.3     Appointment; Power of Attorney.  Franchisee hereby constitutes and appoints Franchisor and any officer or agent of Franchisor, for Franchisor's benefit under the Franchise Agreement and this Telephone Listing Agreement or otherwise, with full power of substitution, as Franchisee's true and lawful attorney-in-fact with full power and authority in Franchisee's place and stead, and in Franchisee's

Exhibit D-1

name or the name of any affiliated person or affiliated company of Franchisee, on Termination of the Franchise Agreement, to take any and all appropriate action and to execute and deliver any and all documents that may be necessary or desirable to accomplish the purposes of this Telephone Listing Agreement. Franchisee further agrees that this appointment constitutes a power coupled with an interest and is irrevocable until Franchisee has satisfied all of its obligations under the Franchise Agreement and any and all other agreements to which Franchisee and any of its affiliates on the one hand, and Franchisor and any of its affiliates on the other, are parties, including, without limitation, this Telephone Listing Agreement. Without limiting the generality of the foregoing, Franchisee hereby grants to Franchisor the power and right to do the following:

(i) Direct the Telephone Companies to transfer all Franchisee's Interest in and to the Telephone Numbers and Listings to Franchisor;

(ii) Direct the Telephone Companies to terminate any or all of the Telephone Numbers and Listings; and

(iii) Execute the Telephone Companies' standard assignment forms or other documents in order to affect such transfer or termination of Franchisee's Interest.

2.4 <u>Certification of Termination</u>. Franchisee hereby directs the Telephone Companies that they shall accept, as conclusive proof of Termination of the Franchise Agreement, Franchisor's written statement, signed by an officer or agent of Franchisor, that the Franchise Agreement has terminated.

2.5 <u>Cessation of Obligations</u>. After the Telephone Companies have duly transferred all Franchisee's Interest in such Telephone Numbers and Listings to Franchisor, as between Franchisee and Franchisor, Franchisee will have no further Interest in, or obligations under, such Telephone Numbers and Listings. Notwithstanding the foregoing, Franchisee will remain liable to each and all of the Telephone Companies for the sums Franchisee is obligated to pay such Telephone Companies for obligations Franchisee incurred before the date Franchisor duly accepted the transfer of such Interest, or for any other obligations not subject to the Franchise Agreement or this Telephone Listing Agreement.

3. **MISCELLANEOUS**

3.1 <u>Release</u>. Franchisee hereby releases, remises, acquits, and forever discharges each and all of the Telephone Companies and each and all of their parent corporations, subsidiaries, affiliates, directors, officers, stockholders, employees, and agents, and the successors and assigns of any of them, from any and all rights, demands, claims, damage, losses, costs, expenses, actions, and causes of action whatsoever, whether in tort or in contract, at law or in equity, known or unknown, contingent or fixed, suspected or unsuspected, arising out of, asserted in, assertable in, or in any way related to this Telephone Listing Agreement.

3.2 <u>Indemnification</u>. Franchisee is solely responsible for all costs and expenses related to Franchisee's performance, Franchisee's nonperformance, and Franchisor's enforcement of this Agreement, which costs and expenses Franchisee will pay Franchisor in full, without defense or setoff, on demand. Franchisee agrees that it will indemnify, defend, and hold harmless Franchisor and its affiliates, and the directors, officers, shareholders, partners, members, employees, agents, and attorneys of Franchisor and its affiliates, and the successors and assigns of any and all of them, from and against, and will reimburse Franchisor and any and all of them for, any and all loss, losses, damage, damages,

DocuSign Envelope ID: A00B65BA-6C73-4345-B659-693992A1FB2E

claims, debts, claims, demands, or obligations that are related to or are based on this Telephone Listing Agreement.

3.3     <u>No Duty</u>.  The powers conferred on Franchisor under this Telephone Listing Agreement are solely to protect Franchisor's interests and shall not impose any duty on Franchisor to exercise any such powers.  Franchisee expressly agrees that in no event shall Franchisor be obligated to accept the transfer of any or all of Franchisee's Interest in any or all such Telephone Numbers and Listings.

3.4     <u>Further Assurances</u>.  Franchisee agrees that at any time after the date hereof, it will perform such acts and execute and deliver such documents as may be necessary to assist in or accomplish the purposes of this Telephone Listing Agreement.

3.5     <u>Successors, Assigns, and Affiliates</u>.  All Franchisor's rights and powers, and all Franchisee's obligations, under this Telephone Listing Agreement shall be binding on Franchisee's successors, assigns, and affiliated persons or entities as if they had duly executed this Telephone Listing Agreement.

3.6     <u>Effect on Other Agreements</u>.  Except as otherwise provided in this Telephone Listing Agreement, all provisions of the Franchise Agreement and exhibits and schedules thereto shall remain in effect as set forth therein.

3.7     <u>Survival</u>.  This Telephone Listing Agreement shall survive the Termination of the Franchise Agreement.

3.8     <u>Joint and Several Obligations</u>.  All Franchisee's obligations under this Telephone Listing Agreement shall be joint and several.

2020 FA v.2
2020 FDD and FA v.3a
01701353-1

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Telephone Listing Agreement as of the Effective Date.


FRANCHISOR:

YOUR CBD STORES FRANCHISING, LLC

By: Adam Campbell

Name: Adam Campbell

Title: Director of Sales

FRANCHISEE:

If an Individual:

Signature:_____

Printed Name:_____


If other than an Individual:

NaturOil Georgia, LLC

By: Amber Knowles

Name: Amber Knowles

Title: Owner

Exhibit D-4

DocuSign Envelope ID: A00B65BA-5C73-4345-B653-503992A1FB2E

Exhibit E

Franchisee Information

1.     Franchisee's legal organization (circle one): (  ) sole proprietorship; (  ) partnership; (  ) corporation; (x) limited liability company; or (  ) other.

2.     If Franchisee is not a sole proprietor, list of all its partners, members or shareholders or others holding any ownership interest in Franchisee:

| Name and address | % interest | Active in Operation of Business? (yes/no) |
|---|---|---|
| (a) Amber Knowles<br>761 Autumn Meadow Dr<br>Loganville, GA 30052 | 50% | Yes |
| (b) Jeff Yabuki<br>761 Autumn Meadow Dr<br>Loganville, GA 30052 | 50% | Yes |
| (c) | | |
| (d) | | |

3.     If Franchisee is not a sole proprietor, list of Franchisee's officers, directors, managers and/or general partners:

| | Name | Title |
|---|---|---|
| (a) | Amber Knowles | Responsible Owner |
| (b) | Jeff Yabuki | General Partner |
| (c) | | |
| (d) | | |

[Signature Appears on Following Page]

Exhibit E-1

Exhibit D-2

The undersigned certifies that all information contained in this Exhibit E is accurate and complete, and agrees to notify Franchisor promptly (and in any case within 15 days) upon any change in the information required to be disclosed in this Exhibit E.

FRANCHISEE:

If an Individual:

Signature:_____

Printed Name:_____

If other than an Individual:

NaturOil Georgia, LLC

By: _Amber Knowles_____

Name: Amber Knowles

Title: Owner

Exhibit E-3

Exhibit F

Guaranty Agreement

(See Attached)

DocuSign Envelope ID: A00B65BA-5C73-4345-B658-593992A1FB2E

<u>GUARANTY AGREEMENT</u>

In consideration of, and as an inducement to, the execution by YOUR CBD STORES FRANCHISING, LLC ("Franchisor") of that certain YOUR CBD STORE™ Franchise Agreement, dated 6/9/2020 , (as the same from time to time may be amended, modified, extended or renewed, the "Franchise Agreement"), by and between <u>NaturOil Georgia, LLC, 1300 Indian Trail Lilburn Rd. NW #105, Norcross, GA 30093</u> ("Franchisee") and Franchisor, the undersigned, for the term of the Franchise Agreement and any extension or renewal thereof, and thereafter until all obligations of Franchisee to Franchisor have been satisfied, jointly and severally, do hereby personally, absolutely, and unconditionally guarantee that Franchisee shall punctually pay and perform each and every undertaking, condition, and covenant set forth in the Franchise Agreement.

Each of the undersigned further waives acceptance and notice of acceptance of the foregoing obligations of Franchisee, notice of demand for payment of any indebtedness or for performance of any obligations hereby guaranteed, and any right the undersigned may have to require that an action be brought against Franchisee or any other person as a condition to the liability of the undersigned.

This Guaranty is a guarantee of payment and performance not merely one of collection. Each of the undersigned further consents and agrees that its liability under this Guaranty shall be direct and immediate and joint and several; that the undersigned shall render any payment or performance required under the Franchise Agreement upon demand if Franchisee fails or refuses punctually to do so; that such liability shall not be contingent or conditioned upon the pursuit of any remedies against Franchisee or any other person; and that such liability shall not be diminished, relieved or otherwise affected by the extension of time, credit or any other indulgence which Franchisor, its affiliates, successors or assigns may, from time to time, grant to Franchisee or to any other person, including, without limitation, the acceptance of any partial payment or performance, or the compromise or release of any claims, or the release of any one or more of the undersigned hereunder, or the consent to assignment of the Franchise Agreement or any interest in Franchisee, none of which shall in any way modify or amend this Guaranty, which shall be continuing and irrevocable throughout the term of the Franchise Agreement and any extension or renewal thereof and thereafter until all obligations of Franchisee to Franchisor have been satisfied.

Until all obligations of Franchisee to Franchisor have been satisfied, the obligations of the undersigned under this Guaranty shall remain in full force and effect without regard to, and shall not be released, discharged or in any way modified or affected by, any circumstance or condition (whether or not the undersigned shall have any knowledge or notice thereof), including, without limitation, any bankruptcy, insolvency, reorganization, composition, liquidation or similar proceeding, with respect to Franchisee or its properties or creditors, or any action taken by any trustee or receiver or by any court in any such proceeding. Each of the undersigned specifically waives any rights that may be conferred upon the undersigned as a guarantor or surety under the applicable law of any state. The remedies provided herein shall be nonexclusive and cumulative of all other rights, powers and remedies provided under the Franchise Agreement or by law or in equity.

The undersigned hereby agree that without the consent of or notice to any of the undersigned and without affecting any of the obligations of the undersigned hereunder, any term, covenant or condition of the Franchise Agreement may be amended, compromised, released or otherwise altered by Franchisor and the Franchisee and the undersigned do guarantee and promise to perform all of the obligations of the Franchisee under the Franchise Agreement as so amended, compromised, released or altered.

Exhibit F-1

Upon notice from Franchisor that Franchisee has failed to pay monies due and owing to Franchisor under the Franchise Agreement, any and each of the undersigned agree to cure the monetary default within five business days from such notice.

Upon the death of an undersigned, the estate of such undersigned shall be bound by this Guaranty but only for defaults and obligations hereunder existing at the time of death.  The obligations of the surviving undersigned shall continue in full force and effect.

The undersigned expressly acknowledge that the obligations hereunder survive the termination of the Franchise Agreement.  Any provisions in the Franchise Agreement calling for mediation and arbitration of disputes shall also be binding on the undersigned.

Franchisor's failure to enforce all or any portion of its rights under this Guaranty shall not constitute a waiver of its ability to do so at any point in the future.

No delay or failure of Franchisor in the exercise of any right, power, or remedy shall operate as a waiver thereof, and no partial exercise by Franchisor shall preclude any further exercise thereof or the exercise of any other right, power or remedy.

This Guaranty shall be governed by and construed in accordance with the internal laws of the State of Florida without recourse to Florida (or any other) choice of law or conflicts of law principles.  If, however, any provision of this Guaranty would not be enforceable under the laws of Florida, and if the business franchised under the Franchise Agreement is located outside of Florida and the provision would be enforceable under the laws of the state in which the franchised business is located, then the provision (and only that provision) will be interpreted and construed under the laws of that state.  Nothing in this Guaranty is intended to invoke the application of any franchise, business opportunity, antitrust, "implied covenant", unfair competition, fiduciary or other doctrine of law of the State of Florida or any other state, which would not otherwise apply.  Any litigation initiated under this Guaranty shall be instituted exclusively at Franchisor's discretion in the most immediate state judicial district and court encompassing Franchisor's headquarters and having subject matter jurisdiction thereof or the United States District Court encompassing Franchisor's headquarters.  Each of the undersigned expressly agrees that the undersigned is subject to the jurisdiction and venue of those courts for purposes of such litigation. Each of the undersigned hereby waives and covenants never to assert any claim that the undersigned is not subject to personal jurisdiction in those courts or that venue in those courts is for any reason improper, inconvenient, prejudicial or otherwise inappropriate (including, without limitation, any claim under the judicial doctrine of *forum non conveniens*).

If Franchisor chooses to proceed against the undersigned under this Guaranty, and Franchisor prevails, the undersigned shall reimburse Franchisor its costs and expenses associated with the proceeding, including its reasonable attorneys' fees, court costs and expenses.

IN WITNESS WHEREOF, each of the undersigned has hereunto affixed its signature on 6/9/2020 .

[Signatures Appear on Following Page]

Exhibit F-2

Agreed:
GUARANTORS:

YOUR CBD STORES FRANCHISING, LLC

By: _Adam Campbell_____
      E4CE5FE33EAF442...

Name: _Adam Campbell_____


Signature _Amber Knowles_____    (SEAL)
      D6A6CC7757F8414...              /SEAL/

Address:_761 Autumn Meadow Drive_
      _Loganville, GA  30052_____

Social Security No.:_ 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__


Signature _[signature]_____    (SEAL)
      306849FBA32746E...              /SEAL/

Address: _761 Autumn Meadow Drive_
      _Loganville, GA  30052_____

Social Security No.:_ 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__


                    (SEAL)

Signature_____

Address:_____

Social Security No.:_____

Exhibit F-3

DocuSign Envelope ID: A00B65BA-5C73-4345-B658-503992A1FB2E

Exhibit G

State Specific Addenda

(See Attached)

YOUR CBD STORES FRANCHISING, LLC
ADDENDUM TO FRANCHISE AGREEMENT
(California)

The following Addendum modifies and supersedes the Your CBD Stores Franchising, LLC Franchise Agreement (the "Agreement") with respect to YOUR CBD STORE™ franchises offered or sold to either a resident of the State of California or a non-resident who will be operating a YOUR CBD STORE™ franchise in the State of California pursuant to the California Franchise Investment Law §§ 31000 through 31516, and the California Franchise Relations Act, California Business and Professions Code §§ 20000 through 20043, as follows:

1.      If any of the provisions of the Agreement concerning termination and non-renewal of a franchise are inconsistent with either the California Franchise Relations Act or with the federal bankruptcy law (11 U.S.C. §101, et seq.) (concerning termination of the Agreement on certain bankruptcy-related events), then such laws will apply.

2.      The Agreement requires that it be governed by Florida law.  This requirement may be unenforceable under California law.

3.      Franchisee must sign a general release if Franchisee renews or transfers its franchise.  California Corporations Code 31512 voids a waiver of Franchisee's rights under the Franchise Investment Law (California Corporations Code 31000 through 31516).  Business and Professions Code 20010 voids a waiver of Franchisee's rights under the Franchise Relations Act (Business and Professions Code 20000 through 20043).

4.      The Agreement contains a covenant not to compete which extends beyond the termination of the franchise.  This provision may not be enforceable under California law.

5.      Franchisor and Franchisee agree to be bound by the provisions of any limitation on the period of time in which claims must be brought under applicable law or this Agreement, whichever expires earlier.

6.      To the extent this Addendum is inconsistent with any terms or conditions of the Agreement or the Exhibits or Schedules thereto, the terms of this Addendum shall govern.

[Signatures Appear on Following Page]

Exhibit G-1

Each of the undersigned hereby acknowledges having read, understood, and executed this Addendum on _____.

FRANCHISOR:

YOUR CBD STORES FRANCHISING, LLC

By:_____

Print Name:_____

Title:_____

FRANCHISEE:

If an Individual:

Signature_____

Print Name:_____

If other than an Individual:

_____

By:_____

Name:_____

Title:_____

Exhibit G-2

YOUR CBD STORES FRANCHISING, LLC
ADDENDUM TO FRANCHISE AGREEMENT
(Illinois)

The following Addendum modifies and supersedes the Your CBD Stores Franchising, LLC Franchise Agreement (the "Agreement") with respect to YOUR CBD STORE™ franchises offered or sold to either a resident of the State of Illinois or a non-resident who will be operating a YOUR CBD STORE™ franchise in the State of Illinois pursuant to the Illinois Franchise Disclosure Act of 1987, Ill. Comp. Stat. §§ 705/1 through 705/44, as follows:

1.      Section 21 of the Agreement, under the heading "TERMINATION", shall be supplemented by the addition of the following Section, which shall be considered an integral part of the Agreement:

21.5          Other.  If any of the provisions of this Section 21 concerning termination are inconsistent with Section 19 of the Illinois Franchise Disclosure Act of 1987, then said Illinois law shall apply.

2.      Although Section 31.1 of the Agreement requires that it be governed by Florida law, Franchisor agrees that Illinois law will govern the Agreement.

3.      Illinois law prohibits a prospective general release of claims subject to the Illinois Franchise Disclosure Act of 1987.

4.      The provisions of the Agreement concerning governing law, jurisdiction, and venue shall not constitute a waiver of any right conferred on Franchisee by Illinois law.  Consistent with the foregoing, any provision in the Agreement which designates jurisdiction and venue in a forum outside of Illinois is void with respect to any cause of action which is otherwise enforceable in Illinois.

5.      Although Section 31.1 of the Agreement requires that litigation permitted under Section 31.2 of the Agreement must be instituted in a court closest to Franchisor's principal executive office, Franchisor agrees that jurisdiction and venue for all litigation claims brought under Section 31.2 will be in the State of Illinois.

6.      Franchisor and Franchisee agree to be bound by the provisions of any limitation on the period of time in which claims must be brought under applicable law or this Agreement, whichever expires earlier.

7.      Each provision of this Addendum shall be effective only to the extent, with respect to each such provision, that the jurisdictional requirements of the Illinois Franchise Disclosure Act are met independently without reference to this Addendum.

8.      To the extent this Addendum is inconsistent with any terms or conditions of the Agreement or the Exhibits or Schedules thereto, the terms of this Addendum shall govern.

Each of the undersigned hereby acknowledges having read, understood, and executed this Addendum on _____.

FRANCHISOR:

YOUR CBD STORES FRANCHISING, LLC

By:_____

Print Name:_____

Title:_____
_

FRANCHISEE:

If an Individual:

Signature_____

Print Name:_____

If other than an Individual:

_____

By:_____
Name:_____
Title:_____

Exhibit G-2

YOUR CBD STORES FRANCHISING, LLC
ADDENDUM TO FRANCHISE AGREEMENT
(Maryland)

The following Addendum modifies and supersedes the Your CBD Stores Franchising, LLC Franchise Agreement (the "Agreement") with respect to YOUR CBD STORE™ franchises offered or sold to either a resident of the State of Maryland or a non-resident who will be operating a YOUR CBD STORE™ franchise in the State of Maryland pursuant to the Maryland Franchise Registration and Disclosure Law, Md. Code Bus. Reg. §§ 14-201 through 14-233, as follows:

     1.     The general release language required as a condition of renewal, sale and/or assignment or transfer shall apply except for claims arising under the Maryland Franchise Registration and Disclosure Law.

     2.     Under certain circumstances, the Agreement requires Franchisee to submit to a court proceeding in the State where Franchisor's principal executive office is located. These provisions may run contrary to the Maryland Franchise Registration and Disclosure Law. Therefore, nothing will preclude Franchisee from being able to enter into litigation with Franchisor in Maryland.

     3.     Any claims arising under the Maryland Franchisor Registration and Disclosure Law must be brought within three years after the grant of the franchise.

     4.     Attached to this Addendum as <u>Schedule 1</u> is the form of the general release that Franchisee and its owners will sign, as, and if, required by Section 2.2 or Section 19.4 of the Agreement.

     5.     Each provision of this Addendum will be effective only to the extent, with respect to such provision, that the jurisdictional requirements of the Maryland Franchise Registration and Disclosure Law are met independently without reference to this Addendum.

     6.     To the extent this Addendum is inconsistent with any terms or conditions of the Agreement or the Exhibits or Schedules thereto, the terms of this Addendum shall govern.

[Signatures Appear on Following Page]

Exhibit G Page 1 of 4

Each of the undersigned hereby acknowledges having read, understood, and executed this Addendum on
_____.

FRANCHISOR:                                    FRANCHISEE:

YOUR CBD STORES FRANCHISING, LLC               If an Individual:

By:_____
Print Name:_____                   Signature:_____
Title:_____                    Print Name:_____
                                               If other than an Individual:

                                               _____

                                               By:_____
                                               Name:_____
                                               Title:_____

Exhibit G Page 2 of 4

Schedule 1

General Release

(See Attached)

2020 FA v.2
2020 FDD and FA v.3a
01701353-1

## GENERAL RELEASE

This General Release is made effective _____.  In consideration for the grant by YOUR CBD STORES FRANCHISING, LLC, a Florida limited liability company ("YOUR CBD STORES FRANCHISING"), to the undersigned of certain rights in connection with the operation of a YOUR CBD STORE™ and/or the transfer or renewal thereof, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned, individually and collectively, hereby unconditionally release, discharge, and acquit YOUR CBD STORES FRANCHISING, its past and present subsidiaries and affiliates, and its and their shareholders, owners, directors, officers, managers, members, partners, employees, agents, representatives, successors and assigns, from any and all liabilities, damages, claims, demands, costs, expenses, debts, indemnities, suits, disputes, controversies, actions and causes of action of any kind whatsoever, whether known or unknown, fixed or contingent, regarding or arising out of any prior or existing franchise relationship, development agreement, franchise agreement or any other agreement executed by any of the undersigned and YOUR CBD STORES FRANCHISING (or any subsidiary or affiliate of YOUR CBD STORES FRANCHISING), any YOUR CBD STORE™ (whether currently or previously owned or operated by the undersigned or any of them), or any other prior or existing business relationship between any of the undersigned and YOUR CBD STORES FRANCHISING (or any subsidiary or affiliate of YOUR CBD STORES FRANCHISING), which the undersigned or any of them individually or collectively has asserted, may have asserted or could have asserted against YOUR CBD STORES FRANCHISING (or any of the aforementioned related parties) at any time up to the date of this General Release, including specifically, without limitation, claims arising from contract, written or oral communications, alleged misrepresentations, and acts of negligence, whether active or passive.  This General Release shall survive the assignment or termination of any of the franchise agreements or other documents entered into by and between YOUR CBD STORES FRANCHISING and any of the undersigned.  This General Release is not intended as a waiver of those rights of the undersigned which cannot be waived under applicable state franchise laws nor is it intended to relieve YOUR CBD STORES FRANCHISING or any other person, directly or indirectly, from liability imposed by the Maryland Franchise Registration and Disclosure Law. This General Release shall be governed by and construed in accordance with the laws of the State of Florida without regard to its conflicts of law provisions.

WITNESS:                                                    Corporate Name

_____          By:_____


                                                           Name: _____

                                                           Title:_____

_____

Exhibit G Page 4 of 4

YOUR CBD STORES FRANCHISING, LLC
ADDENDUM TO FRANCHISE AGREEMENT
(New York)

The following Addendum modifies and supersedes the Your CBD Stores Franchising, LLC Franchise Agreement (the "Agreement") with respect to YOUR CBD STORE™ franchises offered or sold to either a resident of the State of New York or a non-resident who will be operating a YOUR CBD STORE™ franchise in the State of New York pursuant to the General Business Law of the State of New York, Article 33, Sections 680 through 695, as follows:

     1.     Notwithstanding any provision of the Agreement to the contrary, Franchisor will not make any assignment of the Agreement except to an assignee who, in Franchisor's good faith judgment, is willing and able to assume Franchisor's obligations under the Agreement.

     2.     Notwithstanding any provision of the Agreement to the contrary, all rights enjoyed by Franchisee and any causes of action arising in Franchisee's favor from the provisions of Article 33 of the General Business Law of the State of New York and the regulations issued thereunder will remain in force, it being the intent of this proviso that the non-waiver provisions of General Business Law Sections 687.4 and 687.5 be satisfied.

     3.     Section 18.1 of the Agreement is amended by adding the following to the end of such section:

The indemnification contained in this Section 18.1 shall not apply to any claim by any
        third party arising out of a breach of this Agreement by Franchisor or any
        other civil wrong of Franchisor.

     4.     No new or different requirements imposed on Franchisee as a result of any changes made by Franchisor to Franchisor's Operations Manual or otherwise shall place an unreasonable economic burden on Franchisee.

     5.     Each provision of this Addendum will be effective only to the extent, with respect to such provision, that the jurisdictional requirements of the General Business Law of the State of New York are met independently without reference to this Addendum.

     6.     To the extent this Addendum is inconsistent with any terms or conditions of the Agreement or the Exhibits or Schedules thereto, the terms of this Addendum shall govern.

[Signatures Appear on Following Page]

Exhibit G Page 1 of 2

Each of the undersigned hereby acknowledges having read, understood, and executed this Addendum on
_____.

FRANCHISOR:

YOUR CBD STORES FRANCHISING, LLC

By:_____
Print Name:_____
Title:_____

FRANCHISEE:

If an Individual:

Signature:_____
Print Name:_____
If other than an Individual:

_____

By:_____
Name:_____
Title:_____

2020 FA v.2
2020 FDD and FA v.3a
01701353-1

YOUR CBD STORES FRANCHISING, LLC
ADDENDUM TO FRANCHISE AGREEMENT
(Washington)

The following Addendum modifies and supersedes the Your CBD Stores Franchising, LLC Franchise Agreement (the "Agreement") with respect to YOUR CBD STORE™ franchises offered or sold to either a resident of the State of Washington or a non-resident who will be operating a YOUR CBD STORE™ franchise in the State of Washington pursuant to the Washington Franchise Investment Protection Act, Wash. Rev. Code §§ 19.100.010 through 19.100.940, as follows:

1.      The state of Washington has a statute, RCW 19.100.180, which may supersede the Agreement including the areas of termination and renewal of Franchisee's franchise.  There may also be court decisions which may supersede the Agreement including the areas of termination and renewal of Franchisee's franchise.

2.      If any of the provisions in the Agreement are inconsistent with the relationship provisions of RCW 19.100.180 or other requirements of the Washington Franchise Investment Protection Act, the provisions of the Washington Franchise Investment Protection Act will prevail over the inconsistent provisions of the Agreement with regard to any franchise sold in Washington.

3.      The Securities Administrator has concluded that arbitration between a franchisor and franchisee must take place either in the State of Washington or as may be mutually agreed on by the parties or as may be determined by the arbitrator.

4.      A release or waiver of rights executed by Franchisee will not include rights under the Washington Franchise Investment Protection Act except when executed pursuant to a negotiated settlement after the agreement is in effect and where Franchisee is represented by independent counsel.  Provisions such as those which unreasonably restrict or limit the statute of limitations period for claims under the Washington Franchise Investment Protection Act, or rights or remedies under the Act, such as a right to jury trial, may not be enforceable.

5.      In the event of a conflict of laws, the provisions of the Washington Franchise Investment Protection Act will prevail.

6.      Transfer fees are collectible to the extent that they reflect Franchisor's reasonable estimated or actual costs in effecting a transfer.

7.      Franchisor and Franchisee agree to be bound by the provisions of any limitation on the period of time in which claims must be brought under applicable law or this Agreement, whichever expires earlier.

8.      Each provision of this Addendum will be effective only to the extent, with respect to such provision, that the jurisdictional requirements of the Washington Franchise Investment Protection Act are met independently without reference to this Addendum.

9.      To the extent this Addendum is inconsistent with any terms or conditions of the Agreement or the Exhibits or Schedules thereto, the terms of this Addendum shall govern.

Each of the undersigned hereby acknowledges having read, understood, and executed this Addendum on _____.

FRANCHISOR:                                          FRANCHISEE:

YOUR CBD STORES FRANCHISING, LLC          If an Individual:

By:_____
Print Name:_____          Signature:_____

Title:_____          Print Name:_____
                                                    If other than an Individual:

                                                    _____

                                                    By:_____
                                                    Name:_____
                                                    Title:_____

Exhibit G Page 2

DocuSign Envelope ID: A00B65BA-5C73-4345-B658-593992A15B25

**EXHIBIT H**

**COLLATERAL ASSIGNMENT OF LEASE**

This Collateral Assignment of Lease entered into as of _____,by and between NaturOil Georgia, LLC, 1300 Indian Trail Lilburn Rd. NW #105,  Norcross, GA , ("Tenant") party of the first part; and Your CBD Stores Franchising, LLC, a Florida limited liability company ("Franchisor") party of the second part; witnesseth that:

WHEREAS, by Lease (the "Lease") dated _____, _____ ("Lessor") leased unto Tenant, the premises (the "Leased Premises") briefly described as in copy of Lease attached hereto as Exhibit "A" and incorporated herein by reference; and

WHEREAS, Franchisor has a vested interest in the successful operation of the Leased Premises by virtue of a certain Franchise Agreement between Franchisor and Tenant, dated _____ (the "Franchise Agreement");

NOW THEREFORE, for and in consideration of the making the Franchise Agreement between Franchisor and Tenant, Tenant does hereby assign, transfer and set over unto Franchisor, with the right to reassign, all of their rights, title and interest in and to the Lease and in and to the Leased Premises; it being nevertheless expressly understood and agreed that this Assignment of Lease is made to Franchisor upon the following terms, covenants, limitations, and conditions:

1.      Tenant shall retain possession of the leased premises in accordance with the terms and conditions of the Lease so long as no default or breach occurs under the Lease, in any agreement evidencing said Lease or the Franchise Agreement;

2.      If default or breach be made by Tenant in the performance of the Lease or the Franchise Agreement or the Franchise Agreement is Terminated, then Franchisor shall have the option of taking over the Leased Premises, provided, however, that in the event Franchisor elects to exercise said option of taking over the Leased Premises for the purpose of operating the same, written notice of its election to do so shall be mailed promptly by Franchisor to Lessor. Franchisor shall not have the right of possession of the Leased Premises until such notice is received by Lessor.  Upon the receipt of notice of exercise of such option, Franchisor shall be deemed to be substituted as the Tenant/Lessee in said Lease in the place and instead of Tenant, and shall be deemed to have assumed expressly all of the terms, covenants, and obligations of the Lease theretofore applicable to the party of the first part, and shall likewise be entitled to enjoy all of the rights and privileges granted to Tenant under the terms and conditions of the Lease, with the right to reassign same to any tenant or franchisee who can demonstrate a net worth of $150,000, or otherwise to a subsidiary/affiliate of Franchisor;

3.      That Franchisor shall have the right, but shall not be obligated, to cure any default by Tenant under the Lease within Tenant's cure period under the Lease, or within thirty (30) days after the expiration of Tenant's cure period under the Lease, provided that prior to the expiration of Tenant's cure period under the Lease, Franchisor notifies Landlord in writing that Franchisor intends to cure such default;

4.      It is understood and agreed that so long as Franchisor shall not have exercised its option under the foregoing provisions hereof as to the Leased Premises, Franchisor shall not be liable for rent or any obligation of Tenant under and by virtue of or in connection with the Lease, and Tenant shall remain liable for such rent and obligations;

5.      Tenant and Lessor shall not, by agreement or alone, modify or terminate this lease

H-1

without written consent of Franchisor;

6.      The parties hereby agree that in the event Lessor files for protection under the Bankruptcy Code, Tenant has the right to assign to Franchisor its right to elect to accede to Lessor's bankruptcy rejection of the Lease; and

7.      In order to secure Tenant's performance of the Lease and the Franchise Agreement, and in order to facilitate the agreements between Franchisor and Tenant set forth hereunder, Franchisor shall have an interest superior to Lessor on all Tenant's Trade Fixtures.  For purposes of this Assignment, "Trade Fixtures" shall be defined as all merchandise, signs, fixtures, furniture, furnishings, partitions and equipment installed and owned by Tenant.

FRANCHISOR:                                                TENANT:

YOUR CBD STORES FRANCHISING, LLC          _____

BY:_____

Print Name _____

TITLE: _____


CONSENT OF LESSOR:

Name of Lessor_____

BY:_____


TITLE:_____


ATTEST:_____
            Secretary

        [CORPORATE SEAL]

H-1